(2005)

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

_____

DISABILITY LAW CENTER,
KATHERINE C., AND                              CASE NO. 2:17-CV-748
ANTHONY M.,

          PLAINTIFFS,

     VS.

THE STATE OF UTAH, THE UTAH
JUDICIAL COUNCIL, AND THE                      SALT LAKE CITY, UTAH
UTAH ADMINISTRATIVE OFFICE                     NOVEMBER 1, 2017
OF THE COURTS,

          DEFENDANTS.

_____

                  DEFENDANTS' MOTIONS TO DISMISS
              BEFORE THE HONORABLE ROBERT J. SHELBY
                 UNITED STATES DISTRICT COURT JUDGE

1

```
 1
 2
 3    APPEARANCES:
 4
 5    FOR THE PLAINTIFFS:
                              LATHAM & WATKINS
 6                            BY:  KYLE A. VIRGIEN, ESQ.
                                   DOROTTYA SCHRANZ, ESQ.
 7                            505 MONTGOMERY STREET, SUITE 2000
                              SAN FRANCISCO, CALIFORNIA 94111
 8                            (415) 391-0600

 9                            AMERICAN CIVIL LIBERTIES UNION OF
                               UTAH FOUNDATION, INC.
10                            BY:   JOHN MEJIA, ESQ.
                                    LEAH FARRELL, ESQ.
11                            355 NORTH 300 WEST
                              SALT LAKE CITY, UTAH 84103
12                            (801) 521-9862

13    FOR DEFENDANT STATE OF UTAH:

14                            UTAH ATTORNEY GENERAL'S OFFICE
                              BY:   DAVID N. WOLF, ESQ.
15                                  LAURA K. THOMPSON, ESQ.
                                    ANDREW DYMEK, ESQ.
16                            160 EAST 300 SOUTH, SIXTH FLOOR
                              P.O. BOX 140856
17                            SALT LAKE CITY, UTAH 84114-0856
                              (801) 366-0100
18
      FOR DEFENDANTS UTAH JUDICIAL COUNCIL AND
19     UTAH ADMINISTRATIVE OFFICE OF THE COURTS:

20                            BY:   NANCY J. SYLVESTER, ESQ.
                              ADMINISTRATIVE OFFICE OF THE COURTS
21                            P.O. BOX 140241
                              SALT LAKE CITY, UTAH 84114-0241
22                            (801) 578-3800

23    COURT REPORTER:
                              RAYMOND P. FENLON
24                            351 SOUTH WEST TEMPLE, #7.430
                              SALT LAKE CITY, UTAH 84101
25                            (801) 809-4634
```

```
 1                    P-R-O-C-E-E-D-I-N-G-S
 2                        (1:00 P.M.)
 3          THE COURT:  Good afternoon, everyone.  We'll call
 4   case number 2:17-CV-748.  This is our Disability Law Center
 5   versus State of Utah, etcetera case.  We have a whole cadre of
 6   lawyers here today, always a great pleasure as you can
 7   imagine.  Many of you are familiar to me, but why don't we
 8   make appearances, should we.
 9          MR. VIRGIEN:  Your Honor, Kyle Virgien, Latham
10   Watkins, for the plaintiffs.
11          THE COURT:  Will you say your last name one more
12   time.
13          MR. VIRGIEN:  Virgien.
14          THE COURT:  Thank you.
15          MS. SCHRANZ:  Your Honor, Dorottya Schranz of Latham
16   Watkins for the plaintiffs.
17          THE COURT:  Thank you.
18          MR. DYMEK:  Andrew Dymek for the State of Utah.
19          MR. WOLF:  David Wolf, State of Utah.
20          MS. THOMPSON:  Laura Thompson for the State of Utah.
21   We have a staff member seated with us at the table.
22          MS. SYLVESTER:  Nancy Sylvester for the AOC and the
23   Council.
24          MS. FARRELL:  Leah Farrell from the ACLU for the
25   plaintiffs with John Mejia.
```

1          THE COURT:  Thanks, and welcome to all of you,

2     especially those of you who are from out of state and haven't

3     been with us before.

4          This is the time set for hearing on two motions to

5     dismiss filed by the defendants, dockets 36 and 42, and the

6     plaintiffs' motion for preliminary injunction, docket number

7     8.  There are motions to supplement the record, notices of

8     supplemental authority, and a motion to strike that,

9     evidentiary objections as well.

10         As is almost always the case, as is our practice, we

11    spent a great deal of time preparing for the hearing today and

12    have prepared a preliminary orientation to help focus our

13    argument in this case, substantially narrow our argument I

14    think.

15         Let me just remove all the mystery and then let's get to

16    it.  I don't think I have jurisdiction based on the

17    allegations in the complaint, and even if we reach into the

18    facts in the supplemental declarations.  The starting point

19    for any federal court, of course, is jurisdiction, and it's

20    the plaintiffs' burden invoking the court's jurisdiction to

21    establish jurisdiction.

22         Here, standing I think is the threshold issue that we

23    can't clear, at least initially.  Let me share with you my

24    thoughts about why that is.  And what I have in mind is that

25    it's not fatal to the merits of the claim but that we need to

1    start with a new pleading probably.

2         I don't think that the individual plaintiffs have -- I

3    don't think the plaintiffs have alleged facts in the complaint

4    that establish an actual or imminent injury for these

5    plaintiffs.  And I'm mindful of course that this is a --

6    there's not a bright-line here.  There can come a time when

7    you have a reasonable apprehension of injury that's sufficient

8    for Article III standing.  My judgment is that we fall short

9    of that here, that we need something more than a reasonable

10   apprehension and fear.

11        Even reading the plaintiffs' cases submitted in the

12   papers in support of standing of the individual plaintiffs,

13   those cases all have at least one plus factor that's -- I just

14   made that up.  That's not a word in these cases, but something

15   more than just apprehension, either some specific injury or

16   that apprehension has caused them to take some action or step

17   that has resulted in some injury, and that -- there is no

18   allegation of any impact either on their behavior or specific

19   injury for the individual plaintiffs, at least I didn't see

20   it.  I will tell you I looked very carefully, so I don't think

21   that's there.  I do think it's required.

22        If we're right about that, and neither of the named

23   plaintiffs have demonstrated standing on this record, then

24   there's still a basis to proceed if the Disability Law Center

25   can establish associational standing especially.

1    Organizational standing is a different question.

2        And associational standing is complicated I think in this

3    context.  It's not super clear.  And there may be even -- I

4    recognize the authority from the Eleventh Circuit that the

5    plaintiffs cite.  I think there may be some question about

6    whether, given the statutory grants here, whether there needs

7    to be a showing to satisfy the Hunt factors.

8        This is what I think.  Our best reading of the case law,

9    and the one that makes the most sense to me, is that a

10   plaintiff seeking to proceed under these statutes with

11   associational standing still must identify at least one

12   plaintiff by name, and not as a technical pleading

13   requirement, though that's part of it, but really so that we

14   can ensure that we have satisfied Article III standing

15   requirements of an actual injury.

16       If we think of the Hunt factors -- I'm making this part

17   up.  This is my own conception of how this would work, this

18   framework would work.  I don't see this in a case.  But if we

19   think of the three Hunt factors, I think I would agree with

20   the Eleventh Circuit in part that these statutes -- these

21   statutory grants from Congress probably cause us to disregard

22   the third Hunt factor.  We probably just don't even reach it.

23   And my best instinct about it is that these statutes would be

24   a factor that would weigh in favor of a showing under the

25   second factor.

1    But we're still left with the requirement that a party

2    demonstrate an actual, imminent harm, an injury, that we have

3    a real case in controversy, not a hypothetical or theoretical

4    case.  And unless we have some person, a specific person,

5    identified who can make that showing, I don't see how we could

6    cross the line, remembering that it's the plaintiffs' burden

7    to establish jurisdiction and standing.  I don't think -- I

8    don't think it could be done.

9    And there's language in the Supreme Court decision -- why

10   am I blanking on the name now?  The recent Supreme Court case

11   there's language about having to have named a specific -- here

12   it is.  It's from the Summers case, the 2009 decision.  This

13   is a quote that organizations seeking to sue under

14   associational standing must make specific allegations

15   establishing that at least one identified member has suffered

16   or would suffer harm.  And I'll acknowledge that's not

17   a -- that's not a holding, it's just language in the case, but

18   it makes sense to me when I think about Lujan and I think

19   about Hunt.

20   There's another question here that's not really fully

21   fleshed out in the papers and that is the question about what

22   a court considers in evaluating the record and the showing for

23   standing at this stage of the proceeding.  And I don't -- I

24   think that parties can supplement the complaint with evidence

25   to establish standing.  There's no requirement you plead

1    standing, certainly not Rule 9 sort of stuff, so I don't think

2    you have to anticipate a standing challenge and plead it in

3    the first instance.  I think you could come in with evidence

4    to establish standing.

5        So I think we reach the declarations.  And let's set

6    aside the evidentiary concerns about the declarations for a

7    moment.  I think they're insufficient to establish standing

8    for a couple reasons.  Number one -- and I want to say again,

9    I construe -- I read them carefully, the allegations in the

10   declarations, but I construe them narrowly because it's the

11   plaintiffs' burden to demonstrate standing, and I don't think

12   those allegations on their face establish any of these things:

13   Number one, any specific individual; number two, that any

14   person who was in one of those proceedings was otherwise a

15   constituent of the Disability Law Center.  That statement is

16   not there.  I see it could be inferred.  It's not noted.

17   Nobody says that's the case.

18       There's another question that arose in the context of the

19   declarations, and that is, well, did any injury result?  Which

20   raised a general question about the complaint and the nature

21   of the rights that are allegedly at issue.  Do those rights

22   attach to every part of a guardianship proceeding?  So if

23   somebody was in court and saw a hearing and somebody was there

24   assuming they were a constituent of the DLC, and they didn't

25   have counsel, is that itself an injury?  Or are there certain

 1    parts of the guardianship -- for example, what if that was a

 2    scheduling conference.  I'm just making this up because it's

 3    not stated in the declaration.  Is that still an injury?  Is

 4    it a constitutional injury not to have counsel there or does

 5    the court have to take some substantive action in the course

 6    without the benefit of counsel for the subject of the

 7    guardianship proceeding?  The declarations of course tell us

 8    nothing about what those proceedings were, which may be a

 9    problem.  I think it is a problem for showing an actual

10    injury.

11        There was at least one more and now it's skipped my mind

12    as we're talking.  For those reasons I think the complaint and

13    the evidentiary submissions are insufficient to establish

14    associational standing for the Center.

15        I think I largely disagree with the State's argument

16    about organizational standing.  Again, I'm using my words not

17    the words of the State, but I read the essence of the State's

18    argument about organizational standing to be a complaint that

19    the Center had not alleged specifically enough who it had

20    helped and when and in what capacity and how, but I read that

21    as sort of arguing for something more than Rule 8 notice

22    pleading, and I don't think that's required here.  I think --

23    I think the allegations in the complaint are probably

24    sufficient in my view to give rise to organizational standing

25    for the Center.

1        But that raises a different problem.  The Center, if it's

2    proceeding only in an organizational capacity, doesn't have

3    any injuries related to the claims.  And the Center is not a

4    person with a disability under the ADA.  It's not a person I

5    don't think who suffers a Rehabilitation Act injury and is not

6    claiming a Fourteenth Amendment injury in some way.

7        So then I think there's a disassociation between the

8    Center and the claims.  That only results if I'm right about

9    the first cards falling the way that I have in mind.  Which

10   really suggests to me that we just have a pleading issue if we

11   get to that point.

12       So those are just my preliminary thoughts about it.  I

13   have prepared a preliminary oral ruling, but as I often say --

14   Mr. Virgien, you're in the first seat.  I'll just -- I come

15   out with an open heart and an open mind.  I may have

16   misunderstood things or misread the cases.  I'll gladly hear

17   anything you'd like to share about how I just have it wrong.

18           MR. VIRGIEN:  Thank you, Your Honor.  Should I

19   proceed now or I know we're opposing the motion?

20           THE COURT:  Well, since my preliminary orientation

21   is not favorable to you, let me invite you to come to the

22   podium, would you?

23           MR. VIRGIEN:  Thank you for that invitation, Your

24   Honor.  I would like to start in the first instance by noting

25   that we did request leave to amend the complaint.

1          THE COURT:  Right.

2          MR. VIRGIEN:  I don't think that there's any

3   prejudice here as we've stated our allegations clearly.  This

4   is an issue of form rather than substance.  So we would like

5   to --

6          THE COURT:  Not entirely.  I mean the allegations

7   are going to support jurisdiction or not, but that's

8   substantive.  I understand what you mean though I think.

9          MR. VIRGIEN:  As to notice at least I think we can

10  agree that there's -- the defect does not get to notice.

11         THE COURT:  Agreed.

12         MR. VIRGIEN:  I'd like to start with organizational

13  standing, where Your Honor left off.  Your Honor did agree

14  with us that organizational standing is a valid theory here

15  under which the Center may proceed.  And although Your Honor

16  stated that the Center has not alleged a Fourteenth Amendment

17  or ADA or Rehabilitation Act harm, I think at least as to the

18  constitutional claims that harm is clear.  The Center has

19  suffered a deprivation, as we allege, in that it's unable to

20  carry out its mission through the Guardianship Signature

21  Program, and also that it needs to deal with the fallout of

22  all of these deprivations, and that is a constitutional harm

23  as to the Fourteenth Amendment.

24         THE COURT:  Well, those are alleged injuries.  What

25  Fourteenth Amendment right is it that the Center has that is

1  injured?

2  MR. VIRGIEN:  Well, here the right is, Your Honor

3  has recognized, is via the Center's constituents, however, the

4  Center certainly has alleged a right to carry out its mission

5  of advocacy for its constituents.

6  THE COURT:  Well, in fact it's its charge, but does

7  that give rise to constitutional rights?

8  MR. VIRGIEN:  I think that if Your Honor looks at

9  the case law on the organizational standing issues, for

10  example Havens Realty is the leading Supreme Court case here,

11  there it's exactly the same issue we're facing here.  The

12  organization in Havens Realty was an antidiscrimination

13  organization.  And that organization was suing as an

14  organization because its -- its -- the people on whose behalf

15  it was advocating had suffered constitutional deprivations.

16  I don't know that in the sense that Your Honor is looking

17  to have the -- the organization itself have some right to

18  counsel that it itself lost, I think the same thing applies

19  there, that the organization in Havens Realty did not itself

20  suffer racial discrimination.  It just suffered an

21  organizational harm because individuals had suffered racial

22  discrimination.

23  THE COURT:  Okay.

24  MR. VIRGIEN:  Going along to the --

25  THE COURT:  Let me ask you though, Mr. Virgien,

12

1    if -- if you fail to persuade me that on this record the

2    individual plaintiffs have established standing or that the

3    Center has established a basis to proceed under associational

4    standing, the question about the organizational standing --

5    well, I see your point.  But if you don't -- if you don't

6    prevail on those other issues, you'd rather amend anyway,

7    wouldn't you?

8              MR. VIRGIEN:  Absolutely.

9              THE COURT:  Right.  So -- well, okay, go ahead.

10             MR. VIRGIEN:  All right.  Turning to associational

11   standing, I wanted to address the Summers case that Your Honor

12   was relying on.  In the Summers case it dealt with a somewhat

13   different issue from what we're facing here.  That case I

14   believe dealt with the Sierra Club and some other

15   environmental organizations whose members -- who allege that

16   their members enjoyed going to Sequoia National Park and might

17   happen upon a particular parcel of that park that was being

18   regulated by the Forest Service in a particular way.

19       Here -- and in that -- under those circumstances it is

20   quite reasonable to require an allegation of a particular

21   individual who is harmed, otherwise those allegations really

22   were speculative.  Here the -- there are fewer jumps that one

23   needs to take to get to a harm.  Here there are guardianship

24   proceedings that are happening with some regularity.  All

25   disabled Utahns are constituents of the DLC.  So when a

1    guardianship proceeding occurs and counsel -- the guarantee of

2    counsel is denied, that is a necessary harm that is

3    necessarily happening.

4              THE COURT:  Well, is it?  I wondered about this.

5    What about -- I think -- I think the way you just said it that

6    may be true.  The way I read the papers, and especially I

7    think the preliminary injunction papers, suggested to me

8    something broader in scope than that.  And this is probably an

9    imperfect example, but I thought about a six-year-old,

10   hypothetical six-year-old whose parents die, who leave an

11   estate, and there's a personal representative.  That

12   six-year-old has money.  For whatever reason the personal

13   representative comes to court and seeks a guardianship.  That

14   person doesn't suffer any disabilities, except for age.  Is

15   that person part of your constituency?

16             MR. VIRGIEN:  That person is not part of DLC's

17   constituency, assuming that that person does not have any

18   disabilities.

19             THE COURT:  So we need to know something.  Don't we

20   need to know something about the identity of some person in

21   the guardianship proceeding to ensure that we have somebody

22   who you represent their interests at the Center who suffered

23   an injury?

24             MR. VIRGIEN:  I don't know that the guardianship

25   statutes contemplate bringing a guardianship proceeding

1    against a minor who is not disabled though.   The guardianship

2    proceedings that we're dealing with address the idea of

3    bringing a guardianship proceeding against someone who will be

4    of age of majority who is disabled.   The State mentioned some

5    cases where someone might be a practicing attorney and have a

6    frivolous proceeding brought against him.   In those kinds of

7    cases we might have an issue here, but I think in the large,

8    large majority of cases this person is going to be a DLC

9    constituent by virtue of the statutory mandate.

10           THE COURT:   How do you think we'll ever assure

11    ourselves of an actual injury, an actual controversy unless we

12    identify somebody?   It's not an overly burdensome requirement,

13    coincidentally, I don't believe, but how will we know for

14    sure?   And it's a significant issue, jurisdiction.

15           MR. VIRGIEN:   Understood, Your Honor.   Just to back

16    up and to provide a little bit of context for the burden of

17    that requirement, not that it's one we would not seek to meet

18    were we granted leave to amend, it is difficult given the

19    circumstances here to identify by name individual people that

20    have suffered a deprivation.   Your Honor has granted a motion

21    to proceed pseudonymously in this case that I think raised a

22    lot of these issues.

23        These are sensitive medical diagnoses, sensitive topics.

24    And here to be a named person or a named plaintiff in this

25    case requires a lot of courage and requires a lot of

1    understanding from the family members here too.  You know,

2    we're talking about -- if we're talking about someone who has

3    already been placed under a guardianship without counsel, this

4    is someone who has now had their legal person stripped away

5    who needs to work with their family members to challenge that

6    legally.  It's not a small undertaking.  It's one we'd attempt

7    would the Court allow us leave to amend, but this is not

8    merely a matter of form here.

9        THE COURT:  So I think what you're suggesting is

10   that you can meet your Article III requirement by inference.

11   There are -- there's a class of people, there's a certain kind

12   of proceeding that happens, and it happens with this class of

13   people, and so -- I never speak Latin in the courtroom -- but

14   ipso facto there must be standing.  There was an injury.

15       MR. VIRGIEN:  Yes, Your Honor, that's the argument

16   that we lay out in the complaint, and we think it is

17   sufficient here.  And if the Court were to request that we

18   amend to actually state that someone at the DLC has observed a

19   particular instance where someone has been deprived of counsel

20   or something, that would be -- we'd be more than happy to do

21   that.  It's the naming of a specific individual that presents

22   some level of burden that I don't think is necessary here.  At

23   any rate --

24       THE COURT:  Do we need to have such a person in

25   these kinds of cases -- by these kinds of cases I'm thinking

1    about associational standing cases, not necessarily the

2    subject matter of this case -- so that we can test the

3    sufficiency of the showing of both the apprehension or the

4    harm or the injury and the controversy?

5              MR. VIRGIEN:  For purposes of standing?

6              THE COURT:  Right.

7              MR. VIRGIEN:  Not in a case like this.

8              THE COURT:   Couldn't there be -- couldn't there

9    be -- surely some of those cases that the State points out

10   that -- an example with the fraudulent guardianship

11   proceeding.  There might -- there will be others I suppose

12   where the subject of the guardianship proceeding wishes to

13   proceed without a lawyer.  Or you can imagine other facts that

14   would lead to a conclusion if we just examined that person, if

15   that person came to court, we'd say, oh, you don't belong here

16   because you haven't suffered an actual injury for example or

17   some other reason.  Don't we need something specific in this

18   cloud of people?  You keep telling me no, but it's just a way

19   of posing a question.

20             MR. VIRGIEN:  No, understood.  And we would take

21   issue with some of those hypotheticals, but I'll leave that

22   aside for now.  In this case really the Court does not need

23   that kind of specific person to point to because this is a

24   facial challenge that is addressing a law that is stripping

25   away a whole class of people's rights, and it's not really

1   doing it in a fact specific way.  There's a -- ADA has a

2   requirement for reasonable accommodation here that applies

3   across all people.

4       For example the guardianship respondent who would waive

5   that right to counsel still has a right under the ADA to get

6   to a place where that respondent can knowingly and

7   intelligently waive that right to counsel.  And that would

8   involve a conversation with counsel where counsel would

9   explain the very real consequences.

10      Many guardianship respondents just don't understand going

11  in that this is not merely a matter of their parents getting

12  some kind of temporary control over their lives but this is a

13  permanent lifelong appointment, and when their parent dies,

14  the guardianship will pass on to someone that the State

15  appoints.  These are the kind of questions that someone really

16  needs to know -- needs to have the question posed and then

17  needs to be able to answer before they can even get to the

18  point where they could waive that right to counsel.

19          THE COURT:  What about -- I don't want to steer us

20  too far away from -- we'll circle back to standing in a

21  moment, but it raises this question.  When I think about the

22  relief that I think is sought in the preliminary injunction

23  motion and I read that in -- and I juxtapose what I think

24  you're asking for more generally in the complaint, do we have

25  a different class of constituents who have different interests

1    in the complaint -- the claims generally in the complaint and

2    those in the preliminary injunction?

3            MR. VIRGIEN:  Yes, that's correct, Your Honor.  I'll

4    let -- Ms. Schranz is arguing the P.I. motion so I'll let her

5    explain that more fully, but that's correct.  It's just the

6    merits of the case on the P.I. motion are the same.  We're

7    just seeking a more limited remedy that would only apply to a

8    sub --

9            THE COURT:  Subset of.

10           MR. VIRGIEN:  Of the Plaintiffs' -- or of the

11   constituents in the case.

12           THE COURT:  Those that meet the five statutory

13   elements.

14           MR. VIRGIEN:  That's absolutely correct.

15           THE COURT:  What implication, if any, do you think

16   there is for standing?

17           MR. VIRGIEN:  There's no implication for standing

18   there.  This is really a question of a narrow remedy.  The

19   merits -- like I said, the merits of the case are not

20   different.  We're not arguing that somehow there's a different

21   likelihood of success on the preliminary injunction motion for

22   example.  It's merely, you know, on a preliminary injunction

23   motion the remedies that are status quo -- reverting to the

24   status quo are preferred, and we think that's just a more

25   appropriate intermediate remedy while we resolve the merits of

1   the case.

2           THE COURT:  So that's I think how I was viewing it

3   too, but I wanted the benefit of your thoughts.  It seemed to

4   me that the threshold standing requirement based on the claims

5   that are broader in scope in the complaint are -- require

6   somebody -- once somebody has satisfied that, we know that

7   we've got people who can proceed with the claims in the

8   preliminary injunction.

9           MR. VIRGIEN:  I think that's correct.

10           THE COURT:   We'll come back to associational

11   standing.  You were making good progress and I keep --

12           MR. VIRGIEN:  Thank you, Your Honor.  At any rate,

13   yeah, I think I was discussing Summer.  I was explaining that

14   if we apply the Summer court's rule here to our case, it's

15   very much distinguishable, and I don't think that rule

16   requires the identification of any particular individual

17   because here the deprivation is -- is more simple and it's a

18   more facial type of deprivation in that every single person

19   who goes through a guardianship proceeding, of which there are

20   undisputedly many in the State of Utah, is a DLC constituent

21   and does suffer these harms under the ADA and under the

22   Constitution.  So it's -- it doesn't quite require the same

23   type of individual naming that the Supreme Court suggested it

24   would require in Summer.

25           THE COURT:  And the authority on the other side that

1    you point to for the proposition that you affirmatively need

2    not have such a person is the Eleventh Circuit case?

3              MR. VIRGIEN:  That's correct, the Eleventh Circuit

4    case.  And it is -- I think there are a couple of Supreme

5    Court cases as well that -- that require no naming of a

6    particular individual.  Even the cases that the defendants

7    cite for the most part don't require someone be named.  They

8    require that someone be included in the membership of the

9    organization but that's as far as they go.

10        Does Your Honor have any further questions about

11   associational standing or shall I move on?

12              THE COURT:  Give me just one moment, please.

13              MR. VIRGIEN:  Absolutely.

14              THE COURT:  Thank you.

15                        (BRIEF PAUSE)

16        Go ahead.

17              MR. VIRGIEN:  I also wanted to briefly touch on Your

18   Honor's points about the individual plaintiffs' standing here.

19   Your Honor mentioned a rule where someone has to take some

20   kind of preventative action in order to claim an injury.  I

21   just want to be careful that we're not drawing a distinction

22   here that allows a company to have standing in a way that an

23   individual asserting a non-pecuniary harm cannot.

24        The cases that Your Honor points to that we cited tended

25   to involve companies who were able to book on their balance

1    sheet a contingent liability.  You know, maybe there's a 50

2    percent chance that a particular proceeding would be brought,

3    therefore, they can book half of the liability they'd face in

4    that proceeding.

5        Here we're dealing with something different where it's an

6    individual who is facing a far more severe constitutional

7    deprivation.  And the fact that they might not be able to book

8    that to take into account the probability it might happen I

9    don't think should diminish their standing here.

10            THE COURT:  No, but my reading even of your cases

11   that -- I mean we could think of the Oklahoma license plate

12   case for example.  So there's a person.  There's a

13   constitutional right at issue.  It's a First Amendment right.

14   But that litigant was confronted with a dilemma, a choice to

15   make, either don't exercise my First Amendment right, speech

16   right, or do exercise that right and then risk some

17   proceeding.  And so in that instance for example you have an

18   important right but you're confronted with a choice to make.

19   None of these plaintiffs are alleging that they're making any

20   choice or have impacted any of their decision-making as a

21   result of this apprehension, have they?

22            MR. VIRGIEN:  No, they've not alleged that in the

23   complaint, Your Honor.

24            THE COURT:  We had another case here -- I think

25   Mr. Mejia might have been involved in another case we had

22

1    involving a First Amendment right and somebody who had been

2    prosecuted under a statute but then those claims had been

3    dismissed.  And you don't have to go get arrested again if you

4    have a reasonable apprehension.  And if you're -- if you feel

5    you can't go exercise your First Amendment right for fear that

6    you'll be arrested again, then you've changed your conduct

7    again.  That's the sort of thing I think I'm looking for.

8         I'm not sure -- so I agree with you about corporations,

9    but let's talk about our folks here.  Nothing more than just a

10   generalized fear is enough?

11        MR. VIRGIEN:  I have two points in response to that,

12   Your Honor.  First, for the First Amendment for the Oklahoma

13   license plate case, I read that case to say that -- so Your

14   Honor points to a change in his behavior, he decided not to

15   exercise his First Amendment right.  I read that case to say

16   that he would still have standing if he chose to exercise his

17   First Amendment right, or rather kept exercising it, did not

18   change his behavior in any way and just happened to not have

19   been prosecuted.

20        And that's kind of what we have here.  We have the person

21   carrying on his and her behavior without any government

22   deprivation, but still the imminent likelihood of that

23   deprivation hanging over his or her head.

24        THE COURT:  Well, we haven't established imminent

25   likelihood either, have we?  Generalized fear I think is what

1   we have.  There are facts, one or two, in support of the

2   reasonableness of the apprehension, but that still doesn't

3   tell us anything about the imminency -- is that a word?  Of

4   the harm that's feared.

5           MR. VIRGIEN:  I think that that's a disagreement

6   that we have with the Court.  We certainly think that those

7   facts do support imminency but I understand Your Honor to be

8   saying otherwise.

9           THE COURT:  So what's the limiting principle then in

10  support of the position you're taking?  What else needs to

11  happen besides the State passes a law that concerns me as a

12  citizen, and now I'm really worried that I'm going to be

13  affected by it?  Now do I come to court and just say I'm

14  really worried I'm going to be affected by this law, and it's

15  reasonable for me to be because now I'm in violation of the

16  law?  There's a whole history of cases explaining that's not

17  sufficient.

18          MR. VIRGIEN:  But I think that if there is -- if

19  facts are pled that support a reasonable fear -- and we're not

20  talking some abstract fear, but a reasonable likelihood that

21  this will happen, which our complaint does -- does support.

22  Katherine for example has already had deprivations at the

23  hands of the State.  Her parents have expressed concern for

24  her ability to care for herself.

25          THE COURT:  Except that nobody has initiated a

1    guardianship proceeding in either of those instances.

2          MR. VIRGIEN:  That's correct, but were that to

3    happen, there would simply not be enough time to -- to have

4    this judicial process occur.

5          THE COURT:  I mean but now we're just squabbling

6    about what inference we should draw from past experience, but

7    it's just as reasonable to say, well, it's evidence that your

8    situation isn't one that results in a guardianship proceeding

9    because it's happened before and nobody initiated one.  You'll

10   disagree with that but who is to say?

11         MR. VIRGIEN:  Your Honor, on a Rule 12 motion I

12   think that respectfully we are allowed to draw reasonable

13   inferences.

14         THE COURT:  I don't think in this instance though,

15   right, because aren't you trying to establish standing, which

16   is your burden?

17         MR. VIRGIEN:  It is our burden but based on the

18   allegations of the complaint.

19         THE COURT:  And facts.  Do you think that we draw

20   inferences from the facts in the complaint in your favor to

21   establish standing, which is your burden, not in the Rule 12

22   motion to dismiss context but evaluating the sufficiency of

23   your jurisdictional showing?  Do you think we fill in the gaps

24   for a plaintiff who has a burden to establish standing?

25         MR. VIRGIEN:  We do not fill in the gaps, Your

Honor.  But where the defendants have not put facts into the record that controvert the facts of the complaint, we -- we presume the facts of the complaint to be true.

THE COURT:  I agree with that.  But also inferences you think drawn in your favor in that context?

MR. VIRGIEN:  I don't want to overstate my position.  I think that inferences that can be reasonably drawn from the facts alleged in the complaint, yes.

THE COURT:  At this stage?  Standing could be challenged again later --

MR. VIRGIEN:  Uh-huh.

THE COURT:  -- after discovery for example, then do you think you have a different evidentiary burden?

MR. VIRGIEN:  Yes, if it were on -- after discovery the evidentiary burden would change presumably because facts would be introduced on all of these factual questions.

THE COURT:  Okay.  All right.  I steered you away somewhere.  You were explaining why the individual plaintiffs have demonstrated enough.

MR. VIRGIEN:  Right.  I also want to point the Court to an opinion of this district court that we cited in our briefing, although for a different purpose, if Your Honor will indulge me.

THE COURT:  Of course.

MR. VIRGIEN:  The opinion is Uroza v. Salt Lake

County.  That case involved a question -- or a challenge,
rather, to standing for prospective injunctive relief.  This
was a person who had suffered a deprivation.  He had been
incarcerated.  That was his deprivation.  And then he'd been
released and he was -- he was out.  And basically he would
continue to suffer this deprivation if he were picked up again
by the police.  It was a case involving mandatory detention
for immigration purposes.

So the argument there was, well, this is someone who is
out who is going about his daily life and who is not currently
in custody and can't really point to a particular fact
supporting that he -- the idea that he would be put back into
custody.  But the court found that in that case enough -- it
was enough to say that he had suffered in the past some --
some procedures, some deprivations and had a reasonable fear
that he would be arrested again.  Once he was arrested again
that would kick off this whole series of constitutional
violations, and that that was enough to support standing for
injunctive relief.

Here, if we look at Katherine, she has exactly the same
set of facts.  She suffered some deprivations in the past, not
the guardianship proceeding, but she has been
institutionalized by her parents.  If her parents choose to
bring this proceeding in the future, it will kick off kind of
a chain reaction of facts that will lead inexorably to her

1    being denied her guarantee of counsel.

2              THE COURT:   Are we sure about that?  I mean we

3    didn't get into this yet in our discussion, but isn't there --

4    doesn't there still exist the possibility that the state court

5    judge will appoint counsel in the proceeding?

6              MR. VIRGIEN:  There does, yeah.

7              THE COURT:   And in that case has she suffered the

8    harm that's contemplated in the complaint?

9              MR. VIRGIEN:  She has suffered a constitutional harm

10   that's been contemplated in the complaint, Your Honor, because

11   the State has not paid for that counsel.  That's something

12   that we're alleging is required under the ADA because the

13   State must pay for accommodations, and under the 14th

14   Amendment because the State must pay for indigent defendants,

15   or respondents in this case.

16             THE COURT:   You're pointing to Gideon you mean.

17   You're talking about in a criminal context, the second thing

18   you said, no?

19             MR. VIRGIEN:  We've dismissed our Sixth Amendment as

20   incorporated by the Fourteenth Amendment claims, but under the

21   due process -- procedural due process guarantee there is still

22   a guarantee that the State pay for counsel for indigent

23   people.

24             THE COURT:   What if -- what if the Court appoints

25   pro bono counsel for her?

1          MR. VIRGIEN:  That's still a violation of the ADA's

2     requirement that the -- that the State pay for the counsel.

3     At this stage she's still facing a violation.

4          THE COURT:  I didn't follow that part at all, I'm

5     sorry.  If the -- if the thing -- if the reasonable

6     accommodation is provided at no cost to her, that's still an

7     infringement is what you're saying?

8          MR. VIRGIEN:  It still can be a violation of the

9     ADA.  Now, the State might argue that that is a reasonable

10    modification of its program but that's a fact dispute we would

11    have to deal with on the merits.

12         THE COURT:  And so if we don't presume the outcome

13    of that line of questioning, isn't this another example of a

14    deficiency in showing an actual, imminent Article III

15    controversy, at least with respect to Katherine?  We don't yet

16    know whether there's a set of circumstances, dominos that

17    would fall, that would eventually ring the bell?  Aren't there

18    a host of dominos in between the allegations in this complaint

19    as it's set forth and that injury?

20         MR. VIRGIEN:  Your Honor, the complaint does allege

21    that there is a high likelihood that she would suffer this

22    deprivation were she placed into guardianship proceedings.

23         THE COURT:  Coincidentally, that's a -- that's not a

24    factual allegation that the Court can accept as true at this

25    stage of the proceeding, is it?  That's a -- that's not a

1    statement of fact.  That's a generalized statement.  That's a

2    conclusory statement, is it not?

3              MR. VIRGIEN:  That's a fair point, Your Honor.

4              THE COURT:  So let's not consider that.

5              MR. VIRGIEN:  Fair enough, Your Honor.  This is --

6    this is a case where the key facts that I think will resolve

7    this issue are in the sole possession of the defendants.

8    Really the question that I think we need to answer to know

9    whether those dominos will all fall is what percentage of

10   guardianships where the person is eligible under the first

11   four prongs of H.B. 101 or the fifth prong, which is a little

12   bit more of a judgment call by the judge, where that prong is

13   exercised.

14             THE COURT:  Are there any in the record before me?

15             MR. VIRGIEN:  Where a judge has exercised that

16   discretion?

17             THE COURT:  Where we've come to that part and

18   somebody has either been deprived counsel or required to pay

19   for it themselves?

20             MR. VIRGIEN:  In the context of the P.I. motion

21   there is a declaration that gets to that fact.  In the context

22   of this motion, no.

23             THE COURT:  Right.  But now I've allowed myself to

24   get twisted.  We were talking about the individual plaintiffs.

25   But there's nothing in the record before us about that for

1    either of these folks because of course they haven't yet begun

2    to knock down the first domino?

3                MR. VIRGIEN:  That's correct, Your Honor.

4                THE COURT:  Is that the wrong way to be thinking

5    about it for the individual plaintiffs do you think?

6                MR. VIRGIEN:  The idea that since they haven't

7    knocked down the first domino, we --

8                THE COURT:  Even if I'm wrong about the -- even if

9    I'm misreading the cases that talk about actual or imminent

10   harm, do we need something more in this case to provide -- to

11   demonstrate individual standing for any of these folks?

12               MR. VIRGIEN:  Something more that indicating that

13   once we enter the Court proceeding --

14               THE COURT:  That the harm that they're concerned

15   about will ever actually materialize because they won't be

16   appointed a lawyer or they will be required to pay for it?

17               MR. VIRGIEN:  Well, I think I would fall back on the

18   point I made earlier, that there's still a violation even if

19   they are -- even if they're provided counsel under some

20   circumstances.

21               THE COURT:  So let me press you on that point.  If

22   I'm candid, I don't fully understand that.  What is the harm?

23   If the court -- if the court supplies pro bono counsel for

24   them, for Katherine -- say a guardianship proceeding is

25   initiated against her will.  They go through -- well, let's

1    not even put it in the context of House Bill 101.  Let's just

2    say that she's there and the Court appoints counsel for her at

3    no cost to her.  What's the harm?  What is the harm that's

4    contemplated in the complaint?

5            MR. VIRGIEN:  Well, in terms of this being a

6    violation of the ADA or of the due process clause, I think

7    that there will be a factual question as to whether or not

8    adequate -- this is an adequate measure to protect her

9    interests, and that's a factual question we'll have to reach

10   down the road.

11           THE COURT:  Under the ADA I think is what you said

12   before.  What would be the constitutional question?

13           MR. VIRGIEN:  Well, the constitutional question

14   would still be whether it's an adequate procedural safeguard

15   under the Mathews v. Eldridge balancing test.  But I think as

16   for standing it's a slightly separate question, which is have

17   we alleged a constitutional harm or a statutory harm?  And in

18   that case I think the answer is yes.  We don't reach the

19   merits of, you know, whether or not this is a reasonable

20   substitute procedure or something like that.

21           THE COURT:  And you don't -- I think I agree that

22   ordinarily in this analysis we don't have to look to the last

23   domino.  You can satisfy your standing inquiry without getting

24   that far, right.

25           MR. VIRGIEN:  Uh-huh.

1                THE COURT:   Okay.   What else on standing?   Anything

2       more?

3                MR. VIRGIEN:   That's all I have on standing, Your

4       Honor.

5                THE COURT:   We'll make sure you have a chance to

6       respond to what we hear from the State.

7                MR. VIRGIEN:   Thank you very much, Your Honor.

8                THE COURT:   Thank you.

9           Mr. Dymek, good afternoon.

10               MR. DYMEK:   Good afternoon.

11               THE COURT:   What was it we had wrong at the outset?

12               MR. DYMEK:   I don't think you had anything wrong on

13      standing.   I don't think it's remedial.   And I don't think

14      there's a proper motion before the Court that would give them

15      leave to amend.   But I think on the question of standing

16      you're absolutely correct, there's no standing in this case

17      and it should be dismissed on that basis.

18               THE COURT:   What about associational standing, the

19      State's view about that?   And Mr. Virgien says I have it all

20      wrong, at least with respect to -- well, with all of it, but

21      especially with respect to associational standing, that it's

22      just -- it is a matter of pure logic and math.   There are

23      these proceedings, there are -- there are constituent groups,

24      and there are people who have to proceed without counsel.

25      Everybody in this courtroom and the whole state knows that

33

there are folks out there who are suffering this alleged harm.
Now, it may or may not be a harm, but there are people in that
bucket, and what sense does it make, he says, to impose a
requirement that we identify a specific individual under those
circumstances, even if it makes sense in other contexts?  What
say you?

MR. DYMEK:  The Summers court, the Supreme Court,
considered and rejected a very similar rationale.  The
plaintiffs in Summers said we have a number of members who
enjoy these environmental features, and surely one of them
statistically, inferentially, must be damaged, must have
suffered an injury in fact.  And the court specifically
considered that and rejected that, said it's insufficient.
And in the language you cited it instead said that the
plaintiff must identify someone with standing.

And that's necessary.  It's not sufficient.  You have to
plead the other parts of standing.  And I think with respect
to everyone, Katherine, Anthony, and the unidentified people
especially, they haven't come close to hitting the other parts
of standing.

THE COURT:  Let's think about this case in reverse.
Let's imagine a day, and I am not because we are a country
mile from resolving this question on the merits, but let's
suppose the case is resolved on the merits in favor of the
Center and its constituents.  Let's imagine a world where a

1    federal district court articulates a constitutional right and

2    a statutory right to counsel in these proceedings and it has

3    to be provided without cost to the subject of the guardianship

4    proceeding.

5         Again, I'm not suggesting -- I have no idea whether

6    that's something that could happen in this case or not.  If

7    that were the ruling of the Court, the State doesn't dispute

8    that there are people in the State of Utah right now who have

9    suffered those injuries that the Court would say flowed from

10   the deprivation of counsel.  I didn't say that well, but do

11   you understand my question?

12             MR. DYMEK:  Not exactly.

13             THE COURT:  I'm turning the plaintiffs' burden on

14   its head for a moment.  If this Court concludes that the

15   Fourteenth Amendment and these statutes require the

16   appointment of counsel without expense, and that the failure

17   to do so is a deprivation of the rights of these individuals,

18   if that's the finding of the Court at the end of the day, do

19   you disagree -- does the State seriously contend that there

20   aren't citizens in the state who would have suffered those

21   harms that the Court has said flow from the failure to appoint

22   counsel?

23             MR. DYMEK:  And just so I understand, the harm being

24   not receiving paid-for counsel?

25             THE COURT:  Well, counsel at no charge, whatever

1   form that takes.

2        MR. DYMEK:  Okay.  And that's the harm, not any

3   ramifications from that?  Not, you know, receiving a

4   guardianship more restrictive than would have been had they

5   received counsel?  Just not receiving counsel paid for by the

6   state?

7        THE COURT:  And if I conclude that the Fourteenth

8   Amendment requires that and so does the ADA and the

9   Rehabilitation Act.

10       MR. DYMEK:  That there have been some instances

11  where someone under House Bill 101 has not received paid-for

12  counsel?

13       THE COURT:  Right.

14       MR. DYMEK:  I think factually that has happened.

15  They cite to one instance it appears from during the pendency

16  of House Bill 101 where someone did not receive counsel.  So I

17  think that has happened.

18       THE COURT:  Are you referring to the declaration?

19       MR. DYMEK:  The declaration.  You know, we have some

20  evidentiary concerns with that, but I think we -- you know,

21  when they enacted the statute, there was an expectation that

22  in some instances potential wards would not receive counsel.

23       THE COURT:  And I'm just -- I guess I'm probing the

24  State's views.  If this proceeding lasts for another year

25  before a final judgment, the State doesn't seriously contend

1    that there won't be Utahns who are impacted in the interim?

2           MR. DYMEK:  If it lasts another year this bill would

3    have sunset.  It sunsets July.  I don't know.  I don't know.

4    There may be.  There are cases where Utahns, respondents, in

5    guardianship proceedings do not receive counsel if those five

6    factors are not met, one of which is on the spot judicial

7    determination that counsel is not needed.

8           THE COURT:  What more do the individual plaintiffs

9    here need to assert do you think in order to establish

10   standing to proceed?

11          MR. DYMEK:  A lot more.  You know, imminent injury.

12   They have not come close.  And I think one thing the Court has

13   overlooked is a statement in the brief.  I don't think there's

14   even -- at this point I don't think it's plaintiffs' position

15   that their subjective concerns could amount to subjective

16   injury.  In docket 54 page 9 footnote 9, it's I think their

17   memorandum in opposition to our motion to dismiss --

18          THE COURT:  Page what?

19          MR. DYMEK:  Docket 54 page 9 footnote 9.  I think

20   I'm using their page numbering as opposed to Pacer's.  We had,

21   you know, argued that subjective concerns aren't enough.  And

22   in response to that in the memorandum in opposition the

23   plaintiffs made it clear we're not relying on subjective

24   concerns at all.  What we're relying on is Katherine and

25   Anthony's, the named plaintiffs, deprivation of counsel.

1    Problem is they have not been deprived counsel, and that

2    certainly is not imminent.  I'll let the Court find what I'm

3    referring to before I proceed.

4         THE COURT:   So what about the Eleventh Circuit

5    case?

6         MR. DYMEK:   The Eleventh Circuit case predated

7    Summers, and even then I think reflected the minority view.  I

8    don't think I've seen other cases outside the Eleventh Circuit

9    adopting that view.  I did not pursue this but I think I've

10   seen subsequent Eleventh Circuit cases now requiring

11   identified plaintiffs.

12        THE COURT:   Calling that holding into question you

13   think?

14        MR. DYMEK:   I think so.  But I didn't pursue them

15   because we had the Eleventh Circuit in Summers and then we had

16   Judge Parrish very recently in August applying Summers in the

17   context of a case having some similarity to this case.  It was

18   a case where a disability advocacy group filed a complaint.

19   They had one named plaintiff.  The problem there was that

20   person was not a member of the disability advocacy group.

21        THE COURT:   At the time of the filing of the

22   complaint.

23        MR. DYMEK:   At the time of the filing of the

24   complaint.  And so the result of that determination was the

25   advocacy group did not have any identified member with

38

1    standing, and Judge Parrish as a result dismissed the case.

2        THE COURT:  And it's not that I don't have the most

3    tremendous respect for Judge Parrish, but her view of the same

4    case law that I'm looking at is not binding on me.

5        MR. DYMEK:  I agree, but I think --

6        THE COURT:  It's persuasive.

7        MR. DYMEK:  -- like any persuasive authority I think

8    it was a well reasoned opinion using the very language from

9    Summers that I think you quoted and applying it by its plain

10   terms very logically and reaching I think a conclusion similar

11   to what you have announced as your tentative ruling.  So I

12   think her reading is -- and her reasoning is right on, and I

13   think the Court's initial conclusions are right on.

14       THE COURT:  What about organizational standing?

15       MR. DYMEK:  All right.

16       THE COURT:  First, am I wrong that it appears to me

17   that the Center has adequately pled facts that give rise to

18   organizational standing?  And then, second, Mr. Virgien says,

19   well, if that's true, we've suffered the harm that's alleged

20   in the complaint and we can proceed with those claims.

21       MR. DYMEK:  I disagree with you somewhat, certainly

22   on the scope of things that they have alleged caused an

23   injury.

24       THE COURT:  Am I --

25       MR. DYMEK:  I think if we break those down some we

1    can maybe whittle away and then refine, you know, where we

2    might disagree and talk about that.

3            THE COURT:  Am I unfairly characterizing the State's

4    criticism about the organizational standing showing?

5            MR. DYMEK:  I think so.  I think I could put it more

6    strongly than the Court did.

7            THE COURT:  Let me ask you to do that.

8            MR. DYMEK:  Okay.  You know, first of all, they --

9    in part of our argument we brought in some evidence.  We point

10   to a printout in part of their web page where they say, we,

11   the Disability Law Center, cannot assist people involved in

12   guardianship proceedings.

13           THE COURT:  But they've explained what they contend

14   that means.  No?

15           MR. DYMEK:  Not to my -- not that I saw.  You know,

16   I thought they said that we, you know, expend resources in

17   other ways but they were very conclusory on what those other

18   ways were.  I don't see any allegation or argument

19   establishing, well, how do you expend your resources in a way,

20   in a non-conclusory way, that's causally related to this -- to

21   the deprivation of counsel?  What, if anything, have you done

22   if a person is deprived of their right of counsel?

23           THE COURT:  You think that they have to say

24   something more than we've had to expend resources at this

25   stage of the proceeding?

1          MR. DYMEK:  Yes.

2          THE COURT:   Because the general statement of fact

3    that we've been required to do this as a result of the House

4    Bill 101 is insufficient?  You contend in your papers that's a

5    legal conclusion I think, didn't you?

6          MR. DYMEK:  In part.  And I think, you know, you

7    have to -- you have this plausibility requirement, that for

8    standing you first have to show there's an injury and then

9    that is traceable to the conduct of the defendant.

10       So just asserting that, it's hard to see how any

11   deprivation of counsel is -- you know, has resulted in any

12   injury that's traceable to that deprivation.  They've stated

13   in very conclusory terms that we've expended resources, but

14   they haven't provided anything to show that that's traceable

15   to the deprivation of counsel.

16         THE COURT:  So track with me in a breach of contract

17   case for a minute.  I mean this is the difference between Rule

18   8 and Rule 9 I think, the pro forma pleading that says I have

19   a contract with you.  It's this contract.  You breached it by

20   not doing this, and as a result I've suffered harm and

21   damages.  That claim will always go through a motion to

22   dismiss because you don't have to plead your damages with

23   particularity.  At a motion to dismiss stage we assume the

24   truth of that allegation.  It is a factual allegation.  It is

25   conclusory, I agree, but it's a statement of a fact not law,

1    and it's sufficient at Rule 12 stage.

2         And then the parties can conduct discovery, and you might

3    come back at summary judgment and say, ah-hah, that injury

4    that you're claiming, that was from a third party's conduct

5    not as a result of my breach, and then on we go.  But at the

6    pleading stage we don't require that level of particularity

7    for pleadings ordinarily, do we?

8              MR. DYMEK:  It may be because the defendants aren't

9    challenging it.  But I think under Twombly and Iqbal, if you

10   plead it in such a conclusory manner, it's subject to

11   challenge.  Just saying we are injured or we have expended

12   resources as a result of House Bill 101 or something to that

13   effect, that's too conclusory under Twombly and Iqbal.  You

14   have to provide some facts to show that that's plausible.

15   Even -- they haven't pled even generally facts showing that

16   for example they -- you know, we have sought appeals, sought

17   to amend the guardianship.  What -- no -- there's no pleadings

18   even generally showing any ramifications as a result of a ward

19   not receiving counsel.  So that's part of our issue.

20        Part of the issue regarding their allegations and

21   argument is legal.  They've argued that we've expended

22   resources in pursuing this lawsuit.  That numerous courts have

23   rejected as a basis for standing.  You can't -- it's thought

24   to manufacture standing by just claiming the expenditure of

25   resources on the lawsuit.

1       And part of, you know, that argument brought out the

2  concern, because you don't know from what they've alleged in

3  the complaint whether, you know, that simply means resources

4  expended on this lawsuit.  They haven't alleged enough to show

5  it's an expenditure of resources that's been legally

6  recognized to be an injury.

7       THE COURT:  But if we think about Iqbal and Twombly

8  and if we think about Rule 8, how do you find the answer to

9  that question?  It's in your first interrogatory, isn't it?  I

10  mean we're at the motion to dismiss stage.  All other things

11  being considered equal, everybody is on notice of what's

12  alleged and what's claimed and the basis for it, and that's

13  the purpose of discovery is to flesh those -- I mean I

14  understand your point about the Iqbal and Twombly language

15  about conclusory allegations and legal conclusions, though I'm

16  not sure I've applied them in the way you're saying in any

17  case.  I'm thinking more about it.

18       But there's notice here.  There's not any prejudice or

19  harm, save for you have to answer a complaint.  And you serve

20  interrogatory number one:  Describe with -- describe

21  particularly what economic injuries you've suffered as

22  referenced in paragraph 47 of your amended complaint, or

23  whatever.  And it's easy to solve, isn't it?  If the answer is

24  we haven't, then aren't you right back for summary judgment?

25  This just isn't a problem that is difficult to cure.

1          MR. DYMEK:  It's curable, but this is constitutional

2    and we're on a motion to dismiss.  You know, we want to, you

3    know, end this case if we can based on Twombly and Iqbal.  We

4    don't want to proceed to discovery and all that means and that

5    additional expense.  You know, we've made the challenge.

6    We've pointed to the cases that reject, you know, standing

7    based on expenditures for just the lawsuit itself.

8          THE COURT:  But --

9          MR. DYMEK:  And so we've thrown the gauntlet down.

10   Come back.  They've brought in new declarations.  They had the

11   opportunity to respond and address our concerns and show the

12   basis of where these expenditures are going to.

13         THE COURT:  Or at least generally describe them.

14         MR. DYMEK:  Or generally describe them.

15         THE COURT:  Sure.

16         MR. DYMEK:  You know, so we've raised the challenge,

17   and it's -- you know, on a 12(b)(1), 12(b)(2) you can bring in

18   evidence.  So they had the opportunity.  They used it for

19   other purposes.  I think it's fair game, and I don't think

20   they've met their burden of showing the injury in fact for

21   organizational standing.

22         THE COURT:  Assume for a moment that they have.

23   What is the consequence of that?  Can the Center proceed with

24   any of the claims in the complaint or the preliminary

25   injunction if it is proceeding strictly with organizational

1  standing?

2          MR. DYMEK:  No.

3          THE COURT:  Why?

4          MR. DYMEK:  All their claims are based on

5  deprivation of counsel.  The Disability Law Center has not

6  alleged it ever -- you know, can never even participate in a

7  guardianship proceeding where they would be deprived counsel.

8  All the causes of action are based on the deprivation of

9  counsel.  The DLC has not alleged any causes of action based

10  on a violation of its own rights.  And that's what the cases

11  say that we've cited, even the case that they cited.

12          THE COURT:  Did Mr. Virgien just collapse

13  associational and organizational standing in his argument?  I

14  wish I had asked him that question first.

15          MR. DYMEK:  I think he did.  I think he may have.

16  And --

17          THE COURT:  I'll ask him when he comes back up.

18          MR. DYMEK:  But I think organizational standing is

19  just like that of an individual applied to an organization.

20  You have standing to assert your own rights.  DLC has not

21  covered the second step.  They have not -- even if they get by

22  the injury in fact, they have not used it to assert any causes

23  of action based on a violation of their own rights.  So

24  there's no organizational standing.

25          THE COURT:  It's not clear to me whether they have

45

1    or they haven't on the face of the complaint.  I mean they

2    don't draw this distinction, but I don't know if that's their

3    fault.  I don't think -- I thought a lot about this.  I don't

4    think the plaintiff is required to anticipate the standing

5    argument that's going to come later and then plead alternative

6    standing theories in a complaint.

7        I think that -- I think a fair reading of their complaint

8    is that they were proceeding on behalf of their constituents,

9    not on behalf of itself, and I don't see facts that are

10   alleged in the complaint that would support injury to the

11   organization in the same way as injuries to their

12   constituents, which I think to be the distinction between

13   associational and organizational claims, standing for claims.

14   So I think I agree with you is what I'm saying, I suppose, but

15   not as artfully as you said it.  You can argue with me about

16   it if you want.

17                  MR. DYMEK:  No.  I like that very much.

18                  THE COURT:  All right.

19                  MR. DYMEK:  Now, if you -- there's -- I did raise

20   the concern about the propriety of allowing plaintiffs leave

21   to amend.

22                  THE COURT:  Let's talk about that.  Surely there's

23   leave to amend.  I agree with you they haven't complied with

24   the local rule that requires a motion with an attached

25   pleading, but we often confront this when we're here the first

1    time together in court.  They have no idea what the crazy

2    judge behind the bench is going to come out and say.  They

3    don't know what it is they have to fix.  They just know that

4    if something is wrong, they've told everybody we'd like a

5    chance to try to fix it.  The Tenth Circuit couldn't be more

6    clear about this.  We favor the resolution of claims on the

7    merits after a full and fair opportunity to try to present

8    them.

9        They are not required to anticipate what's in my brain.

10   I'm wrong as often as I'm right, but they have to live with

11   it.  But if they can fix what I talk about today, they're

12   entitled to a right to do that, don't you think, under just

13   about every concept of the way our rules are supposed to work?

14           MR. DYMEK:  That's part of our objection is we don't

15   think their claims are fixable.  I don't --

16           THE COURT:  That requires me to reach the merits of

17   the claims though, right?

18           MR. DYMEK:  It does not.  It does not.  The other

19   constitutional argument -- we have actually two other main

20   constitutional arguments.

21           THE COURT:  Right.

22           MR. DYMEK:  Federal question and sovereign

23   immunity.

24           THE COURT:  Right.

25           MR. DYMEK:  Sovereign immunity, as we've argued, at

1    least on their stand-alone constitutional claims, there's no

2    question that the State of Utah has sovereign immunity to

3    those claims.  But even more fundamentally, even if they can

4    establish standing, there's no federal question here, because

5    the -- what they claim is federal violations will not

6    necessarily arise during the course of a guardianship

7    proceeding.  And that's -- that was the basis of that

8    argument.

9              THE COURT:  I was -- I was -- well, I'll hear more

10   about that.  I was unimpressed with that argument in the

11   papers, but maybe I don't fully appreciate the subtly of it.

12             MR. DYMEK:  Okay.

13             THE COURT:  I will say, and I don't know if this is

14   fair to the parties or not, but I adhere to this rigorously

15   and have since I started this work.  It seems to me clear from

16   the Circuit Court that once the Court concludes I'm without

17   jurisdiction, you stop.  And it's often helpful for the Court

18   to offer guidance about how other issues might be resolved,

19   but once we're out of jurisdiction, we just -- it's a hard

20   stop.  We don't make rulings.  We don't make findings that

21   become advisory, right?  So if there's not standing, I

22   shouldn't touch these -- I understand you're saying these are

23   also jurisdictional claims.

24             MR. DYMEK:  Yes.

25             THE COURT:  I mean I understand the efficiency of

1    taking up all of the arguments that might potentially be

2    jurisdictional.  I haven't done it before.

3            MR. DYMEK:  If you want to officially, you know, say

4    one way or the other whether they can have leave to amend,

5    federal -- addressing the federal question argument, I

6    think --

7            THE COURT:  Except I mean one of the -- there's

8    another reason that we sometimes don't do this.  Once the --

9    once a plaintiff has the benefit of the pleadings and the

10   briefing and the argument and the citation to authority in

11   response to a motion to dismiss, they take a different

12   approach sometimes to pleading facts or theories that they

13   might advance.  So anything that we're talking about then

14   today, if we continue this discussion beyond standing, is

15   hypothetical because what we really need to do is figure out

16   what the next complaint looks like and whether the next

17   complaint poses the same questions in the same way, I think.

18           MR. DYMEK:  Well, in -- our argument is regardless

19   of how they amend the complaint, regardless of if they show

20   standing, they cannot proceed.  The Court will not have

21   subject matter jurisdiction because there's no federal

22   question.  If I could just briefly address that.

23           THE COURT:  Would you please.

24           MR. DYMEK:  Okay.  Say they plead standing based on

25   an anticipated future guardianship proceeding.

49

1              THE COURT:  Well, let's say that they find a

2       plaintiff who is in a guardianship proceeding right now today

3       and yesterday was deprived counsel.

4              MR. DYMEK:  Right.

5              THE COURT:  Okay.

6              MR. DYMEK:  I think -- I think that will be -- you

7       know, still standing will be very difficult there because you

8       simply don't know how the judge is going to rule when he

9       decides on the spot whether the person is entitled to

10      counsel.

11             THE COURT:  Well, that's why I'm saying assume that

12      yesterday this hypothetical plaintiff was denied counsel by

13      one of the judges in the Third District Court.

14             MR. DYMEK:  Okay.  And if that happened, you have

15      Younger Abstention Doctrine, you have the Gromer versus Mack

16      case.  You have those cases saying you don't have federal

17      question jurisdiction.

18             THE COURT:  Isn't the implication of the State's

19      argument, Judge, you can never answer this question and no

20      plaintiff can ever present it, because if they come too soon,

21      it's a hypothetical harm.  And once it's happened you can't be

22      heard.  They're asserting a constitutional claim, which I've

23      understood to take precedent over a lot of other sorts of

24      theories.

25             MR. DYMEK:  Our argument is you won't be able to or

1   a federal court won't be able to consider their arguments.  We

2   have a state court system.  Judges there on the spot with a

3   live controversy, they can certainly make the same rulings

4   that plaintiffs are asking you to make.  We have a very robust

5   appellate system --

6              THE COURT:  That's true.

7              MR. DYMEK:  -- as well.  So we have a system there

8   that is capable of addressing and answering these questions.

9              THE COURT:  Yes.

10             MR. DYMEK:  Also the ADA has a set of administrative

11  procedures, that if there are ADA violations alleged, you can

12  file a complaint with the Department of Justice.  So there is

13  other options available to plaintiffs.  So this is not the

14  only forum available to hear their arguments.

15      Our state courts will give their constitutional arguments

16  due consideration, careful consideration, and our courts care

17  about vindication of a Utah citizen's constitutional rights.

18             THE COURT:  Nobody in this courtroom doubts that

19  last thing for a moment.  The question is the availability of

20  a federal forum to vindicate federal constitutional and

21  federal statutory claims.  And I understand some of the

22  defenses you've raised, but --

23             MR. DYMEK:  And ultimately there could be a federal

24  forum.  You get through the state system up to the Utah

25  Supreme Court and take it up to the U.S. Supreme Court.

1    That's pretty robust.  This might not be the court to decide

2    their arguments.

3              THE COURT:  It sometimes isn't.

4              MR. DYMEK:  And we believe very strongly this is one

5    such case.

6              THE COURT:  Thank you, Mr. Dymek.

7        Mr. Virgien, why don't we hear briefly from you and then

8    we'll take a short recess and I'll consider whether I am

9    prepared to convert a preliminary orientation to a ruling

10   today or whether we should move through to something else.

11   But this question about your argument collapsing potentially

12   associational and organizational standing, help me figure out

13   what space sits between the two if I accept your theory that I

14   thought I understood you to argue at the beginning of this.

15             MR. VIRGIEN:  Yes, Your Honor.  Tore a page out of

16   Havens Realty.  Let me just pull it up.  At any rate,

17   the -- thank you.  I think that the Havens Realty case is very

18   instructive and important here because this was a case that

19   was decided under the organizational theory purely.

20       And in that case -- I'm looking at star -- at 369 in the

21   Supreme Court Reporter -- or sorry -- in the U.S. Reporter.

22   And the Supreme Court said that Home, the organization here,

23   has alleged injury, and it says that -- what it says here is

24   it asserted that the steering practices of the apartment

25   complex had frustrated the organization's counseling and

1    referral services with a consequent drain on resources.   And

2    that's the harm we're talking about here.

3              THE COURT:   So what claim could the organization

4    assert?

5              MR. VIRGIEN:   Under Havens Realty it was able to

6    assert a claim under I believe the Fair Housing Act.   And

7    that's the way in which the Supreme Court framed this

8    organizational theory, that an organization has standing to

9    bring a claim for a harm to its resources, to its purposes.

10             THE COURT:   So how would you describe in your own

11   words then the difference between associational standing and

12   organizational standing for purposes of -- is there any

13   difference -- once you're in this door, does it matter

14   which -- let me say this differently.   Once you come in this

15   courtroom, does it matter if you walked in through the

16   organizational standing or associational standing door?   And

17   if it does matter, how does it matter?

18             MR. VIRGIEN:   In this particular case it does not

19   matter.   There are ways to, as Your Honor mentioned, ways to

20   achieve standing.   In terms of the remedies available, it does

21   not matter.   And I believe the Supreme Court has said as much.

22   Your Honor will bear with me for one second.   I think Seminole

23   Tribe v. Florida -- I'm sorry.   That was a sovereign immunity

24   case.   My apologies.   That's incorrect, Your Honor.   But, at

25   any rate, it is -- the same idea holds true, that here the

1    same remedies are available.  This is just a means of

2    establishing an injury in fact for -- for standing purposes.

3            THE COURT:  So that seems to me -- I mean if that's

4    the approach, it seems to me that with entities like the

5    Center here -- gosh, I'm just thinking that in these sorts of

6    cases why would anybody come and argue associational standing

7    because there would be such great breadth and so much

8    easier -- you just come in with generalized allegations about,

9    well, our members have suffered, and we've had to expend

10   resources to help, and then I'm here arguing with the State

11   and saying that seems like enough, Rule 12, and then off we go

12   and you've pled your way into discovery in a case.  That might

13   not be a very satisfying result in some instances.  Didn't we

14   just circumvent the whole point I think of showing the Article

15   III standing by just allowing you to come in the side door and

16   do what you can do coming through the front door?

17           MR. VIRGIEN:  I think --

18           THE COURT:  When I say you, I mean plaintiffs

19   generally of course.  I'm not talking about just the Center.

20           MR. VIRGIEN:  Absolutely.  There are requirements

21   that must be shown for organizational standing that need not

22   be shown for associational, and I think that's the key here.

23   Associational standing doesn't require any injury to the

24   organization itself.  The organization has standing via its

25   members.

1    So there's -- it's very reasonable to imagine -- for

2    example unions bring a lot of associational standing cases.

3    There there might be some labor practice that harms the

4    union's members very clearly where they have an easy standing

5    argument, but it might not be very clear that the association

6    had to actually divert resources to address that.

7    THE COURT:  Well, surely there will always be some.

8    I mean if your members are suffering some harm and you're an

9    organization that's designed to serve your members, it seems

10   to me that in virtually every instance somebody will be able

11   to come in and say, well, we had to do -- we had to have three

12   meetings, and we had to supply refreshments, and we had a

13   counselor available, people were very distraught, and we've

14   been -- that sounds like economic harm and you had to take

15   some action and, gosh, that seems okay.  But then aren't we

16   just -- haven't we detached ourselves from the inquiry about

17   whether the harms that we're talking about flow from the

18   violations that we're talking about?  Have we lost something

19   in causation if we just allow that application of

20   organizational standing?

21   MR. VIRGIEN:  Under the case law it's fairly clear,

22   the Havens Realty and the cases that follow it, they don't set

23   some kind of -- I believe Your Honor might be imagining some

24   kind of de minimis exception or some kind of requirement that

25   one not have been harmed a little but somehow a lot.

1            THE COURT:  Or directly.  I mean directly is what

2    I'm thinking about, the relationship between the right that's

3    at issue and the harm that's alleged to have been suffered.  I

4    mean it's one thing to say here is this right that exists.

5    Let's just make one up, gender discrimination in the

6    workplace.  And we're a union that represents employees, and

7    here is an employer who fired all of the women or didn't give

8    them raises or promotions.  That's a pretty harm -- pretty

9    significant harm, and it's a specific harm.  And then the

10   organization comes in and says, well, we had to provide

11   counseling services to our members.  That doesn't seem like --

12   for standing purposes it doesn't seem like the sort of harm

13   that we would contemplate flowing from the violation that we

14   have in mind.  The law is designed to make sure women are

15   treated fairly in the workplace.  You're complaining about you

16   had to pay a counselor $60 an hour to come for four hours and

17   talk to some employees, but it's sufficient in your mind.

18   That's sufficient to allow the employer, not the employees, to

19   advocate about the employment harm itself.

20           MR. VIRGIEN:  Well, the Havens Realty court

21   mentioned something about a frustration of purpose, so there

22   might be some argument in that case that that harm is not

23   related to the purpose of the union here in the hypothetical.

24     I think the more important point I'd like to make though

25   is that's not what's happening here.  Here we're dealing with

1    an organization that's statutorily mandated to provide legal

2    services to disabled Utahns, and the harm that the disabled

3    Utahns face is a lack of access to the legal system that

4    results in legal harms that require legal action to be taken.

5    So I understand Your Honor's concerns, but --

6            THE COURT:  Mr. Dymek is dying to leap out of his

7    seat and say, well, this is what we don't know because they

8    didn't tell us.  They didn't say what the harm is.

9            MR. VIRGIEN:  I would like to address that.  The

10   complaint first off does mention harm, this type of harm.  I'd

11   like to point to paragraph 103 as an example.  It states that

12   as a result of defendants' actions, DLC has suffered and will

13   continue to suffer a diversion of limited resources, and it

14   goes on.

15           THE COURT:  But Mr. Dymek will say, and did say a

16   minute ago, that's wholly conclusory.  That doesn't tell us

17   anything.  And insofar as you're talking about having to file

18   this lawsuit, that doesn't count.  So what else is it besides

19   being a lobbyist?  And when you say denial of counsel, you

20   tell everybody, you tell the world elsewhere you can't do

21   anything about that.

22           MR. VIRGIEN:  Right.  I have a couple of responses

23   to that.  First off, there is a statutory mandate that DLC

24   undertake actions that's not -- that that theory doesn't quite

25   contemplate I think.  It's not the DLC wanted to file this

1    lawsuit.  It's the DLC had to file this lawsuit.  And that is

2    an important distinction.

3        Second, there is a declaration attached to our opposition

4    by Ms. Zahradnikova that does detail, not in -- it doesn't

5    provide a balance sheet or any kind of pecuniary spending.  I

6    want to make that clear.  But it does detail the causal chain

7    that requires action on DLC's part to deal with the fallout.

8            THE COURT:  That was the explanation I had in mind

9    when I said to Mr. Dymek I thought you explained what that

10   meant, and then I wondered -- which paragraph do you have in

11   mind?  Is it paragraph 10 of her declaration, the first one?

12           MR. VIRGIEN:  It's paragraphs really five through

13   nine of -- this is the declaration in support of our

14   opposition.  Paragraph 10 is just attached as an exhibit to

15   that one.

16           THE COURT:  Oh, I'm sorry, the second declaration

17   then; is that right?  No.

18           MR. VIRGIEN:  I think there should only be one

19   declaration in this record.  It's docket number 54-1 is what

20   I'm looking at.

21           THE COURT:  What's the date of the declaration?

22           MR. VIRGIEN:  It was filed September 1st.

23           THE COURT:  No, I'm sorry.  When was it executed?

24           MR. VIRGIEN:  Executed on August 31st.  I believe we

25   might have executed multiple declarations that day.

1          THE COURT:  Okay.  I think I have it with me here.

2          MR. VIRGIEN:  All right.  Paragraphs five through

3    nine of that declaration kind of walk through the reasoning as

4    to why the harm here would result in an expenditure of

5    resources.  And that here is something that goes -- goes

6    beyond what Your Honor is imagining as this we'll call it a

7    de minimis showing of organizational harm.  This is a very

8    real and core organizational harm that gets right at DLC's

9    statutory mandate to provide counsel to people who have

10   suffered these kinds of deprivations.

11         THE COURT:  The first argument you made proves too

12   much, does it?  I mean it can't be -- you say that it's a

13   statutory mandate so we had to file this action and so

14   therefore we have standing to file the action.  I think

15   that's -- hasn't the Supreme Court said that Congress can't

16   abrogate the standing requirement?  There still has to be an

17   actual controversy and injury.  Maybe I'm talking myself in a

18   circle now on this issue, but I understand your second point

19   for sure.  Okay.

20         MR. VIRGIEN:  And Congress certainly can create a

21   harm, which here the expenditure of resources is a harm that's

22   being alleged and, yes, it's a harm that flows from a

23   statutory mandate but it's nonetheless a harm.

24         THE COURT:   But all of these statutory entities,

25   like the Center here, could come in and make the same argument

1    in every case and say, well, we had to file the lawsuit.

2    That's -- I'm not sure that resonates with me.  You have an

3    obligation to evaluate claims and assert them in some

4    instances.  I understand what you're saying.

5            MR. VIRGIEN:  And here it does go beyond merely

6    needing to file this lawsuit.  There's a lot of fallout to

7    this denial of counsel that it will fall to the DLC to mop

8    up.

9            THE COURT:  Mr. Dymek says put the nail in the

10   coffin today.  You can't fix the problems that they've

11   identified.  It's incurable.  This lawsuit was dead before it

12   was filed, so no amendment.  If you lose on standing, what's

13   your response to that?

14           MR. VIRGIEN:  That at this stage of the proceedings

15   leave should be freely granted.  We mentioned in our

16   opposition that we would like to request leave to amend.  As

17   Your Honor mentioned, that is not a motion under the court's

18   local rules, but as Your Honor also mentioned, we did not know

19   the -- assuming there's a defect, we did not know the defect

20   at issue here.

21           THE COURT:  There were a lot of arguments made.

22           MR. VIRGIEN:  There were a lot of arguments made.

23           THE COURT:  It's true.  All right.  If there's

24   something more you'd like to share, I'm all ears, otherwise,

25   this is a good time probably for a recess.

1        MR. VIRGIEN:  I would like to address a couple of

2   points quickly.  First, Mr. Dymek mentioned the sunset

3   provision.  We cited in our P.I. papers where that issue was

4   raised already in a case called Bowdry v. United that found

5   that a sunset provision alone is not enough to erase the harm

6   that -- that's created.  And here it is an optional sunset.

7        I'd also like to point out about the August decision by

8   Judge Parrish I believe that was discussed.

9        THE COURT:  In the association case.  I forget the

10  other party's name.

11        MR. VIRGIEN:  Yeah.  It was -- so that court dealt

12  with a situation where this named individual was the only

13  purported member to have suffered a harm.  So we face

14  something a little bit different here where the complaint

15  broadly alleges that all members who have gone through

16  guardianship proceedings are necessary -- or constituents --

17  are necessarily constituents and necessarily suffer the harm.

18  So we're not facing an issue where if we lose one particular

19  plaintiff we lose our entire theory of standing.

20        THE COURT:  She cited that language in Summers I

21  think.  There was discussion about it.  And she cited it

22  favorably for the proposition that the Supreme Court has said

23  you have to name somebody individually.

24        MR. VIRGIEN:  Yes, but I think both Summers and that

25  particular case did not deal with the situation we face here

1    where there's a well defined class of people who are

2    necessarily harmed and are necessarily constituents.  That's

3    something that makes this case unique that takes it outside of

4    both of those theories.

5        I would just like to briefly address the claim that

6    Twombly somehow requires us to plead specific monetary

7    damages.  I think that is an argument that's not before the

8    court on this motion to dismiss and it's one that reads to

9    much into Twombly.  Post Twombly there's certainly ample case

10   law that allows for damages to be stated and then to be

11   evaluated during discovery.

12          THE COURT:  But I think Mr. Dymek would say what

13   they were really saying is if the damages relate to your

14   showing of injury and the question is one of standing not

15   damages on a claim, that it's a different -- different issue.

16   You've got to come forward.  You don't have to plead it maybe

17   if it -- anticipate the standing challenge, but once it's

18   made, provide an explanation like you did about other things.

19   I think that's what he said.

20          MR. VIRGIEN:  So we're moving away from Twombly into

21   a 12(b)(1) framework.

22          THE COURT:  No.  He said both, didn't he?  All

23   right, fair enough.  But what about that?  That's a fair

24   criticism of the Center's response, is it not?  I mean you

25   submitted declarations talking about other things.  You knew

 1    that we challenged this as a basis for jurisdiction and

 2    standing and you could easily have said we've suffered these

 3    harms.

 4         MR. VIRGIEN:  Yes, but nothing in the case law cited

 5    by the Government or otherwise requires specific financial

 6    disclosures or things of that nature.

 7         THE COURT:  I agree with that.

 8         MR. VIRGIEN:  And that's all I have for the Court.

 9         THE COURT:  Ms. Sylvester, it occurs to me I've

10    skipped over you twice.

11         MS. SYLVESTER:  I was going to bring that up.  I

12    think nowhere in this discussion have we talked about the

13    injury that could be redressible by the AOC or the Council.

14    And I'd like an opportunity to at least address that, because

15    if you dismiss nothing else, I think you ought to dismiss us

16    today because there's just nothing that we can redress at this

17    point with their claim.

18         THE COURT:  It's your view of course today that --

19    come on up Ms. Sylvester.  It's nice to have you back.  It's

20    your view of course that I should reach into these other

21    issues even notwithstanding that I might conclude that I lack

22    jurisdiction in the case?

23         MS. SYLVESTER:  Well, kind of.  I mean I agree that

24    you lack jurisdiction in this case and I think, you know, just

25    briefly addressing redressability, there is none by -- you

                                                              63

1    know, the AOC and the Judicial Council can't do anything in

2    these cases.  And what we've argued is that they have

3    conflated implementation of H.B. 101 with applying it in

4    individual cases and that just doesn't make any sense.  We

5    don't tell the judges what to do.  I mean you know this.  If

6    you had staff coming in telling you what to do, you'd --

7              THE COURT:  They do constantly.

8              MS. SYLVESTER:  You know, but not with the intention

9    of interfering with your individual discretion in an

10   individual case.  And I think that's our biggest concern is

11   that we don't -- the only thing that we did to implement this

12   legislation -- implement, I use that in quotes because that's

13   not really a good word, although Brent Johnson is here and

14   probably regretting that he used that in his letter.

15   Basically what it means is that we educated the judges on what

16   happened with H.B. 101.  We created a form, happy to take that

17   down if the Court so determines that we should, and then

18   updated some bench books and basically had, you know, some

19   legislative updates on this, you know, created a bench guard

20   and said this is what the statute says, but that's it.  So I

21   think it's just inappropriate for us to be here.

22             THE COURT:  So let me reframe the question.  Let's

23   see if I can state it more artfully now than I did with

24   Mr. Dymek.  Doesn't the question become this.  If I

25   conclude -- and I think I'm going to, though I'm not certain

of it until I sit down and think for a minute more.  But if I
conclude today that there's not a basis to proceed, that we
haven't established standing in any manner that allows me to
reach the merits, and I conclude that at this stage of the
proceeding I'm going to allow amendment, then isn't the most
prudent course to wait and see what comes back from the
plaintiff and what modifications are made to the pleading,
whether the same claims are asserted, against the same
parties, or different parties, or different claims, supported
by different allegations, or different theories, and then take
up the issue of whether it's sufficient or not?

I mean the arguments you're making now, we could answer
them today, like I said to Mr. Dymek, but we might have a
different set of issues before us next week, and now
everything I've said was advisory because it wasn't necessary
to the determination of the motion to dismiss and it didn't
finally resolve the issue that would be before us.

That may be the wrong way to think about it but why isn't
that right?  I mean Mr. Virgien and Ms. Schranz are bright
folks.  They work with some bright folks at the Center and
they've been in court before and they've read the arguments
now.  They've seen a forecast.  They've read some cases.  They
might think you're all wrong and come back and say the same
thing.  But then the harm to the court is you come back and
say now we're here.  Now take up our argument.  And it's not

1    much harm for a defendant, is it?

2             MS. SYLVESTER:  I suppose not.  It's a few more

3    hours of me rewriting the same answer to the briefs.

4             THE COURT:  You get to come back here.

5             MS. SYLVESTER:  I don't know how this could possibly

6    change.  You know, I think it's fatal to begin with.  I mean

7    maybe they have some kind of colorable argument against the

8    State, but what are they going possibly do with us?  You know

9    we're not -- unless they're going through an individual case

10   and going after one of our individual judges about a decision

11   they made, the AOC and Council have absolutely nothing to do

12   with H.B. 101.  We were simply educating about it.  I can't

13   even think in my right mind what we could possibly redress by

14   having a judgment from this Court.

15        And I just -- I don't think that -- you know, although,

16   you know, maybe you could give them leave to amend and the

17   State could respond, I just think that our motion to dismiss

18   should be granted today.  I just don't think it's a good use

19   of the Court's time to have us come back and argue the same

20   points we're going to argue next time.

21            THE COURT:  I understand completely.

22            MS. SYLVESTER:  I appreciate that.

23            THE COURT:  All right.  Thank you, Ms. Sylvester.

24            MS. SYLVESTER:  Thank you.

25            THE COURT:  We'll take --

1        You'd like to add something.

2        MR. VIRGIEN:  Briefly, Your Honor.  Just to very

3    quickly address that point about redressability here.  We

4    think that at most there's a fact dispute at this point on

5    redressability that needs to be answered before we can

6    proceed.  There's evidence in the record that the AOC and J.C.

7    have admitted that they implement this program.  There's

8    evidence in the record that they have an ADA program that

9    they -- that they're the administrators for, and those are

10   claims that simply cannot be brought in state court, the ADA

11   claims as some kind of counterclaim.  This is the proper forum

12   to resolve those and the proper defendants, and the same

13   applies for the constitutional claims.

14       THE COURT:  I think I was left with an impression,

15   and I can't point to anything specific, but I think I walked

16   away from the papers with an impression that the Center, if we

17   were moving forward, cared to reevaluate whether the courts

18   were a proper party in the case.  I'm not going to press you

19   today and ask you for an answer to that, though I will say

20   that you have Ms. Sylvester's phone number and I'm sure she'd

21   be happy to talk to you about anything that you want to know

22   before there's an amendment.

23       MR. VIRGIEN:  Thank you, Your Honor.  One additional

24   point I'd like to make, which is that we are prepared to argue

25   the preliminary injunction today.  I understand that if the

                                                              67

1    Court has no jurisdiction over the case it has no jurisdiction
2    to enter a preliminary injunction.  But to the extent the
3    Court is willing to allow leave to amend, we'd request to be
4    able to argue the preliminary injunction and the Court could
5    consider it for a later point when it would determine it has
6    jurisdiction.
7              THE COURT:  Okay.
8              MR. VIRGIEN:  Thank you.
9              MR. DYMEK:  Your Honor, before you go back, if I
10   could just very briefly?
11             THE COURT:  That's what we're here for.  We'll hear
12   anything you'd like to share.
13             MR. DYMEK:  Thank you, Your Honor.
14             THE COURT:  This is the time for it.
15             MR. DYMEK:  I just want to make the point that, you
16   know, if you're inclined to amend, the -- or allow leave to
17   amend, let's have them follow the local rule.  It's not just a
18   technical requirement in this case.  I'd proffer that we could
19   make a strong argument that any amendment is futile based on
20   what we've already briefed.  The Medtronic, Devon Energy case,
21   you know, deal with declaratory judgments, people who have not
22   actually had their rights violated.  You would just reframe it
23   as -- as it -- as a proceeding -- as a hypothetical proceeding
24   and ask the question does the federal question necessarily
25   arise in the course of that proceeding?  It's clear I think

1   because you have the judicial determination that's

2   unpredictable that the federal question would not necessarily

3   arise because you cannot predict whether or not the judge will

4   appoint counsel.

5          And then for potential wards who don't receive counsel or

6   have been through the entire proceeding and had a guardianship

7   placed on them, you have doctrines like the Younger Abstention

8   doctrine, the Rooker-Feldman doctrine where those ongoing and

9   state proceedings and then cases that have reached final

10  judgment aren't subject to federal court review.

11         So I think if we go through that procedure, it will serve

12  an important purpose and avoid having to go through the motion

13  to dismiss and preliminary injunction arguments all over

14  again.

15            THE COURT:  Won't we have exactly the same arguments

16  either way?  I mean the issues will be the same, and the

17  question will be whether they're granted leave to file the

18  amended complaint or whether the amended complaint they file

19  is dismissed?  I mean I don't -- maybe there's some additional

20  benefit I'm not contemplating.  In some cases there is a

21  strong benefit to following the local rule.

22            MR. DYMEK:  I think it will be much more narrow.

23  We'll focus only on the arguments that make it futile, other

24  than, you know, other arguments.

25            THE COURT:  Isn't the problem with that that -- that

1  it can actually add a layer of briefing?  They filed a motion

2  for leave to file their amended complaint.  You oppose,

3  raising some but not all of the arguments you'd raise in a

4  motion to dismiss.  Say you lose.  They file the motion -- the

5  amended complaint.  Now you file a motion to dismiss and we're

6  just -- isn't that three visits instead of two?

7           MR. DYMEK:  If you have to go to the next step.  We

8  think the first step --

9           THE COURT:  I know you do.

10          MR. DYMEK:  -- will render it unnecessary.

11          THE COURT:  I understand.  Thank you.

12          MR. DYMEK:  Thank you, Your Honor.

13          THE COURT:  All right.  Why don't we come back at

14  3:00 o'clock.  Thank you.  We'll be in recess.

15             (RECESS FROM 2:41 P.M. UNTIL 3:25 P.M.)

16          THE COURT:  All right, thank you.  All right.

17  Thanks everyone for your patience.  That was interesting.  You

18  know, in the papers I went back to make sure I hadn't missed

19  some part of this discussion.  This is -- it's not unusual

20  that this would happen, it's not common, but this distinction

21  between organizational standing and associational standing and

22  what the implications are garners very little attention in the

23  papers.  In fact, it really sort of -- I went back and reading

24  some of the case law, especially Havens, I don't think it's an

25  issue that is often addressed by courts either.  I think

1    parties themselves sort of blur some of these edges.

2        I will say I don't know that it matters, because

3    Mr. Virgien said in our earlier discussion that if the

4    individuals -- if their claims fall for failure to establish

5    standing, and I conclude the Center doesn't -- hasn't

6    established associational standing, what I heard Mr. Virgien

7    say is he'd like to amend anyway.  And that's where we are one

8    way or the other.

9        Though I will say, and I'll provide a more detailed

10   ruling in a moment, rereading Havens I'm reminded of two

11   things.  Number one -- but part of it's not in Havens.  It's

12   in a secondary source and other cases that predate Havens, so

13   this is unfair.  It's not in the papers.  None of you know

14   about it.  That the courts recognize the Fair Housing Act has

15   a broader implementation than I think the ADA or the

16   Rehabilitation Act have.

17       The Fair Housing Act affirmatively enables aggrieved

18   persons to bring actions, including third parties like tenants

19   who were not the subject of racial discrimination but as a

20   result didn't have diverse housing, and other entities

21   specifically have standing under the Fair Housing Act to

22   assert claims.  So it's a different animal to begin with.

23   It's a different inquiry I think potentially.  I didn't read

24   this in a case, but it makes sense to me, where the ADA and

25   the Rehabilitation Act talk about claims brought by disabled

1    individuals, not more generally aggrieved persons.  But I

2    don't know.  You didn't all have the opportunity to brief that

3    issue.

4        Second, rereading Havens, and especially the critical

5    passage, Mr. Virgien, I think -- I wonder if I draw -- no.  I

6    know I draw a different conclusion than you do.  The fact that

7    the court's talking about a difference between what it styled

8    the representative claims and the individual claims of the

9    entity I think draws attention to this idea that the court

10   viewed them differently.  That term, representative claims, I

11   think it must be dated.  That's an '82 decision, and that's

12   not a term that's used a lot I don't think in the modern cases

13   talking about this, but it's a good way to think about it.

14   It's the way I was conceiving of it, that the associational

15   standing gives rise to assert somebody else's claims.

16       I do think -- I continue to disagree with the State I

17   think -- that the Center has alleged facts that would give

18   rise to standing, organizational standing to assert the

19   organizational claims.  But then I'm thinking about what that

20   means, and I think, as in Havens, the claim that went forward

21   for the organization there was the claim for monetary damages

22   that the organization suffered, not injunctive claims and not

23   representative claims but claims for monetary damages related

24   to the provision of counseling and other things.  So those are

25   the injuries, the concrete particularized injuries that give

1    rise to the organization's claim for the -- to redress the

2    organizational injury, monetary damages, I think.

3        Again, I don't have the benefit of your evaluation of the

4    case law to know if that's really true, but that's how I read

5    it.  And what Havens didn't say is now because you have an

6    individual claim for the organization, now you can come back

7    and reassert the representative claims that you said you

8    didn't have.  I think they were dismissed voluntarily there so

9    I don't want to say the court said you don't have them.

10       But why even have that discussion if you could assert all

11   of the claims under either basis for standing?  It doesn't

12   resonate with me as something that makes sense.  It won't

13   matter because you're going to amend.  But I am going to

14   conclude, for the reasons I'm about to state, that we don't

15   have on the record before me adequate basis to establish

16   individual standing for the individual plaintiffs or

17   associational standing for the Center, but we are going to

18   allow amendment.

19       I'm not going to reach the arguments, the additional

20   arguments, advanced by the State and the courts today for the

21   reason that, number one, I don't know whether they'll be here

22   when we come to them next time, and, number two, I don't know

23   what they'll look like.  And I understand both the State and

24   the courts think that there's no conceivable way to fashion a

25   claim, but I don't know that, and I don't lawyer for the

1    parties.  We'll see what the bright minds on the other side of
2    the courtroom come up with if they decide to assert claims at
3    all against the courts or the State and what fashion.  So
4    we'll take up those in turn.

5        But, similarly, Mr. Virgien, I'm going to decline your
6    opportunity to preargue the preliminary injunction because we
7    won't know until we get back here again and consider motions
8    which claims will be alive, which is essential to determining
9    whether there's been a sufficient showing and then what relief
10   you'd be entitled to.  So any argument we had today just would
11   not -- it just would not be very helpful.  So I appreciate
12   that everybody would like to argue additional issues.  I think
13   I'm out of jurisdiction so I'm going to stop.

14       Except that I'm going to try to provide you some
15   explanation for the basis of my ruling to the extent that it's
16   helpful to all of you.  Let me save your hands some cramping.
17   I'm not going to ask anybody to prepare an order and submit
18   it.  We'll file a minute entry that will refer to this portion
19   of the transcript as the Court's ruling and the basis for the
20   ruling so that all of you don't need to concern yourselves
21   with it, but you'll have the transcript to aid you as you
22   think about the case moving forward.

23       So by way of background, this is the Court's ruling in
24   Disability Law Center versus Utah and others.  The Court's
25   reaching in this ruling the defendants' motions to dismiss, I

1    suppose the other motions as well insofar as the other motions

2    that are pending I think are now denied as moot and we'll have

3    amendment as explained.

4        But with respect to dockets number 36 and 42, the motions

5    to dismiss filed by the defendants, this is the Court's

6    ruling.  Plaintiffs Disability Law Center, Katherine C., and

7    Anthony M., brought this action against the State of Utah, the

8    Utah Judicial Council, and the Utah Administrative Office of

9    the Courts.

10       Plaintiffs assert generally that House Bill 101, a Utah

11   law restricting entitlement to counsel in guardianship

12   proceedings, violates the Americans With Disabilities Act, the

13   Rehabilitation Act, and the Due Process Clause.

14       Plaintiff Disability Law Center is a private, non-profit

15   organization designated by statute to bring legal challenges

16   to protect the rights of Utahns with disabilities.

17       Plaintiff Anthony M. is a custodian with intellectual

18   disabilities whose parents have expressed a desire to obtain

19   legal guardianship over him.

20       Plaintiff Katherine C. is a law clerk who suffers from

21   paranoid schizophrenia and fears her parents will seek to

22   obtain legal guardianship over her.

23       Plaintiffs seek, among other things, a preliminary

24   injunction enjoining the enforcement of House Bill 101 through

25   the resolution of this case.  They seek additional relief as

1    well.

2        Plaintiffs -- excuse me.  Defendants have filed motions

3    to dismiss challenging, among other things, the plaintiffs'

4    standing to sue.  And that is the singular issue that I will

5    resolve today as it is determinative at this stage of the

6    proceeding and because standing is a threshold jurisdictional

7    requirement, so said the Supreme Court in United Food versus

8    Brown, 1996.

9        The test to establish standing is familiar to the parties

10   from Lujan, the Supreme Court's 1992 decision.  In order to

11   demonstrate standing to sue a plaintiff must show, number one,

12   it has suffered an injury in fact; number two, the injury is

13   traceable to the alleged conduct of the defendant; and, number

14   three, the injury is likely to be redressed by a favorable

15   decision.

16       Plaintiffs have asserted standing under three separate

17   theories:  The individual standing of plaintiffs Katherine and

18   Anthony in their individual capacities, the Center's

19   associational standing to assert what I'm -- now I'm using my

20   words and not theirs -- but representative claims of their

21   constituents and, third, the Center's organizational standing.

22   And I'll take each up in turn beginning with individual

23   standing.

24       In their complaint, plaintiffs allege that plaintiffs

25   Katherine and Anthony have standing to sue under the ADA, the

Rehabilitation Act, and the Fourteenth Amendment, because they are disabled individuals and they cannot fully participate in a guardianship proceeding without an attorney representative. Plaintiffs argue for that reason that implementation of House Bill 101, which removes a guarantee of counsel in those proceedings, therefore violates their rights.

The complaint alleges that Anthony's parents have expressed a desire to obtain legal guardianship over him at sometime in the future, and Katherine's parents express concern about her ability to function autonomously, causing her to fear they will seek a guardianship over her at some point in the future. However, there are no allegations that the individual plaintiffs have actually participated in any guardianship proceedings or that any such proceedings have been initiated.

In their motions to dismiss, the defendants contend that these allegations by themselves fail to demonstrate that either plaintiff has suffered an injury in fact because any denial of counsel under House Bill 101 is speculative and likely to happen, if at all, only at some point in the future, and for that reason in either instance is the denial of counsel or the injury imminent.

Plaintiffs disagree, arguing that a deprivation related to a legal proceeding that has not yet commenced, and in fact may never commence, can still constitute an injury in fact, so

1   here the possibility and the reasonable apprehension of the

2   possibility that the plaintiffs will be subject to

3   guardianship proceedings without a guarantee of counsel itself

4   is sufficient to constitute an injury in fact.

5       I part ways I think with the plaintiffs on this point and

6   am unable to find case law that I think squarely supports the

7   plaintiffs' proposition that really what is speculative and

8   potentially remote injury can qualify as an injury in fact for

9   purposes of Article III standing.

10      And I read the cases submitted by the plaintiffs

11  differently I think than they do, at least in part.  And the

12  plaintiffs rely primarily on three Tenth Circuit decisions.

13  In Protocols versus Leavitt from 2008, for example, that case

14  involved a Medicare settlement consultant suing an agency

15  after the agency issued a memorandum that conflicted with

16  previous guidance about settlements.  And the plaintiff there

17  alleged that because of the memorandum, it was possible, if

18  not likely, that in the future it would be forced to repay

19  some of the fees it collected based on settlements it had

20  previously arranged based on the prior policy or guidance.

21      The consultant also alleged that at the time of the

22  filing of the suit, the company had decreased in value because

23  of the potential repayments, also that it was hampered in its

24  ability to budget for the future, and it had postponed talks

25  with potential investors who were concerned about the

1  potential repayments.

2       The Tenth Circuit concluded that that plaintiff had

3  standing because even though the direct harm, that is, whether

4  the plaintiff would at some point in the future be forced to

5  repay fees it had already received, even though that harm, the

6  direct harm, was speculative and not certain to occur, the

7  plaintiff had alleged that it had decreased in value and had

8  been forced to change its behavior because of the new

9  memorandum that issued, both of which the Tenth Circuit

10 concluded were present, concrete harms.

11      Similarly, in U.S. versus Supreme Court of New Mexico,

12 another Tenth Circuit decision, this one from last year, the

13 United States sued various defendants over a New Mexico Rule

14 of Professional Conduct that exposed prosecutors to

15 disciplinary violations for improperly subpoenaing lawyers to

16 testify before grand juries about former clients.  The United

17 States there alleged the prosecutors had changed their

18 practices with respect to those proceedings out of fear of

19 disciplinary proceedings, including resulting from -- excuse

20 me -- and that the changed practices, rather, included, among

21 other things, issuing fewer subpoenas.

22      Again the Tenth Circuit concluded that there was

23 standing, this time for the United States as plaintiff,

24 because notwithstanding that no prosecutors had actually been

25 subject to disciplinary proceedings, that the United States

1    had alleged that the prosecutors had been forced to make

2    present changes in their behavior motivated by fear resulting

3    from the new rule.

4        Finally, in Cressman versus Thompson, the Oklahoma

5    license plate case we talked about earlier from 2013, Oklahoma

6    changed its default license plate to include an image of a

7    Native American, and a citizen protested on First Amendment

8    grounds contending that he was compelled either to display the

9    plate, even though he believed it violated his speech rights,

10   or purchase a specialty plate, or cover up the image and risk

11   prosecution.

12       Again, the Tenth Circuit concluded that each of these

13   options represented an injury in fact.  And there the court

14   explained that at least as to the last point, even though

15   Cressman had not yet violated the law by covering the image,

16   the threat of future prosecution for doing so had caused a

17   present change in his behavior and had caused him to refrain

18   from exercising his First Amendment speech rights.

19       The complaint in this case alleges only that the

20   individual plaintiffs fear being subjected to guardianship

21   proceedings at some point in the future.  Nowhere in the

22   complaint do the plaintiffs allege, as in the cases that they

23   cite, that they are presently injured by House Bill 101, or

24   that they have changed their current behavior in some

25   meaningful way on account of the law.

1          As such, at least in my judgment, the individual

2     plaintiffs, Anthony and Katherine, have failed to meet their

3     burden to establish standing by virtue of failing to

4     adequately plead an injury in fact, and the defendants' motion

5     to dismiss their claims is granted without prejudice to

6     refiling an amended complaint.

7          I think I said something I didn't quite mean to say.  I

8     said having pled an injury in fact, and on this point we had

9     some discussion about this earlier, I think a plaintiff can

10    come forward with evidence to support a showing of standing,

11    not -- need not rest just on the allegations in the complaint,

12    but there were not additional allegations here beyond those in

13    the complaint in support of the individual plaintiffs so it's

14    the same for those purposes.

15         Turning to associational standing and adopting the

16    language of the Supreme Court case in Havens, the

17    representative claims, I'll address the Center's allegations

18    that it has associational standing to sue on behalf of

19    Anthony, Katherine, and prospective disabled wards in

20    guardianship proceedings who are the Center's constituents.

21         An association like the Disability Law Center can of

22    course have standing to sue on behalf of its members so long

23    as it meets what are generally known as the three Hunt

24    factors:  First, that its members would otherwise have

25    standing to sue on their own; second, the interests the

1   organization seeks to protect are germane to the

2   organizational -- excuse me -- the organization's purpose;

3   and, third, that the suit does not require the individual

4   participation of the organization's members.  This comes from

5   the Supreme Court case Hunt versus Washington State Apple

6   Advertising Commission, 1977.

7       The defendants contend that the Center fails to meet

8   these requirements because its complaint does not allege that

9   any of its members have standing to sue on their own.  The

10  Center again disagrees, arguing that Katherine and Anthony are

11  members and have standing, and that it also alleges injuries

12  on behalf of other unnamed constituents who are by definition

13  disabled Utahns deprived of the guarantee of counsel who have

14  standing to sue.

15      I've already concluded that Katherine and Anthony do not

16  otherwise have individual standing to sue so I will instead

17  focus now on the allegations related to disabled Utahns

18  deprived of the guarantee of counsel, allegations, that is,

19  having made no finding one way or the other about whether

20  there is such a right.

21      But after reviewing the complaint and various

22  declarations subsequently filed by the Center, I conclude that

23  these allegations are insufficient to support the Disability

24  Law Center's associational standing.

25      Plaintiffs' complaint alleges only that its constituents,

1   Utahns with disabilities, quote, have each suffered injuries,
2   or are at risk of suffering injuries, that would allow them to
3   bring suit against defendants in their own right.  That's
4   paragraph 20 from the complaint.

5       And as I view it, there are at least two problems with
6   that allegation.  First, without Katherine and Anthony there
7   is no named constituent in the complaint.  And while it's not
8   a direct holding, it is language from the Supreme Court and
9   language that one of my colleagues in this court has relied
10  upon.  I understand the Supreme Court to be a superior court
11  to this one and so I follow it.

12      The Supreme Court stated, of course, in Summers versus
13  Earth Island Institute in 2009 that organizations seeking to
14  sue under associational standing must, quote, make specific
15  allegations establishing that at least one identified member
16  has suffered or would suffer harm, end quote.

17      And that makes sense to me, because without naming a
18  constituent, it would be difficult to assess whether any
19  specific constituent has suffered an injury in fact.  And I'm
20  not unpersuaded by Mr. Virgien's logical argument here that
21  assuming that's a legal theory that makes sense in most cases,
22  it's unnecessary here just by operation of the definitions
23  that apply, so that we're certain to have injury, and yet I
24  haven't read any court to make an exception to this rule, save
25  possibly in the Eleventh Circuit as we talked about.  And I

1    think the rule is a good rule that makes sense in

2    associational standing cases.  I'll follow the plain language

3    quoted from the Supreme Court.

4        But, second, there's no allegation in the complaint that

5    any unnamed constituents have suffered or will suffer any

6    imminent harm.  As I mentioned, with respect to Katherine and

7    Anthony, the Center must allege its constituents have suffered

8    past or imminent future injury, yet there are no allegations

9    in the complaint that any unnamed members or constituents face

10   an imminent guardianship proceeding.

11       I think that's a necessary allegation, and as the party

12   with the burden, the burden is with the Center to at least

13   supply those allegations, which at this stage of the

14   proceeding would be assumed true provided there's a basis for

15   them.

16       And I'll note that those allegations, again, don't have

17   to appear in the complaint itself.  The Court has discretion

18   to consider affidavits and other materials of record before

19   dismissing a complaint for lack of standing.  That's Warth

20   versus Seldin, Supreme Court 1975, but at least the allegation

21   has to appear in the record.  I don't think it does here

22   except by inference, and I'm not sure that's proper in this

23   circumstance.

24       To that end though, talking about evidentiary materials,

25   the plaintiffs submitted two declarations stating that a

1    Disability Law Center member witnessed guardianship

2    proceedings where the respondent was not given counsel.  At

3    least in my judgment those allegations themselves do not cure

4    the defects in the complaint.  For one, they don't name any

5    individual constituent.  And I'll note that it's not entirely

6    clear whether that constituent has to be named in the

7    complaint, even assuming it's a requirement for associational

8    standing, or whether a plaintiff can name a constituent in a

9    subsequent declaration.  But because there isn't one named

10    anywhere here, save for Katherine and Anthony, that's not a

11    question we have to resolve today.

12        But, second, the declarations submitted do not allege

13    that the respondents in the guardianship proceedings that were

14    viewed were Disability Law Center constituents, which is

15    required under the first factor in the Hunt analysis.

16        And I understood from Mr. Virgien's argument today that

17    that is almost certainly necessarily the case.  And I

18    understand that argument that flows through the papers, but I

19    don't understand where there's a basis for that understanding

20    in the record before me, and I'm confined to the record before

21    me.

22        In sum, at least in my judgment, the allegations in the

23    complaint and those in the subsequent declarations do not

24    individually or collectively sufficiently allege facts to

25    support associational standing, and for that reason the

1    defendants' motion to dismiss the Center's associational -- at

2    least the representative claims asserted by the Center, that

3    motion to dismiss is granted, without prejudice to refile or

4    amend.

5        Turning finally to organizational standing, the Center

6    argues that it has properly alleged organizational standing.

7    And just as an individual may bring suit, so to may an

8    organization, and the inquiry is the same, whether the

9    organization has alleged such a personal stake in the outcome

10   of the controversy as to warrant its invocation of federal

11   court jurisdiction.  That's the Havens case, the Supreme Court

12   1982.

13       The Center contends it has standing in its own right

14   because it has diverted resources to advocate in opposition to

15   House Bill 101, and because it has diverted funds to provide

16   legal assistance to those who have been denied counsel.  In

17   fact it alleges, I think correctly, that under the statute

18   it's required to do so.

19       I will just note -- briefly note I think that the Center

20   also argues in its papers that House Bill 101 at least has

21   impeded its ability to carry out its statutory mission, but I

22   don't think that theory is sufficiently supported by

23   allegations in the complaint.

24       The essence of the defendants' argument in their motions

25   to dismiss, I think with some clarity hearing from Mr. Dymek

today, but essentially the complaint is twofold.  One is an

Iqbal/Twombly concern and the second is that there's

insufficient allegation in the complaint concerning the

specific damages suffered by the Center.  I guess they're two

sides of the same coin, those two arguments.

But I just disagree with the State.  I think that a claim

for damages like the kind that are asserted here, assuming

they were seeking economic relief, which isn't clear from the

complaint, are sufficient I think ordinarily to move forward.

There's not a heightened pleading standard that applies here

to damages or any other element of the claim.

And indeed the Supreme Court has already explained that

general allegations that an organization had to devote

resources in response to a defendant's conduct can be

sufficient at this stage of the proceeding to assert an

organizational standing theory.  And I just read it again in

Havens, the 1982 case from the Supreme Court.

Here the Center alleges that House Bill 101 has caused it

to expend resources it otherwise would not have expended.

Defendants, if they wish, and if the case survives into

discovery, will have an opportunity to discover the facts

behind those allegations and later an opportunity to challenge

the sufficiency of those claims if we get to that point.  But

for the time being, in my view those allegations are

sufficient to allege organizational standing to sue.

1    But then as I said earlier, at least in my view, the

2    organizational claim is different from the representative

3    claim that could be asserted in an associational standing

4    capacity.  And I don't read the complaint to support relief

5    for the specific injuries the association has suffered, at

6    least as the allegations are pled in the complaint, but, in

7    any event, it will be repled.

8    For those reasons, I grant the defendants' motions to

9    dismiss without prejudice to the plaintiffs amending their

10    complaints.  The remaining motions are denied moot in view of

11    that ruling.

12    And, Mr. Virgien, I suppose I'd like to visit with you

13    about a timeline for filing an amended complaint.  Let me

14    further clarify.  I'm going to decline the State's invitation

15    to rigorously adhere to our local rule here.  Just in the

16    interest of efficiency let's do this once and not twice.  And

17    so you need not file a motion for leave.  I'm granting you

18    leave.  When will you file?

19    MR. VIRGIEN:  I think 30 days, Your Honor, should be

20    sufficient.

21    THE COURT:  Terrific.  So within 30 days of today

22    we'll have an amended pleading from the plaintiffs, some or

23    all of the plaintiffs.  There's no prejudice to adding new

24    plaintiffs or parties if you wish.  You don't have to bring

25    all these folks back if you don't want to.  It's not really a

1    hint, but call Ms. Sylvester.  Okay.  And then we'll just have

2    responses from the defendants in the normal time and sequence

3    under the rules.

4        Notwithstanding any objections any of you may have to

5    that ruling, what questions do you have or what else should we

6    take up while we're here?

7        Mr. Dymek?

8            MR. DYMEK:  No questions, Your Honor.

9            THE COURT:  Ms. Sylvester?

10           MS. SYLVESTER:  None from me, thank you.

11           MR. VIRGIEN:  None from us also.

12           THE COURT:  Well, I appreciate all your patience,

13   counsel, also your briefing, which was extremely helpful, as

14   was your argument today.

15       Have I forgotten something, Mr. Lee?  You're looking at

16   me.

17       Thank you.  We'll be in recess.

18               (HEARING CONCLUDED AT 3:57 P.M.)

19                       * * *

20

21

22

23

24

25

1

2

3

4

5                          Certificate of Reporter

6          I, Raymond P. Fenlon, Official Court Reporter for the

7     United States District Court, District of Utah, do hereby

8     certify that I reported in my official capacity, the

9     proceedings had upon the hearing in the case of

10    Disability Law Center, et al. Vs. The State of Utah, et al.,

11    case No. 2:17-CV-748, in said court, on the 1st day of

12    November, 2017.

13         I further certify that the foregoing pages constitute

14    the official transcript of said proceedings as taken from my

15    machine shorthand notes.

16         In witness whereof, I have hereto subscribed my name

17    this 8th day of November, 2017.

18

19

20

21                                      /s/ Raymond P. Fenlon

22

23

24

25