Alfred C. Pfeiffer, Jr. (*pro hac vice*)
Kyle A. Virgien (*pro hac vice*)
Dorottya Schranz (*pro hac vice*)
John H. Steinbach (*pro hac vice*)
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, California  94111-6538
Telephone: 415.391.0600
Facsimile: 415.395.8095
al.pfeiffer@lw.com
kyle.virgien@lw.com
dorey.schranz@lw.com
john.steinbach@lw.com

Claudia Center (*pro hac vice*)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
39 Drumm Street
San Francisco, CA 94111
Telephone: 415.343.0762
Facsimile: 415.395.0950
ccenter@aclu.org

John Mejia (Bar No. 13965)
Leah Farrell (Bar No. 13696)
AMERICAN CIVIL LIBERTIES UNION OF
UTAH FOUNDATION, INC.
355 N. 300 W.
Salt Lake City, Utah 84103
Telephone: 801.521.9862
Facsimile: 801.532.2850
aclu@acluutah.org

*Attorneys for Plaintiffs Disability Law Center,
Katherine C., and Anthony M.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH
## CENTRAL DIVISION

| | |
|---|---|
| Disability Law Center, Katherine C., and Anthony M.<br><br>          Plaintiffs,<br><br>v.<br><br>The State of Utah; Gary Herbert in his official capacity as Governor of Utah<br><br>          Defendants. | Case No. 2:17-cv-00748-RJS-PMW<br><br>**AMENDED COMPLAINT**<br><br>**FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF**<br><br>**<u>REDACTED</u>** |

## INTRODUCTION

1.      In the 54 years since the Supreme Court's landmark decision in *Gideon v. Wainwright*, 372 U.S. 335 (1963), the right to independent counsel has emerged as one of the most fundamental safeguards of individual liberty.  Before the law may strip us of our most basic and inalienable rights, it guarantees us representation by a zealous, committed advocate.

2.      This principle undergirds our most elementary conceptions of fairness, due process, and equality before the law.  The Constitution dictates that certain interests are too important to be summarily forfeited.  Nowhere is this axiom more important than when it operates to shield the most vulnerable elements of society—groups like children, the elderly, and those with disabilities.  Where fundamental liberties are at stake, the byzantine legal process cannot be fair to a person "unaided by counsel, and who by reason of his mental conditions stands helpless and alone before the court." *Massey v. Moore*, 348 U.S. 105, 108 (1954).

3.      An adult guardianship is one of the most invasive governmental incursions imaginable on a citizen's basic liberties.  Wards subjected to a guardianship lose fundamental autonomies, including their ability to determine where to live, whom to marry, and what medical treatment to receive.  This deprivation of basic liberties continues until the ward's death—which may come to pass because a guardian has declined medical treatment that would otherwise sustain the ward's life.  Upon a guardian's death the guardianship will pass to another guardian or to the state in a process over which the ward has no control.

4.      The Defendants operate a system that imposes guardianships without regard for the guarantee of counsel that lies at our legal system's foundation.  Utah Code § 75-5-303 recognizes the importance of independent counsel for a guardianship respondent by requiring he

or she be represented by an attorney, but it violates both federal law and the U.S. Constitution by imposing the costs of that representation (or the burden of securing pro bono counsel) on respondents.  A newly enacted state law—H.B. 101, also known as the Disabled Adult Guardianship Amendments—exacerbates this deprivation by removing the right to counsel for certain respondents in guardianship proceedings.  Many Utahns face a complete forfeiture of legal autonomy without a chance to have their interests protected by an independent attorney.

5.      Further, H.B. 101 impacts the poorest Utahns with disabilities: it applies only to respondents with less than $20,000 in net assets.

6.      Plaintiffs bring this action for injunctive and declaratory relief because the Fourteenth Amendment, the Americans with Disabilities Act ("ADA"), and the Rehabilitation Act oblige Utah to require—and pay for—counsel before stripping respondents of their most fundamental and precious legal rights.

## JURISDICTION AND VENUE

7.      This court has jurisdiction pursuant to 28 U.S.C. § 1331 because this case arises under the laws of the United States, namely the ADA, the Rehabilitation Act, and the federal Constitution.

8.      This court also has jurisdiction under 28 U.S.C. § 1343(a)(3) and (4) over this civil action commenced to (i) redress the deprivation of a right or privilege secured by an Act of Congress providing for equal rights of all citizens, and (ii) to secure equitable relief under an Act of Congress providing for the protection of civil rights.

9.      This court has jurisdiction to issue declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

10.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because the events giving rise to the dispute occurred in this district.

## PARTIES

### Plaintiffs

### Disability Law Center

11.     Founded in 1978, Plaintiff Disability Law Center ("DLC") is a private, non-profit organization dedicated to protecting the rights of Utahns with disabilities.

12.     The governor of Utah designated DLC an authorized protection and advocacy organization under the Protection and Advocacy for Individuals with Mental Illness Act ("PAIMI"), 42 U.S.C. § 10801, *et seq.*   In PAIMI, the United States Congress grants organizations like DLC authority to "pursue administrative, legal, and other appropriate remedies to ensure the protection of individuals with mental illness" who are receiving care or treatment in the state.  42 U.S.C. § 10805(a)(1)(C).

13.     The Protection and Advocacy for Individuals with Developmental Disabilities statutes ("PADD"), 42 U.S.C. § 15001, *et seq.*, likewise authorize protection and advocacy organizations such as DLC to "pursue legal, administrative, and other appropriate remedies or approaches to ensure the protection of, and advocacy for, the rights of [those with developmental disabilities] within the State who are or who may be eligible for treatment, services, or habilitation[.]" 42 U.S.C. § 15043(a)(2)(A)(i).

14.     DLC has frequently exercised its statutory authority to bring suit challenging laws and practices that harm Utahns with disabilities.  *See*, *e.g.*, *J.H. v. Just for Kids of Utah County, Inc.*, No. 2:16-cv-00358-JNP (D. Utah May 2, 2016) (challenging exclusion of an individual with

disabilities from a vocational education program); *J.H. v. Six Feet Below, LLC*, No. 1:16-cv-00031-BCW (D. Utah Apr. 11, 2016) (opposing tattoo parlor's blanket denial of service to those with HIV); *Disability Law Center v. Utah*, No. 2:15-cv-00645-RJS (D. Utah Sept. 8, 2015) (bringing class-action suit to bar state entities from forcing vulnerable criminal defendants with mental illness to languish in jail while waiting months for transfer to the Utah State Hospital).

15.     In accordance with the statutory requirements of PAIMI, DLC relies on an advisory council composed of consumers of mental health services, family members, providers, attorneys, and other interested community members.

16.     The PAIMI advisory council accepts suggestions and input from people with disabilities and their family members and uses that feedback to help shape DLC's advocacy priorities.

17.     DLC's 16-member elected governing board counts among its members several Utahns with disabilities and their family members.  The governing board is intimately familiar with the needs of those with mental illness and developmental disabilities.  Along with the PAIMI advisory council, this organizational structure ensures a close connection between DLC's activities and the interests of its constituents.

18.     DLC counts among its constituents the over 300,000 Utahns with disabilities. This constituency is based on DLC's statutory grants of authority under PAIMI and PADD to protect and advocate on behalf of persons with mental illness and developmental disabilities within the state of Utah.  *See* 42 U.S.C. §§ 10802, 15002 (defining "individual with mental illness" under PAIMI and "developmental disability" under PADD, respectively).

19.    DLC advocates on behalf of its constituents.  This advocacy includes working to expand the availability of healthcare, increase access to education, and secure voting rights for those individuals.

20.    DLC files this action to protect and advocate for the rights and interests of respondents in guardianship proceedings in the state of Utah.  Because they are alleged incapacitated due to a severe mental or developmental disability, these Utahns must be DLC constituents.

21.     These constituents have significant mental illnesses or developmental disabilities that substantially limit their ability to perform major life activities, such as self-care, working, and interaction with others.  Many also have a record of these mental illnesses or developmental disabilities.  They are therefore individuals with disabilities for purposes of the ADA.  42 U.S.C. § 12102.  To the extent these constituents have diagnosed mental illnesses, they are "individuals with mental illness" under PAIMI.  42 U.S.C. § 10802.

22.     These constituents have each suffered injuries, or are at risk of suffering injuries, that would allow them to bring suit against Defendants in their own right.

23.     On November 15, 2017, a DLC employee personally witnessed a guardianship hearing in the Salt Lake County Third District Court.  This respondent in this matter, ███████ ("Constituent A"), was subject to the statutory provisions of H.B. 101.  Although Constituent A's parents, the petitioners in the matter, were represented by counsel, the court did not appoint counsel for Constituent A.  The court did not ask Constituent A any questions during the one-minute hearing and summarily granted the petitioners a full guardianship.

24.     The guardianship order granted in the matter of Constituent A granted the petitioners "full power and authority under the law to make any and all decisions" for Constituent A.  It also specifically permitted the petitioners to, among other things, "make end-of-life decisions" for Constituent A and stipulated that the petitioners were "granted power and authority to commit [Constituent A] to a Psychiatric Hospital if necessary to protect the safety of [Constituent A], or to protect the safety of others."

25.     Another DLC constituent, ▮▮▮▮▮▮▮▮▮ ("Constituent B"), had a guardianship imposed upon him without being represented by counsel, pursuant to H.B. 101. The guardianship proceedings for Constituent B took place in Weber County on February 7, 2017 and resulted in a full, plenary guardianship being entered.   The court also entered an order noting that, "based upon the request made my Petitioners and for good cause shown, the Court waives the requirement for a lawyer for the Respondent based upon the factors in UCA Section 75-5-303(5)(d) being met in this case."

26.     DLC understands that protecting the legal interests of Utahns with disabilities is central to its statutory mission as outlined in PADD and PAIMI.  Prior to and since the passage of H.B. 101, DLC has devoted a substantial portion of its operating budget to formal advocacy efforts designed to urge reconsideration of the bill and mitigate its harmful effects.  DLC has diverted a significant amount of its limited resources toward educational initiatives to help compensate for DLC constituents' loss of counsel under H.B. 101 by helping them and their families to better understand the serious, long-lasting consequences of a guardianship.

27.     For instance, in part because of the increased risk of erroneous and overbroad guardianships stemming from H.B. 101's incursion on respondents' right to counsel, DLC hosted

6

a "Celebration of Self-Determination" conference focusing on alternatives to full guardianships. This conference, on July 10, 2017, featured seminar discussions and policy analysis from some of the nation's leading disability rights advocates.  The educational conference attracted nearly 200 attendees and cost DLC approximately $24,668 to host.

**Katherine C.**

28.     Plaintiff Katherine C. is a resident of Sandy, Utah.

29.     Katherine formerly worked as a law clerk at a nonprofit in Salt Lake City, Utah. Her work focused on abuse and neglect of mentally ill prisoners, including the constitutionality of solitary confinement for inmates with mental illnesses.  She graduated Magna Cum Laude with an undergraduate degree in sociology and later earned her law degree.

30.     Shortly after graduating from law school, Katherine was diagnosed with paranoid schizophrenia, which at times significantly limits her ability to engage in a variety of major life activities.   At times in the past, her condition has impeded her ability to work, sleep, communicate, care for herself, and socialize with others.

31.     Due in large part to her paranoid schizophrenia, Katherine currently lives with her parents in Sandy and relies on them for financial support.

32.     Katherine possesses less than $20,000 in total assets.

33.     In October 2015, Katherine was committed to the University of Utah Neuropsychiatric Institute in Salt Lake City, Utah.  Although she initially entered the facility voluntarily, she was involuntarily confined for two weeks and subjected to inpatient care.

34.     In September 2016, Katherine was committed to Salt Lake Behavioral Health for six weeks.  Again, Katherine checked herself into the facility voluntarily, but was subjected to

continued detention against her will.  The psychiatrist initially assigned to her case did not ask about her symptoms and attacked her personal beliefs.  Eventually, Katherine's treatment team held a forced medication hearing and determined that Katherine would be injected with Abilify (a powerful antipsychotic drug).

35.     Following her release from Salt Lake Behavioral Health, Katherine was placed on the waitlist for the Utah State Hospital.  Consequently, Katherine faces the prospect of long-term involuntary confinement should she experience another paranoid schizophrenic episode.

36.     Although Katherine's parents are loving and supportive, they have expressed concern about Katherine's ability to function autonomously.  Katherine is deeply concerned that her parents will file to create a permanent guardianship that would deprive her of her essential liberty interests.

37.     Recently, in response to her acute fear that her parents would try to obtain a guardianship over her, Katherine took steps to place herself as far away from her parents' control as possible.  She quit her job, stopped using her credit cards and cell phone, and left the state.

38.     Katherine has since returned to Utah and is again living with her parents, as she lacks the financial means to live on her own.

39.     Katherine's relationship with her parents has recently become more strained, in the wake of her abrupt move away from Utah (and home).  Katherine worries that if her parents think her symptoms are worsening again or feel they otherwise need to control behavior and other aspects of her life, they will attempt to get a guardianship over her.  Therefore, although she lives at home, she takes steps to avoid spending time with her parents or doing anything that

would anger or frustrate them. She also avoids discussing her symptoms, medications, and treatment with her parents.

40.　　In the event of guardianship proceedings initiated by Katherine's parents, Katherine would be unable to afford a lawyer of her own to advocate on her behalf.

41.　　Despite Katherine's legal training, she worries that a guardianship proceeding would likely come at a time when she is experiencing symptoms of paranoid schizophrenia that will interfere with her ability to defend herself.

42.　　Due to the provisions of H.B. 101, Katherine faces the very real prospect of being subjected to a guardianship proceeding and deprived of fundamental liberties without an independent advocate to protect her interests.

43.　　Because of Katherine's fears that her parents will initiate guardianship proceedings against her and that the Defendants will deny her counsel or will impose the burden on her to pay for her own counsel or secure pro bono counsel, she has called several family law and probate attorneys to inquire about rates and retainers for representation in guardianship matters as a respondent. Due to her limited financial means, it would be difficult for her to afford a retainer or the hourly rate for an attorney.

**Anthony M.**

44.　　Plaintiff Anthony M. is 34 years old and a resident of Draper, Utah.

45.　　Anthony is currently employed as an assistant custodian with a Utah school district.

46.　　Anthony has developmental and intellectual disabilities. He has microcephaly, club feet, and generalized anxiety disorder.

47.   Due to his disabilities, Anthony is unable to manage his own finances and relies on others to look after his limited financial resources.

48.   As a result of his disability, Anthony requires support to live in the community. He currently lives with his wife and son but receives continuing care and financial support from his parents.

49.   Anthony was adopted from the Utah Department of Child Foster Services.  He was severely abused while in the system, and Anthony's adoptive parents believed he would eventually need a legal guardianship to ensure continuing care.

50.   Although Anthony has developed skills and abilities over time, Anthony's parents have expressed a desire to obtain a determination of legal guardianship over him.

51.   Anthony has less than $20,000 in net total assets.

52.   Due to the provisions of H.B. 101, Anthony faces the very real prospect of being subjected to a guardianship proceeding and deprived of fundamental liberties without an independent advocate to protect his interests.

53.   Anthony fears that his parents will initiate guardianship proceedings against him and that the Defendants will deny him counsel or will impose the burden on him to pay for his own counsel or secure pro bono counsel.  Due to this fear, Anthony has set aside $40 of his limited available money for legal expenses and other related costs should his parents file for a guardianship.  Because Anthony understands that $40 will likely be insufficient to fully cover his potential legal costs, Anthony intends to set aside more money as soon as he is able, despite his limited finances.

**Defendants**

54.     Defendant the State of Utah is responsible for operating its programs, services, and activities (including its guardianship procedures under Utah Code § 75-5-303) in conformity with the Americans with Disabilities Act, the Rehabilitation Act, and the United States Constitution.

55.     Defendant Gary Herbert is Governor of the State of Utah.  DLC brings this suit against him in his official capacity.

56.     Defendant Gary Herbert, in his official capacity as Governor of the State of Utah, is charged with "see[ing] that the laws are faithfully executed."  Utah Const. art. VII, § 5.

57.     Defendant Gary Herbert, in his official capacity as Governor of the State of Utah, is charged with delivering proposed budget recommendations to the Legislature.   These recommendations include "an itemized estimate of the proposed changes to appropriations for: . . . the Judicial Department as certified by the state court administrator"  Utah Code § 63J-1-201. In addition, the governor may make "separate recommendations" on the state court administrator's estimate.  Utah Code § 63J-1-201.

58.     Defendants are responsible for the implementation and operation of Utah Code § 75-5-303, in general, and H.B. 101, specifically, which govern guardianship proceedings.

59.     Defendant the State of Utah is a public entity subject to the requirements of Title II of the ADA, 42 U.S.C. § 12131, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

60.     The Utah State Court system is a public entity subject to the requirements of Title II of the ADA, 42 U.S.C. § 12131 and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

**FACTS**

**Utah's Guardianship Process**

61.     Utah's guardianship proceedings for adults are governed by Utah Code § 75-5-303.

62.     The petitioner in a guardianship proceeding must prove by clear and convincing evidence that the adult respondent is incapacitated, which is defined by Utah Code § 75-1-201 as "lack[ing] the ability, even with appropriate technological assistance, to meet the essential requirements for financial protection or physical health, safety, or self-care: (a) receive and evaluate information; (b) make and communicate decisions; or (c) provide for necessities such as food, shelter, clothing, health care, or safety."

63.     Except as modified by order of the court, a guardian's rights, powers, and duties respecting his or her ward include:

    a.   the right to "establish the ward's place of abode within or without this state";

    b.   the right to consent to the ward's medical care or treatment; and

    c.   "the same powers, rights and duties respecting the ward that a parent has respecting the parent's unemancipated minor child."  Utah Code § 75-5-312.

64.     Until May 10, 2016, Utah law required that all respondents in guardianship proceedings under Utah Code § 75-5-312 be represented by a lawyer.  If the respondent had not chosen a lawyer, the court was mandated to appoint one.  But in most cases, Utah passed the burden of paying for the respondent's attorney onto the respondent.  *See* Utah Code § 75-5-303(2) ("Unless the allegedly incapacitated person has counsel of the person's own choice, the court shall appoint an attorney to represent the person in the proceeding the cost of which shall

be paid by the person alleged to be incapacitated.  If the court determines that the petition is without merit, the attorney fees and court costs shall be paid by the person filing the petition.").

65.     On information and belief, guardianship hearings are held every Wednesday in the Salt Lake City district courthouse and at regular intervals in other district courthouses in Utah.

66.     On information and belief, at least some guardianship proceedings under Utah Code § 75-5-303 in which the potential respondent is the child of the guardianship petitioner are designated "Guardian – Adult Child" on both court calendars and case dockets.  On information and belief, all other guardianship proceedings under Utah Code § 75-5-303 are designated "Guardian – Adult."

67.     As one of H.B. 101's requirements is that the respondent be the child of the guardianship petitioner, guardianship proceedings in which H.B. 101's criteria could be met (and counsel for the respondent denied) would be designated "Guardian– Adult Child" on both court calendars and case dockets.

68.     According   to   the   Utah   Courts'   website   at https://www.utcourts.gov/stats/files/2017FY/, there have been 361 "Guardian – Adult Child" proceedings and 371 "Guardian – Adult" proceedings filed this year statewide.

69.     At least as recently as June 2017, The Office of the Public Guardian, the Utah state agency responsible for public guardianship and conservatorship services in Utah, offered a description   of   the   guardianship   process   on   its   website,   available   at https://opg.utah.gov/guardianship/rights-of-protectedpersons/.   The website noted that respondents "have certain 'due process' rights, including the right to . . . be represented by an

attorney" and to "[p]resent evidence in opposition to the petition for guardianship," rights which the website describes as "crucial because they serve as part of a system of checks and balances on guardianship."   The website went on to state that, "even though guardianship may be necessary and very helpful, guardianship limits the self-determination of the person placed under it.  There are few legal processes more restrictive of citizens in a free society than guardianship." After the Complaint in this lawsuit was filed noting this description, it was removed from this website.

**House Bill 101: the Disabled Adult Guardianship Amendments**

70.     In 2016, the Utah state legislature passed the Disabled Adult Guardianship Amendments, or H.B. 101, codified in § 75-5-303(d) of the Utah Code.

71.     H.B. 101 rescinds a respondent's statutory right to independent counsel in a guardianship hearing in certain circumstances.

72.     H.B. 101 removes the respondent's guarantee of counsel if: (i) he or she is the biological or adopted child of the petitioner; (ii) the value of his or her entire estate does not exceed $20,000; (iii) he or she appears in court with the petitioner; (iv) he or she is given the opportunity to communicate, to the extent possible, his or her acceptance of the appointment of the petitioner; and (v) the court is satisfied that counsel is not necessary in order to protect his or her interests.

73.     As a result of this legislation, certain Utahns with disabilities and limited financial resources are no longer guaranteed counsel in guardianship hearings**.**

**The Guardianship Signature Program**

74.     The Utah Board of District Court Judges and Utah Bar Commission endorse a program called The Guardianship Signature Program ("Signature Program") which is described on the Utah Courts website at: https://www.utcourts.gov/howto/family/gc/signature/index.html.

75.     The Signature Program provides judges with a list of lawyers who have volunteered to represent respondents in guardianship proceedings, either on a sliding scale if the client's income qualifies or for reasonable and necessary attorney fees if the client's income is more than three times the federal poverty guidelines.

76.     The S.J. Quinney College of Law at the University of Utah has organized a program for second- and third-year students and recent law graduates to assist Signature Program attorneys at no cost to the state.

77.     The Signature Program description on the Utah Courts website provides that an attorney who agrees to represent a respondent in a guardianship proceeding will, among other duties, "zealously assert the client's position under the statutes and rules," "investigate alternatives to guardianship," "present the client's proposals and contest proposals with which the client does not agree," and "investigate the proper limited authority of a guardian, ensuring that the court grants a full guardianship only if no alternative exists."

**The Online Court Assistance Program**

78.     The Utah Courts website also allows litigants in certain types of cases to use an online program to help them determine their eligibility for certain kinds of relief and to fill out necessary pleadings and other papers to file with the court.  This program is called the "Online Court Assistance Program" ("OCAP").

79.     OCAP allows potential guardianship petitioners to fill out pleadings and other paperwork online, by answering questions which determine their eligibility to file certain types of guardianships and which prepopulate forms for filing with the court.

80.     On information and belief, OCAP directs guardianship petitioners who are filing for a guardianship of an adult (guardianship under Utah Code § 75-5-303) to fill out forms under either the category "Guardian – Adult" or "Guardian – Adult Child."

81.     On information and belief, the "Guardian – Adult Child" category is only available when the petitioner is the parent of the adult guardianship respondent.

82.     On information and belief, if the potential guardianship petitioner indicates that the potential guardianship respondent is the potential petitioner's adult child, has an estate that does not exceed $20,000, and will attend the hearing, the OCAP provides the following information: "Most likely you will not need to hire an attorney for [the potential guardianship respondent.]"

83.     On information and belief, if the potential guardianship petitioner selects the "Guardianship – Adult" option or if the potential guardianship petitioner indicates that one of the conditions of H.B. 101 is not met, the OCAP provides the following information, "Utah law requires that Potential Ward be represented by an attorney in this guardianship case."

**FIRST CLAIM FOR RELIEF**
**(For Injunctive Relief Against All Defendants)**
**(Americans with Disabilities Act)**

84.     Plaintiffs incorporate paragraphs 1 to 83 by reference.

85.     Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132, provides that "no qualified individual with a disability shall, by reason of such disability, be

16

excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."

86.     The ADA defines "disability" as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment."  42 U.S.C. § 12102(1).

87.     The ADA defines "qualified individual with a disability" as an "individual with a disability who, with or without reasonable modifications to rules, policies, the removal of  . . . communication . . . barriers, or the provision of auxiliary aids or services meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity."  42 U.S.C. § 12131(2).

88.     The ADA defines "public entity' as "A) any State or local government; [and] (B) any department, agency, special purpose district, or other instrumentality of a State or States or local government . . . ."  42 U.S.C. § 12131(1).

89.     The United States Department of Justice has promulgated regulations under Title II of the ADA requiring public entities to make their services, programs, or activities "readily accessible" to disabled individuals.  28 C.F.R. §  35.150(a)(1).

90.     These regulations further require that a public entity may not, "directly or through contractual or other arrangements, utilize criteria or methods of administration . . . [t]hat have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability[.]" 28  C.F.R.  § 35.130(b)(3)(i).  And  "[a]  public  entity  shall  make  reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability[.]"  28 C.F.R. § 35.130(b)(7)(i).

91.     The regulations also require public entities to "take appropriate steps to ensure that communications with the applicants, participants, members of the public, and companions with disabilities are as effective as communications with others," 28 C.F.R. § 35.160(a)(1), and to "furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities. . .  an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity."  28 C.F.R. § 35.160(b)(1).

92.     These regulations require a public entity to "give primary consideration to the requests of individuals with disabilities . . . in determining what types of auxiliary aids and services are necessary."  28 C.F.R. § 35.160(b)(2).

93.     These regulations bar the public entity from passing on the costs of accommodations to disabled individuals.  28 C.F.R. § 33.130(f).

94.     Plaintiff Katherine C. is an individual with a disability under the ADA. Katherine's impairments substantially limit one or more major life activities in that her diagnosed paranoid schizophrenia inhibits her ability to work, sleep, communicate, care for herself, and socialize with peers.  *See* 28 C.F.R. § 35.108(d)(2)(iii)(K) ("schizophrenia . . . substantially limits brain function").  Katherine is a DLC constituent because PAIMI instructs DLC to "pursue administrative, legal, and other appropriate remedies to ensure the protection of individuals with mental illness" who are receiving care or treatment in the state.  42 U.S.C. § 10805(a)(1)(C).  Katherine meets the PAIMI definition of an "individual with mental illness" because her paranoid schizophrenia is a "significant mental illness or emotional impairment, as determined by a mental health professional qualified under the laws and regulations of the State"

who "lives in a community setting, including their own home."  42 U.S.C. § 10802 (4)(A)-(B)(ii).

95.     Plaintiff Anthony M. is an individual with a disability under the ADA.  Anthony's impairments substantially limit one or more major life activities in that his developmental disability makes it difficult for him to work, sleep, communicate, care for himself, and socialize with peers.  *See* 28 C.F.R. § 35.108(d)(2)(iii)(C) ("Intellectual disability substantially limits brain function").  Anthony is a DLC constituent because PADD instructs DLC, as Utah's designated P&A organization, to "protect and advocate the rights of individuals with developmental disabilities."  42 U.S.C. § 15043(a)(1).  Anthony's microcephaly and club feet fall within the PADD definition of "developmental disability" because both are "physical impairments" that manifested before age 22, are likely to continue indefinitely, and substantially affect Anthony's mobility, ability to live independently, and his ability to care for himself.  *See* 42 U.S.C. § 15002 (defining "developmental disability" within PADD).

96.     Constituent A is an individual with a disability under the ADA.   Upon information and belief, Constituent A has impairments that substantially limit one or more major life activities in that his disability makes it difficult for him to work, sleep, communicate, care for himself, and/or socialize with peers.  *See* 28 C.F.R. § 35.108(c)(i)) (listing examples of major life activities).  Constituent A is also a DLC constituent under PAIMI or PADD, as Constituent A's disability falls under the definitions articulated in either or both of these statutes.  *See* 42 U.S.C. §§ 10802, 15002 (defining "individual with mental illness" under PAIMI and "developmental disability" under PADD, respectively).  The guardianship order issued in the matter of Constituent A allows his parents to "commit [Constituent A] to a Psychiatric Hospital

if necessary to protect the safety of [Constituent A], or to protect the safety of others."
Additionally, at least as of the imposition of a plenary guardianship in the matter of Constituent
A, Constituent A also has a record of having a disability.

97.     Constituent B is an individual with a disability under the ADA.  Upon information
and belief, Constituent B has impairments that substantially limit one or more major life
activities in that his disability makes it difficult for him to work, sleep, communicate, care for
himself, and/or socialize with peers.  *See* 28 C.F.R. § 35.108(c)(i)) (listing examples of major life
activities).  Constituent B is also a DLC constituent under PAIMI or PADD, as Constituent B's
disability falls under the definitions articulated in either or both of these statutes.  *See* 42 U.S.C.
§§ 10802, 15002 (defining "individual with mental illness" under PAIMI and "developmental
disability" under PADD, respectively).   The guardianship order issued in the matter of
Constituent  B  confirms  that  Constituent B's "doctor has certified that he is in need of
protection."  Additionally, at least as of the imposition of a plenary guardianship in the matter of
Constituent B, Constituent B also has a record of having a disability.

98.     Those  of  DLC's  constituents  who  have  been  or  may  be  subjected  to  a
guardianship proceeding are individuals with disabilities under the ADA.  These constituents
have mental illnesses or developmental disabilities that substantially limit one or more major life
activity, such as self-care and interaction with others.  These constituents also have a record of
these mental illnesses or developmental disabilities.

99.     Plaintiffs Katherine C. and Anthony M., along with DLC's constituents who have
been or may be subjected to a guardianship proceeding, are qualified individuals under the ADA
in that they meet the essential eligibility requirements for access to the courts.

100.   Katherine C., Anthony M., and DLC's constituents who have been or may be subjected to a guardianship proceeding cannot fully participate in this proceeding without an attorney representative.  Absent counsel, these respondents cannot participate and communicate on an equal, equally effective, or meaningful basis in the adversarial process.  They are less likely to contest the proposed guardianship or to advocate for limits to such guardianship.

101.   Under Title II of the ADA and its implementing regulations, counsel constitute a required reasonable accommodation for individuals with mental illnesses or developmental disabilities, who otherwise would be excluded from participation in, denied the benefits of, and subjected to discrimination in attempting to defend themselves in guardianship proceedings. Counsel also constitutes a required reasonable accommodation under Title II of the ADA and its implementing regulations to ensure that the court system's communications with developmentally disabled individuals and individuals with mental illnesses are as effective as its communications with others.

102.   Defendants discriminate against Plaintiffs in violation of Title II of the ADA and its implementing regulations by:

    a.   failing to make the reasonable accommodations necessary to ensure an equal opportunity for Plaintiffs to participate in Defendants' programs and activities;

    b.   failing to make the reasonable accommodations necessary to ensure effective communication with Plaintiffs; and

    c.   by forcing Plaintiffs to bear the costs of their reasonable accommodations.

103.    This failure to make reasonable accommodations constitutes discrimination.  This discrimination is by reason of Katherine C.'s, Anthony M.'s and DLC's constituents' disabilities because their disabilities are the reason for their need for the reasonable accommodation.

104.    As a result of Defendants' failure to provide counsel, Katherine C., Anthony M., and DLC's constituents have been excluded from or denied the benefits of Defendants' programs and activities or face exclusion from or denial of the benefits of Defendants' programs and activities.

105.    This exclusion is by reason of Katherine C.'s, Anthony M.'s, and DLC's constituents' disabilities because their disabilities are the reason for their need for the reasonable accommodation.

106.    Because providing counsel for the respondent in a guardianship proceeding is a required accommodation under the ADA, Defendants discriminate against Katherine C., Anthony M., and DLC's constituents by implementing H.B. 101, legislation that allows a guardianship to proceed without counsel for the respondent.

107.    Even when Defendants partially comply with the ADA's required accommodation by requiring counsel for the respondent in a guardianship proceeding, Defendants violate Title II of the ADA and its implementing regulations by requiring the respondent to pay for this representation.  Title II and its implementing regulations forbid Defendants from passing on the costs of representation to individuals with mental illnesses or developmental disabilities.

108.    As a result of Defendants' actions, Katherine C., Anthony M., and DLC's constituents (including Constituents A and B) have been and will be injured, and have suffered or will suffer pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of

enjoyment of life, and other nonpecuniary losses.   Remedies at law cannot adequately compensate Katherine C., Anthony M., and DLC's constituents (including Constituents A and B) for these losses.

109.    As explained in paragraphs 26-27,  the Defendants' actions have caused DLC to suffer and will continue cause DLC to suffer a diversion of its limited resources addressing the consequences of H.B. 101, the Defendants' denial of counsel to guardianship respondents, and the Defendants' imposition on respondents of the burden of paying for counsel or securing pro bono counsel.  Remedies at law cannot adequately compensate DLC for these losses.

**SECOND CLAIM FOR RELIEF**
**(For Injunctive Relief Against All Defendants)**
**(Section 504 of the Rehabilitation Act)**

110.    Plaintiffs incorporate paragraphs 1 to 109 by reference.

111.    Section 504 of the Rehabilitation Act ("Section 504") provides, "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance[.]"  29 U.S.C. § 794.

112.    Section 504 defines "disability" by reference to the ADA's definition of the term. 29 U.S.C. § 705(20).  The ADA defines "disability" as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment."  42 U.S.C. § 12102(1).

113.   Section 504 includes in its definition of a "program or activity" the operations of any "department, agency, special purpose district, or other instrumentality of a State or of a local government."  29 U.S.C. § 794(b)(1)(A).

114.   Section 504 has been interpreted to demand "certain 'reasonable' modifications to existing practices in order to 'accommodate' persons with disabilities."  *Fry v. Napoleon Cmty. Sch.*, 137 S. Ct. 743, 749 (2017) (citing *Alexander v. Choate*, 469 U.S. 287, 299–300 (1985)).

115.   Courts in this Circuit "apply the standards from the [ADA] in analyzing a Rehabilitation Act claim."  *Wilkerson v. Shinseki*, 606 F.3d 1256, 1262 (10th Cir. 2010) (citations omitted); *see also Jarvis v. Potter*, 500 F.3d 1113, 1121 (10th Cir. 2007) ("We . . . look to the ADA for guidance in resolving Rehabilitation Act claims.").

116.   On information and belief, the State of Utah receives federal funding, including federal funding for its court system.

117.   Plaintiff Katherine C. is an individual with a disability under Section 504. Katherine's impairments substantially limit one or more major life activities in that her diagnosed paranoid schizophrenia inhibits her ability to work, sleep, communicate, care for herself, and socialize with peers.  *See* 28 C.F.R. § 35.108(d)(2)(iii)(K) ("schizophrenia . . . substantially limits brain function").  Katherine is a DLC constituent because PAIMI instructs DLC to "pursue administrative, legal, and other appropriate remedies to ensure the protection of individuals with mental illness" who are receiving care or treatment in the state.  42 U.S.C. § 10805(a)(1)(C).  Katherine meets the PAIMI definition of an "individual with mental illness" because her paranoid schizophrenia is a "significant mental illness or emotional impairment, as determined by a mental health professional qualified under the laws and regulations of the State"

24

who "lives in a community setting, including their own home."  42 U.S.C. § 10802 (4)(A)-(B)(ii).

118.   Plaintiff Anthony M. is an individual with a disability under Section 504. Anthony's impairments substantially limit one or more major life activities in that his developmental disability makes it difficult for him to work, sleep, communicate, care for himself, and socialize with peers.  *See* 28 C.F.R. § 35.108(d)(2)(iii)(C) ("Intellectual disability substantially limits brain function").  Anthony is a DLC constituent because PADD instructs DLC, as Utah's designated P&A organization, to "protect and advocate the rights of individuals with developmental disabilities."  42 U.S.C. § 15043(a)(1).  Anthony's microcephaly and club feet fall within the PADD definition of "developmental disability" because both are "physical impairments" that manifested before age 22, are likely to continue indefinitely, and substantially affect Anthony's mobility, ability to live independently, and his ability to care for himself.  *See* 42 U.S.C. § 15002 (defining "developmental disability" within PADD).

119.   Constituent A is an individual with a disability under Section 504.   Upon information and belief, Constituent A has impairments that substantially limit one or more major life activities in that his developmental disability makes it difficult for him to work, sleep, communicate, care for himself, and socialize with peers.  *See* 28 C.F.R. § 35.108(c)(i) (listing examples of major life activities).  Constituent A is also a DLC constituent under PAIMI or PADD, as Constituent A's disability falls under the definitions articulated in either or both of these statutes.  *See* 42 U.S.C. §§ 10802, 15002 (defining "individual with mental illness" under PAIMI and "developmental disability" under PADD, respectively).  The guardianship order issued in the matter of Constituent A allows his parents to "commit [Constituent A] to a

25

Psychiatric Hospital if necessary to protect the safety of [Constituent A], or to protect the safety of others." Additionally, at least as of the imposition of a plenary guardianship in the matter of Constituent A, Constituent A also has a record of having a disability.

120.    Constituent B is an individual with a disability under Section 504. Upon information and belief, Constituent B has impairments that substantially limit one or more major life activities in that his developmental disability makes it difficult for him to work, sleep, communicate, care for himself, and socialize with peers. *See* 28 C.F.R. § 35.108(c)(i)) (listing examples of major life activities). Constituent B is also a DLC constituent under PAIMI or PADD, as Constituent B's disability falls under the definitions articulated in either or both of these statutes. *See* 42 U.S.C. §§ 10802, 15002 (defining "individual with mental illness" under PAIMI and "developmental disability" under PADD, respectively). The guardianship order issued in the matter of Constituent B confirms that Constituent B's "doctor has certified that he is in need of protection." Additionally, at least as of the imposition of a plenary guardianship in the matter of Constituent B, Constituent B also has a record of having a disability.

121.    Those of DLC's constituents who have been or may be subjected to a guardianship proceeding are individuals with disabilities under Section 504. These constituents have mental illnesses or developmental disabilities that substantially limit one or more major life activity, such as self-care and interaction with others. These constituents also have a record of these mental illnesses or developmental disabilities.

122.    Plaintiffs Katherine C. and Anthony M., along with DLC's constituents who have been or may be subjected to a guardianship proceeding, are qualified individuals under Section 504 in that they meet the essential eligibility requirements for access to the courts.

123.   Katherine C, Anthony M., and DLC's constituents who have been or may be subjected to a guardianship proceeding cannot fully participate in this proceeding without an attorney representative.  Absent counsel, these respondents cannot participate and communicate on an equal, equally effective, or meaningful basis in the adversarial process.  They are less likely to contest the proposed guardianship or, where some form of guardianship is appropriate, to advocate for limits to this guardianship.

124.   Under Section 504 and its implementing regulations, counsel constitute a required reasonable accommodation for individuals with mental illnesses or developmental disabilities, who otherwise would be excluded from participation in, denied the benefits of, and subjected to discrimination in attempting to access guardianship proceedings. Counsel also constitute a required reasonable accommodation under Section 504 and its implementing regulations to ensure that the court system's communications with developmentally disabled individuals and individuals with mental illnesses are as effective as its communications with others.

125.   Defendants discriminate against Plaintiffs in violation of Section 504 and its implementing regulations by:

      a.  failing to make the reasonable accommodations necessary to ensure an equal opportunity for Plaintiffs to participate in Defendants' programs and activities;

      b.  failing to make the reasonable accommodations necessary to ensure effective communication with Plaintiffs; and

      c.  by forcing Plaintiffs to bear the costs of their reasonable accommodations.

126.   This failure to make reasonable accommodations constitutes discrimination.  This discrimination is by reason of Katherine C.'s, Anthony M.'s and DLC's constituents' disabilities because their disabilities are the reason for their need for the reasonable accommodation.

127.   As a result of Defendants' failure to provide counsel, Katherine C., Anthony M., and DLC's constituents have been excluded from or denied the benefits of Defendants' programs and activities or face exclusion from or denial of the benefits of Defendants' programs and activities.

128.   This exclusion is by reason of Katherine C.'s, Anthony M.'s, and DLC's constituents' disabilities because their disabilities are the reason for their need for the reasonable accommodation.

129.   By implementing legislation allowing a guardianship to proceed without counsel for the respondent (H.B. 101), a required accommodation under Section 504, Defendants discriminate against Katherine C., Anthony M., and DLC's constituents.

130.   Even when Defendants require counsel for the respondent, Defendants violate Section 504 and its implementing regulations by requiring the respondent to pay for this representation.  Section 504 and its implementing regulations forbid Defendants from passing on the costs of representation, which representation constitutes a reasonable accommodation, to individuals with mental illnesses or developmental disabilities.

131.   As a result of Defendants' actions, Katherine C., Anthony M., and DLC's constituents (including Constituents A and B) have been and will be injured, and have suffered or will suffer pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses.  Remedies at law cannot adequately

compensate Katherine C., Anthony M., and DLC's constituents (including Constituents A and B) for these losses.

132.     As explained in paragraphs 26-27,  the Defendants' actions have caused DLC to suffer and will continue cause DLC to suffer a diversion of its limited resources addressing the consequences of H.B. 101, the Defendants' denial of counsel to guardianship respondents, and the Defendants' imposition on respondents of the burden of paying for counsel or securing pro bono counsel.  Remedies at law cannot adequately compensate DLC for these losses.

**THIRD CLAIM FOR RELIEF**
**(For Injunctive Relief Against Defendant Herbert)**
**(28 U.S.C. § 1983; Procedural Due Process: United States Constitution, Amendment XIV)**

133.     Plaintiffs incorporate paragraphs 1 to 132 by reference.

134.     Defendant Herbert is a state actor as contemplated by 28 U.S.C. § 1983 and Amendment XIV of the United States Constitution.

135.     As a direct and proximate result of Defendant Herbert's actions, Katherine C., Anthony M., and DLC's constituents face a significant risk of being adjudged incapacitated and placed into legal guardianships without being represented by independent counsel.  Such a legal guardianship would infringe on an extensive range of physical liberty interests, including the ability to make medical decisions, travel between states, and freely associate with others.

136.     Without independent counsel, Katherine C., Anthony M., and DLC's constituents will be unable to fully and fairly participate in the guardianship hearings that will determine whether or not their legal autonomy is effectively erased.  This greatly enhances the likelihood that a guardianship will be improperly or erroneously imposed.

137.    Defendant Herbert's failure to require and pay for counsel deprives respondents unable to afford counsel of their due-process right to a full and fair hearing.  "[R]eason and reflection require us to recognize that in our adversary system . . . any person haled into court, who is too poor to hire a lawyer, cannot be assured a fair trial unless counsel is provided for him." *Gideon*, 372 U.S. at 344.

138.    Failure to require and pay for counsel in these circumstances infringes the right to a full and fair hearing encompassed in the procedural due process guaranteed by the Due Process Clause of Amendment XIV of the United States Constitution.

139.    As a direct and proximate result of Defendant Herbert's actions, Katherine C., Anthony M., and DLC's constituents (including Constituents A and B) face a serious threat of damages including physical, mental, and emotional injury, pain, suffering, humiliation, and embarrassment.  Remedies at law cannot adequately compensate Katherine C., Anthony M., and DLC's constituents for these losses.

140.    As explained in paragraphs 26-27,  Defendant Herbert's actions have caused DLC to suffer and will continue cause DLC to suffer a diversion of its limited resources addressing the consequences of H.B. 101, Defendant Herbert's denial of counsel to guardianship respondents, and Defendant Herbert's imposition on respondents of the burden of paying for counsel or securing pro bono counsel.  Remedies at law cannot adequately compensate DLC for these losses.

**FOURTH CLAIM FOR RELIEF**
**(For Injunctive Relief Against Defendant State of Utah)**
**(Procedural Due Process: United States Constitution, Amendment XIV)**

141.    Plaintiffs incorporate paragraphs 1 to 140 by reference.

142.    Defendant State of Utah is a state actor as contemplated by Amendment XIV of the United States Constitution.

143.    As a direct and proximate result of Defendant State of Utah's actions, Katherine C., Anthony M., and DLC's constituents face a significant risk of being adjudged incapacitated and placed into legal guardianships without being represented by independent counsel.  Such a legal guardianship would infringe on an extensive range of physical liberty interests, including the ability to make medical decisions, travel between states, and freely associate with others.

144.    Without independent counsel, Katherine C., Anthony M., and DLC's constituents will be unable to fully and fairly participate in the guardianship hearings that will determine whether or not their legal autonomy is effectively erased.  This greatly enhances the likelihood that a guardianship will be improperly or erroneously imposed.

145.    Defendant State of Utah's failure to require and pay for counsel deprives respondents unable to afford counsel of their due-process right to a full and fair hearing.  "[R]eason and reflection require us to recognize that in our adversary system . . . any person haled into court, who is too poor to hire a lawyer, cannot be assured a fair trial unless counsel is provided for him."  *Gideon*, 372 U.S. at 344.

146.    Failure to require and pay for counsel in these circumstances infringes the right to a full and fair hearing encompassed in the procedural due process guaranteed by the Due Process Clause of Amendment XIV of the United States Constitution.

147.    As a direct and proximate result of Defendant State of Utah's actions, Katherine C., Anthony M., and DLC's constituents (including Constituents A and B) face a serious threat of damages including physical, mental, and emotional injury, pain, suffering, humiliation, and

embarrassment.  Remedies at law cannot adequately compensate Katherine C., Anthony M., and DLC's constituents for these losses.

148.    As explained in paragraphs 26-27,  Defendant State of Utah's actions have caused DLC to suffer and will continue cause DLC to suffer a diversion of its limited resources addressing the consequences of H.B. 101, Defendant State of Utah's denial of counsel to guardianship respondents, and Defendant State of Utah's imposition on respondents of the burden of paying for counsel or securing pro bono counsel.  Remedies at law cannot adequately compensate DLC for these losses.

## FIFTH CLAIM FOR RELIEF
### (For Declaratory Judgment Against All Defendants)
### (Americans with Disabilities Act and the United States Constitution)

149.    Plaintiffs incorporate paragraphs 1 to 148 by reference.

150.    Plaintiffs are entitled to a declaratory judgment that Title II of the ADA obligates Defendants to require counsel for all guardianship respondents in the State of Utah.

151.    Plaintiffs are entitled to a declaratory judgment that Title II of the ADA requires Defendants to pay for counsel for all guardianship respondents in the State of Utah.

152.     Plaintiffs are entitled to a declaratory judgment that the Fourteenth Amendment to the United States Constitution obligates Defendants to require and pay for counsel for all guardianship respondents in the State of Utah.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs seek the following relief:

A.      An injunction prohibiting Defendants from implementing or administering H.B. 101 to remove the requirement of counsel for respondents in guardianship proceedings in the State of Utah.

B.      An injunction requiring Defendants to appoint and pay for counsel for all guardianship respondents in the State of Utah.

C.      A judicial declaration that Title II of the ADA and Section 504 of the Rehabilitation Act require respondents in guardianship proceedings to have counsel.

D.      A judicial declaration that Title II of the ADA and Section 504 of the Rehabilitation Act require Defendants to appoint and pay for counsel for all guardianship respondents in the State of Utah.

E.      A judicial declaration that the Fourteenth Amendment to the United States Constitution requires Defendants to appoint and pay for counsel for all guardianship respondents in the State of Utah.

F.      Any other relief as the Court deems just and equitable, including but not limited to fees under the ADA and Rehabilitation Act and any other applicable statute or regulation.

Dated this 1st day of December, 2017          Respectfully submitted,

                                              /s/  Kyle A. Virgien

                                              Alfred C. Pfeiffer, Jr. (*pro hac vice*)
                                              Kyle A. Virgien (*pro hac vice*)
                                              Dorottya Schranz (*pro hac vice*)
                                              John H. Steinbach (*pro hac vice*)
                                              LATHAM & WATKINS LLP

33

505 Montgomery Street, Suite 2000
San Francisco, California  94111-6538
Telephone: 415-391-0600
Facsimile: 415-395-8095
al.pfeiffer@lw.com
kyle.virgien@lw.com
dorey.schranz@lw.com
john.steinbach@lw.com

Claudia Center (*pro hac vice* )
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
39 Drumm Street
San Francisco, CA 94111
Telephone: 415.343.0762
Facsimile: 415.395.0950
ccenter@aclu.org

John Mejia (Bar No. 13965)
Leah Farrell (Bar No. 13696)
AMERICAN CIVIL LIBERTIES UNION OF
UTAH FOUNDATION, INC.
355 N. 300 W.
Salt Lake City, Utah 84103
Telephone: 801.521.9862
Facsimile: 801.532.2850
aclu@acluutah.org

Attorneys for Plaintiffs Disability Law Center,
Katherine C., and Anthony M.