Alfred C. Pfeiffer, Jr. (*pro hac vice*)
Kyle A. Virgien (*pro hac vice*)
Dorottya Schranz (*pro hac vice*)
John H. Steinbach (*pro hac vice*)
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, California 94111-6538
Telephone: 415.391.0600
Facsimile: 415.395.8095
al.pfeiffer@lw.com
kyle.virgien@lw.com
dorey.schranz@lw.com
john.steinbach@lw.com

Claudia Center (*pro hac vice*)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
39 Drumm Street
San Francisco, CA 94111
Telephone: 415.343.0762
Facsimile: 415.395.0950
ccenter@aclu.org

John Mejia (Bar No. 13965)
Leah Farrell (Bar No. 13696)
AMERICAN CIVIL LIBERTIES UNION OF
UTAH FOUNDATION, INC.
355 N. 300 W.
Salt Lake City, Utah 84103
Telephone: 801.521.9862
Facsimile: 801.532.2850
aclu@acluutah.org

*Attorneys for Plaintiffs Disability Law
Center, Katherine C., and Anthony M.*

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| Disability Law Center, Katherine C., and Anthony M. | Case No. 2:17-cv-00748-RJS |
| Plaintiffs, | **PLAINTIFFS' MOTION AND MEMORANDUM IN SUPPORT FOR A PRELIMINARY INJUNCTION** |
| v. | |
| The State of Utah; Gary Herbert, in his official capacity as Governor of Utah | Judge Robert J. Shelby |
| Defendants. | Chief Magistrate Judge Paul M. Warner |

# TABLE OF CONTENTS

**Page**

I.  The Plaintiffs Will Suffer Irreparable Harm in the Absence of An Injunction Because They Stand to Lose Their Most Basic Freedoms Without Meaningful Access to the Judicial Process. ...............................................................6

II. The Balance of Equities Weighs in the Plaintiffs' Favor. ....................................9

III. The Plaintiffs Have a Substantial Likelihood of Success on the Merits of Their ADA and Constitutional Claims. ......................................................10

    A.  Plaintiffs Properly Bring Their Claims As A Facial Challenge To Utah's Statutory Scheme ...............................................................10

    B.  Denying Individuals with Disabilities the Full Ability to Defend Themselves Against Guardianship Proceedings Violates Title II of the Americans With Disabilities Act. ...............................................11

        1.  Any Respondent in a Guardianship Proceeding Necessarily Meets the ADA's Requirements That He or She Be "Qualified" and "Disabled." ...............................................................12

        2.  Absent an Injunction, Guardianship Respondents' Lack of Counsel Will Deprive Them of the Ability to Meaningfully Defend Against a Guardianship, Subjecting Them to Both (1) Exclusion From or Denial of Benefits of Public Activities and (2) Discrimination. ...............13

        3.  The Discrimination or Denial of Benefits Is on the Basis of Guardianship Respondents' Disabilities Because It Removes Their Ability to Meaningfully Present a Defense. ...............................17

    C.  The Same Showing That Establishes an ADA Violation Also Establishes A Violation of Section 504 of the Rehabilitation Act. ..............................17

    D.  Utah's Guardianship Law Undermines the Fourteenth Amendment's Procedural Due Process Guarantee of Access to a Full and Fair Hearing. ...........19

        1.  H.B. 101 Puts at Risk the Guardianship Respondent's Fundamental Autonomy and Physical Liberty ...............................................19

        2.  The Risk of Erroneous Deprivation Is Far Too High Given the Weight of the Liberty Interests at Stake ...........................................23

        3.  The Defendants' Interests Pale in Comparison to the Fundamental Liberty Interests Imperiled by H.B. 101. ....................................24

i

IV.    The Public Interest Requires a Preliminary Injunction Protecting Guardianship
       Respondents from Devastating, Permanent Deprivations of Liberty while this
       Case Proceeds to a Final Determination. .........................................................................25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## CASES

*ACLU v. Individual Members of the Ind. State Bd. of Law Examiners*,
  2011 U.S. Dist. LEXIS 106337 (S.D. Ind. Sept. 20, 2011) ...................................................10

*Addington v. Texas*,
  441 U.S. 418 (1979)...................................................................................................................20

*Alexander v. Choate*,
  469 U.S. 287 (1985)...................................................................................................................18

*Awad v. Ziriax*,
  670 F.3d 1111 (10th Cir. 2012) .................................................................................................25

*Boddie v. Connecticut*,
  401 U.S. 371 (1971)..............................................................................................................18, 19

*Bowdry v. United Air Lines, Inc.*,
  956 F.2d 999 (10th Cir. 1992) .....................................................................................................8

*California Found. for Indep. Living Centers v. Cty. of Sacramento*,
  142 F. Supp. 3d 1035 (E.D. Cal. 2015).................................................................................10, 11

*Chaffin v. Kansas State Fair Bd.*,
  348 F.3d 850 (10th Cir. 2003) ...................................................................................................14

*Citizens United v. FEC*,
  558 U.S. 310  (2010)...................................................................................................................10

*City of Mesquite v. Aladdin's Castle, Inc.*,
  455 U.S. 283 (1982).....................................................................................................................8

*Cooper v. Meyer*,
  No. 16-CV-526-JDP, 2017 WL 3128822 (W.D. Wis. July 21, 2017).........................................9

*Doe v. City of Albuquerque*,
  667 F.3d 1111 (10th Cir. 2012) .................................................................................................10

*Enyart v. Nat'l Conference of Bar Examiners, Inc.*,
  630 F.3d 1153 (9th Cir. 2011) ...................................................................................................26

*Fish v. Kobach*,
   840 F.3d 710 (10th Cir. 2016) ...................................................................................7

*Fishman v. Paolucci*,
   628 F. App'x 797 (2d Cir. 2015) ...............................................................................9

*Franco-Gonzales v. Holder*,
   767 F. Supp. 2d 1034 (C.D. Cal. 2010) (*Franco I*)..............................................3, 15

*Franco-Gonzales v. Napolitano*,
   No. 10-CV-02211, 2011 WL 11705815 (C.D. Cal. Nov. 21, 2011) (*Franco II*) ...................11

*Franco-Gonzalez v. Holder* (*Franco II*),
   No. 10-CV-02211, 2013 WL 8115423 (C.D. Cal. Apr. 23, 2013) (*Franco III*).....................11

*Gagnon v. Scarpelli*,
   411 U.S. 778 (1973)..................................................................................................23

*In re Gault*,
   387 U.S. 1 (1967)...........................................................................................2, 20, 21

*Gideon v. Wainwright*,
   372 U.S. 335 (1963)......................................................................................2, 21, 23

*Goldberg v. Kelly*,
   397 U.S. 254 (1970)..................................................................................................23

*Grant v. Johnson*,
   757 F. Supp. 1127 (D. Or. 1991) ............................................................................21

*Hamdi v. Rumsfeld*,
   542 U.S. 507 (2004).................................................................................................20

*Hamlyn v. Rock Island Cty. Metro. Mass Transit Dist.*,
   960 F. Supp. 160 (C.D. Ill. 1997) ............................................................................7

*Henrietta D. v. Bloomberg*,
   331 F.3d 261 (2d Cir. 2003)....................................................................................16

*Heryford v. Parker*,
   396 F.2d 393 (10th Cir. 1968) .............................................................................2, 22

*Hollonbeck v. U.S. Olympic Comm.*,
   513 F.3d 1191 (10th Cir. 2008) ..............................................................................17

*Matter of Howes*,
   471 A.2d 689 (Me. 1984)............................................................................................19

*J.V. v. Albuquerque Pub. Sch.*,
   813 F.3d 1289 (10th Cir. 2016) .................................................................................13

*Jarvis v. Potter*,
   500 F.3d 1113 (10th Cir. 2007) .................................................................................17

*Kikumura v. Hurley*,
   242 F.3d 950 (10th Cir. 2001) .....................................................................................7

*Kitchen v. Herbert*,
   961 F. Supp. 2d 1181 (D. Utah 2013), *aff'd*, 755 F.3d 1193 (10th Cir. 2014) ........11

*Leonardson v. City of E. Lansing*,
   896 F.2d 190 (6th Cir. 1990) .......................................................................................8

*Little v. Streater*,
   452 U.S. 1 (1981)........................................................................................................25

*Massey v. Moore*,
   348 U.S. 105 (1954)......................................................................................................3

*Mathews v. Eldridge*,
   424 U.S. 319 (1976)....................................................................................................19

*McClendon v. City of Albuquerque*,
   272 F. Supp. 2d 1250 (D.N.M. 2003) ..........................................................................7

*Estate of Milstein v. Ayers*,
   955 P.2d 78 (Colo. App. 1998) ..................................................................................19

*Mullane v. Cent. Hanover Bank & Trust Co.*,
   339 U.S. 306 (1950)....................................................................................................18

*Olmstead v. L.C. ex rel. Zimring*,
   527 U.S. 581 (1999)....................................................................................................17

*Planned Parenthood Ass'n of Utah v. Herbert*,
   828 F.3d 1245 (10th Cir. 2016) ...................................................................................7

*Planned Parenthood of S.E. Penn. v. Casey*,
   505 U.S. 833 (1992)....................................................................................................11

*Popovich v. Cuyahoga Cty. Ct. Com. Pl., Dom. Rel. Div.*,
  276 F.3d 808 (6th Cir. 2002) (en banc) ....................................................13, 16

*Powell v. Alabama*,
  287 U.S. 45 (1932).........................................................................................23

*Prairie Band of Potawatomi Indians v. Pierce*,
  253 F.3d 1234 (10th Cir. 2001) .......................................................................8

*Randolph v. Rodgers*,
  170 F.3d 850 (8th Cir. 1999) .........................................................................14

*Robertson v. Las Animas Cty. Sheriff's Dep't*,
  500 F.3d 1185 (10th Cir. 2007) ..........................................................11, 12, 14

*Miller ex rel. S.M. v. Bd. of Educ. of Albuquerque Pub. Sch.*,
  565 F.3d 1232 (10th Cir. 2009) .....................................................................18

*Seegmiller v. Accredited Home Lenders, Inc.*,
  No. 2:11-CV-00771 CW, 2011 WL 4964508 (D. Utah Oct. 19, 2011)....................................7

*State ex rel. Shamblin v. Collier*,
  445 S.E.2d 736 (W. Va. 1994)....................................................................2, 19

*Shotz v. Cates*,
  256 F.3d 1077 (11th Cir. 2001) .....................................................................12

*Tennessee v. Lane*,
  541 U.S. 509 (2004)....................................................................................3, 14

*Turner v. Rogers*,
  564 U.S. 431 (2011)..............................................................................3, 23, 24

*United States v. James Daniel Good Real Prop.*,
  510 U.S. 43 (1993).........................................................................................19

*Verlo v. Martinez*,
  820 F.3d 1113 (10th Cir. 2016) .....................................................................25

*Vitek v. Jones*,
  445 U.S. 480 (1980)..................................................................................21, 22

*Walker v. McLain*,
  768 F.2d 1181 (10th Cir. 1985) .......................................................................2

*Wilkerson v. Shinseki*,
   606 F.3d 1256 (10th Cir. 2010) .................................................................17, 18

*Winter v. NRDC, Inc.*,
   555 U.S. 7 (2008) .........................................................................................6

*Young v. City of Claremore*,
   411 F. Supp. 2d 1295 (N.D. Okla. 2005) ...................................................15

## STATUTES

29 U.S.C. § 794(a) .........................................................................................16, 17

29 U.S.C. § 794(b)(1)(A) .................................................................................17

42 U.S.C. § 12102(1) .......................................................................................12

42 U.S.C. § 12131(1) .......................................................................................12

42 U.S.C. § 12131(2) .......................................................................................12

42 U.S.C. § 12132 ...............................................................................11, 12, 16

Utah Code § 75-1-201(22) ...............................................................................13

Utah Code § 75-5 ............................................................................................17

Utah Code § 75-5-201 .......................................................................................1

Utah Code § 75-5-301 .......................................................................................2

Utah Code § 75-5-303(d) ........................................................................4, 5, 10

Utah Code § 75-5-304 .......................................................................................1

Utah Code § 75-5-306 ...................................................................................5, 20

Utah Code § 75-5-312 ................................................................................2, 9, 20

Utah Code § 75-5-312(3) ...................................................................................4

Utah Code § 75-5-312(3)(c) ..............................................................................4

## TREATISES

11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice
   and Procedure § 2948.1 (2d ed. 1995) .........................................................7

# REGULATIONS

28 C.F.R. § 35.108(d)(2)(iii)(C), (E), (G), (K) ..................................................................13

28 C.F.R. § 35.130(b)(3)(i) ..............................................................................................14

28 C.F.R. § 35.130(b)(7)(i) ..............................................................................................14

# OTHER AUTHORITIES

*General Session: Executive Offices and Criminal Justice*, Utah Legislature
  Website (2017), *available at*
  https://le.utah.gov/lfa/cobi/currentCobi/cobi.html?cobiID=94&tab=financials
  Tab. .................................................................................................................................18

*Guardianship Signature Program*, Utah Courts Website (June 2, 2016), available
  at https://www.utcourts.gov/howto/family/gc/signature/index.html ...........................5

Law and Aging, *Representation and Investigation in Guardianship Proceedings,*
  *available at*
  http://www.americanbar.org/content/dam/aba/administrative/law_aging/chartr
  epresentationandinvestigation.authcheckdam.pdf (2015)..........................................22

*Rights of Protected Persons*, Utah Office of the Public Guardian, *available at*
  digitallibrary.utah.gov/awweb/awarchive?type=download&item=17999 .............................21

Utah District Courts: FY2017 Case Type by Court, *available at*
  https://www.utcourts.gov/stats/files/2017FY/district/0-Statewide.pdf...................................6

## RELIEF SOUGHT AND SPECIFIC GROUNDS FOR MOTION

Disability Law Center (on behalf of itself and its constituents), Katherine C., and Anthony M. (collectively the "Plaintiffs") hereby move the Court for a preliminary injunction barring defendants the State of Utah, and Governor Gary Herbert in his official capacity (collectively the "Defendants") from implementing and enforcing House Bill 101 pending the resolution of this case. House Bill 101 strips the guarantee of representation by counsel from those facing guardianship proceedings. In doing so, it violates guardianship respondents' rights under the Americans with Disabilities Act, the Rehabilitation Act, and the U.S. Constitution.

Injunctive relief is appropriate to protect the Plaintiffs and the public. Those who are subject to guardianship proceedings face the type of imminent, irreparable deprivation of rights that requires the protection of a preliminary injunction. As explained below, (1) the Plaintiffs are likely to suffer immediate and irreparable harm in the absence of preliminary relief, (2) the balance of equities favors an injunction, (3) the Plaintiffs are likely to succeed on the merits, and (4) an injunction is in the public interest. Accordingly, the Plaintiffs respectfully request that the Court grant this motion.

## INTRODUCTION

Upon showing that an adult respondent[1] is incapacitated and that a guardianship appointment is necessary or desirable as a means of providing care and supervision, a petitioner may obtain guardianship over this respondent, now termed a "ward." Utah Code § 75-5-304.

---

[1] Utah has a separate statutory scheme to appoint guardianships over minors, as codified in Utah Code Section 75-5-201, et. seq. ("Guardians of Minors"). This suit challenges Utah's statutory scheme related to the appointment of guardians for disabled *adults*, as codified in Utah Code Section 75-5-301, et. seq. ("Guardians of Incapacitated Persons").

Guardianship is a drastic measure "result[ing] in a massive curtailment of liberty." *State ex rel. Shamblin v. Collier*, 445 S.E.2d 736, 739 (W. Va. 1994) (internal quotation omitted).  Under an unlimited guardianship, the ward loses basic aspects of human autonomy including the ability to determine where to live, whether to marry and become a parent, whom to associate with, whether or where to work, and whether or not to receive medical treatment.  Utah Code § 75-5-312; Zahradnikova Decl., ¶ 12, Ex. G.  This deprivation of basic liberties continues until the ward's death.  Upon the guardian's death the guardianship will pass to another guardian or to the state in a process over which the ward has no control.  Utah Code § 75-5-301.

Guardianship respondents—a vulnerable population facing severe intrusions on their liberties—require the safeguard of counsel.  The American legal system has long relied on the right to counsel as the primary safeguard against the erroneous deprivation of basic liberties.  In *Gideon v. Wainwright*, the Supreme Court recognized that the right to counsel in criminal proceedings is so fundamental to our concept of liberty that it is incorporated in the Fourteenth Amendment's guarantee of due process.  372 U.S. 335, 345 (1963).  Soon after, the Supreme Court held that "the essentials of due process and fair treatment" extend this same right to counsel to the civil context of juvenile justice.  *In re Gault*, 387 U.S. 1, 30-31 (1967).  In doing so, it discarded the fiction that the state was acting in the juvenile's interest by providing him custody, instead recognizing any deprivation of liberty as necessarily adverse to his interests.  *Id.* at 16.  Courts have recognized counsel as a necessary procedural protection in many civil proceedings where a party's physical liberty interest is at stake.  *Heryford v. Parker*, 396 F.2d 393, 396 (10th Cir. 1968) (extending the right to counsel to civil-commitment proceedings); *Walker v. McLain*, 768 F.2d 1181, 1184 (10th Cir. 1985) (recognizing a right to counsel for those facing imprisonment for civil

contempt).  The law now recognizes the right to counsel as a primary bulwark against any serious governmental incursion on physical liberty that is guaranteed unless the government can ensure a proceeding's "fundamental fairness" through substitute procedural safeguards.  *Turner v. Rogers*, 564 U.S. 431, 448 (2011).

The right to counsel is especially crucial when the person whose liberty is at stake has an intellectual, developmental, or psychiatric disability.  Even before *Gideon*, the Supreme Court recognized that "[n]o trial can be fair that leaves the defense to a man who is insane, unaided by counsel, and who by reason of his mental conditions stands helpless and alone before the court."[2] *Massey v. Moore*, 348 U.S. 105, 108 (1954).  And when Congress passed the Americans with Disabilities Act (the "ADA"), it explicitly recognized full access to the courts as one of the act's key protections.  *Tennessee v.  Lane*, 541 U.S. 509, 527-29 (2004).  When a party's disability affects his or her ability to meaningfully communicate with the court in a proceeding in which he or she is asked to defend against a serious judicial incursion on his or her interests, the ADA—and the related Rehabilitation Act—require counsel as an accommodation for that disability.  *Franco-Gonzales v. Holder*, 767 F. Supp. 2d 1034, 1053-55 (C.D. Cal. 2010) (*Franco I*).

For almost three decades, Utah guaranteed all guardianship respondents representation by independent counsel.  This guarantee was flawed because the state required respondents to pay for their own counsel (or to secure *pro bono* counsel)—a flaw that the Plaintiffs challenge in this suit.  But this motion for a preliminary injunction targets a narrower, more immediate deprivation that results from a recent change in the law.  Utah's House Bill 101 went into effect on May 10, 2016,

---

[2] The term "insane" is outdated.  Plaintiffs use contemporary phrasing like "mental disability."

gutting the existing statutory guarantee of counsel. This bill amended the law so that a guardianship respondent is no longer guaranteed counsel when he or she falls into a statutorily defined category. Disabled Adult Guardianship Amendments, H.B. 101, 2016 Gen. Sess. (Utah 2016) ("H.B. 101"); Utah Code § 75-5-303(d).

House Bill 101 violates the Americans with Disabilities Act, the Rehabilitation Act, and the Fourteenth Amendment to the U.S. Constitution. It materially curtails guardianship respondents' ability to communicate with the court to defend their interests in proceedings that may irrevocably deprive them of their most fundamental liberties, and it does so without providing the state any significant countervailing benefit. The Plaintiffs therefore respectfully request that this Court protect guardianship respondents with a preliminary injunction returning Utah's guardianship system to the status quo before H.B. 101 went into effect.

## STATEMENT OF FACTS

A guardianship involves a serious incursion on a potential ward's liberty. A guardian gains control over a ward's place of abode, ability to travel, and ability to associate with others. Utah Code § 75-5-312(3); Zahradnikova Decl., ¶ 12. A guardian can also control decisions over a ward's medical treatment, including whether to terminate life-sustaining care and whether to institutionalize the ward. Utah Code § 75-5-312(3)(c); Zahradnikova Decl., ¶ 12; Virgien Decl., Ex. B (authorizing guardian appointed in hearing without counsel pursuant to HB101 to make "end of life decisions" for the ward and to institutionalize the ward in a psychiatric hospital); Zahradnikova Decl., Ex. G (limited guardianship providing guardians with the power to "exercise dominion over [the ward], to conduct medical and psychological evaluations, as necessary and as appropriate, to detain [the ward] and transfer her to a more appropriate living situation, if

4

necessary").  A guardianship may give a guardian authority over a ward's ability to marry or raise his or her own children.  Zahradnikova Decl., ¶ 12; *see also* Zahradnikova Decl., Ex. G (limited guardianship specifying that the ward will seek her guardians' "advice regarding her pending marriage and, in any event, shall not discuss the date of her nuptials until after January 1, 2015"). In contrast to incarceration or juvenile detention, which is generally temporary, these constraints on the fundamental freedom are designed to be permanent.  Utah Code § 75-5-306; *see also* Zahradnikova Decl., Ex. G (limited guardianship order described as "permanent").

The Utah Board of District Court Judges and Utah Bar Commission endorse the Guardianship Signature Program, which provides counsel to some respondents in guardianship proceedings.  *See* Guardianship Signature Program, Utah Courts Website (June 2, 2016), available at http://www.utcourts.gov/howto/family/gc/signature//. The Signature Program provides judges with a list of lawyers who have volunteered to represent respondents in guardianship proceedings, either on a pro-bono or sliding-scale basis.  *Id.*  Law students and recent graduates assist Signature Program attorneys through a University of Utah program.  *Id.*

Until last year, Utah law guaranteed all guardianship respondents counsel, although it required some to pay for this counsel.  But on May 10, 2016, House Bill 101 went into effect, stripping respondents of guaranteed counsel when they fall into a statutorily defined category:

> (i) the ward is the biological or adopted child of the person seeking guardianship;
> (ii) the value of the ward's entire estate does not exceed $20,000;
> (iii) the ward appears in court with his or her parent;
> (iv) the ward is given the opportunity to communicate, to the extent possible, acceptance of the appointment of petitioner; and
> (v) the court is satisfied that counsel is not necessary in order to protect the ward's interests.

H.B. 101; Utah Code § 75-5-303(d).

The Utah Courts website listed 361 "Guardian – Adult Child" cases filed in Utah district

5

courts between July 1, 2016 and June 30, 2017.  *See* Utah District Courts: FY2017 Case Type by Court, available at  https://www.utcourts.gov/stats/files/2017FY/district/0-Statewide.pdf.   Since the passage of H.B. 101, a number of DLC's constituents have had guardianships imposed without representation by counsel.  *Id.* at ¶ 27; *see also* Sell Decl. at ¶¶ 6-10; Virgien Decl., Exs. E (recording of 41-second hearing in which guardianship was imposed without counsel for respondent), H (order granting request to waive requirement for lawyer for respondent), G (order appointing guardianship in same case as Exhibit H).  Many more are at risk of losing their rights to a guardianship without the benefit of counsel.  *Id.* at ¶¶ 14, 27.  There is a higher likelihood of error in cases where the respondent is not represented by independent counsel, and wards not represented by counsel are at a greater risk of receiving a full guardianship when a partial one would suffice.  *Id.* at ¶ 13; *see also* Katherine C. Decl. at ¶ 23; Anthony M. Decl. at ¶ 7.

## ARGUMENT

The Plaintiffs seek a preliminary injunction returning Utah's guardianship program to its status quo before H.B. 101 went into effect until this case is resolved.  The Court should order this preliminary injunction because (1) the Plaintiffs are likely to suffer immediate and irreparable harm in the absence of preliminary relief, (2) the balance of equities tips in favor of an injunction, (3) the Plaintiffs are likely to succeed on the merits, and (4) an injunction is in the public interest. *Winter v. NRDC, Inc.*, 555 U.S. 7, 19-20 (2008).

## I.     THE PLAINTIFFS WILL SUFFER IRREPARABLE HARM IN THE ABSENCE OF AN INJUNCTION BECAUSE THEY STAND TO LOSE THEIR MOST BASIC FREEDOMS WITHOUT MEANINGFUL ACCESS TO THE JUDICIAL PROCESS.

The Plaintiffs will suffer irreparable harm should the Court deny them their right to be represented by counsel in guardianship proceedings brought against them.  They need show no

harm beyond the statutory and constitutional violations they have suffered, and even if the Court

would look beyond these violations the facts of this case show irreparable harm.

A party who shows a deprivation of a constitutional right succeeds on irreparable harm.

*Fish v. Kobach*, 840 F.3d 710, 752 (10th Cir. 2016) (evaluating irreparable harm in a case brought

on statutory grounds to enforce voting rights, and noting that "the violation of a constitutional right

[to vote] must weigh heavily in that analysis"); *Planned Parenthood Ass'n of Utah v. Herbert*, 828

F.3d 1245, 1263 (10th Cir. 2016) ("We . . . conclude that the likelihood that PPAU will suffer a

violation of its First Amendment rights if the Directive is left in place, standing alone, gives rise

to an irreparable injury."); *Kikumura v. Hurley*, 242 F.3d 950, 963 (10th Cir. 2001) ("'When an

alleged constitutional right is involved, most courts hold that no further showing of irreparable

injury is necessary.'" (quoting 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane,

Federal Practice and Procedure § 2948.1 (2d ed. 1995)).  This is true both for constitutional claims

and non-constitutional claims alleging a harm that amounts to a constitutional violation.  *See Fish*,

840 F.3d at 752 (presumption of irreparable harm based on infringement of "the right to vote" in

case brought under federal voting statute and elections clause of the Constitution).  Because the

Plaintiffs allege infringement of their constitutional rights to access the courts, they need make no

additional showing of irreparable harm on their constitutional claims.[3]  *See McClendon v. City of*

---

[3] A procedural due process violation may result in reparable monetary damages, so a deprivation
of property "typically does not *automatically* trigger a finding of irreparable harm."  *Seegmiller v.
Accredited Home Lenders, Inc.*, No. 2:11-CV-00771 CW, 2011 WL 4964508, at *3 (D. Utah Oct.
19, 2011) (quotation omitted) (emphasis added); *accord Hamlyn v. Rock Island Cty. Metro. Mass
Transit Dist.*, 960 F. Supp. 160, 163 (C.D. Ill. 1997) ("For instance, in a procedural due process
action, there is no [irreparable] harm where the injury is ultimately redressable through monetary
compensation.").  The deprivation here is of a liberty interest—not a monetarily compensable
property interest—so this exception to automatic irreparable harm does not apply.

*Albuquerque*, 272 F. Supp. 2d 1250, 1259 (D.N.M. 2003) (holding that plaintiffs "need not make any further showing of irreparable injury" beyond alleging "a violation of [their] constitutional right to access to courts").

Although the Plaintiffs need not make any further showing of irreparable harm, there is abundant evidence of harm in any event.[4] "[I]rreparable harm is often suffered when the injury cannot be adequately atoned for in money or when the district court cannot remedy the injury following a final determination on the merits." *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1250 (10th Cir. 2001) (internal quotation omitted)).  Under the guardianship framework as amended by H.B. 101, certain citizens of Utah risk erroneously losing a full panoply of fundamental liberty interests—including the right to control whether they will be institutionalized or receive life-sustaining medical treatment.  *See*, *e.g.*, Virgien Decl. Ex. B (order appointing guardians "full power and authority to make end-of-life decisions for the Incapacitated Person" and granting "power and authority to commit the incapacitated person to a physiatrist hospital if necessary to protect the safety of the Incapacitated Person, or to protect the safety of others" in proceeding without counsel for the respondent); *see also* Zahradnikova Decl., ¶ 12.  These harms

---

[4] H.B. 101 contains an optional sunset provision causing it to lapse on July 1, 2018, unless the legislature extends it.  This sunset provision has no limiting effect on the Plaintiffs' claims.  *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982) ("It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice."); *see also Leonardson v. City of E. Lansing*, 896 F.2d 190, 194 (6th Cir. 1990) (holding that a law that had lapsed pursuant to a sunset provision was still ripe for review as the law "lies dormant, ready to be brought back to life if the need for it reoccurs").  Even if a sunset provision could moot Plaintiffs' claims, it could only do so after becoming operative.  *See Bowdry v. United Air Lines, Inc.*, 956 F.2d 999, 1004 n.4 (10th Cir. 1992) (noting that a sunset provision in an employment agreement "will eventually make the question moot" for employees who are terminated after the sunset provision goes into effect).

are irreparable.  *See*, *e.g.*, *Fishman v. Paolucci*, 628 F. App'x. 797, 801 (2d Cir. 2015) ("A lack of medical services is exactly the sort of irreparable harm that preliminary injunctions are designed to address."); *Cooper v. Meyer*, No. 16-CV-526-JDP, 2017 WL 3128822, at \*2 (W.D. Wis. July 21, 2017) ("[D]eath is an irreparable harm.").

## II.      THE BALANCE OF EQUITIES WEIGHS IN THE PLAINTIFFS' FAVOR.

The Defendants stand to lose little by maintaining the basic protection they offered all guardianship respondents prior to the passage of H.B. 101.  An injunction against implementation of the act would merely place the Defendants back in the position they were in on May 9, 2016. Programs already in place will provide pro-bono and sliding-scale representation to guardianship respondents at no cost to the state.   Defendants cannot point to any other cost they will incur if the Court grants a preliminary injunction.  Further, any harm Utah may claim to suffer would be temporary, ceasing when this case reaches final resolution and the preliminary injunction ends.

In stark contrast to the temporary and at most minor impact on the Defendants as a result of this injunction, the Plaintiffs will suffer great and permanent harms in the absence of a preliminary injunction.  Guardianship takes practically every consequential life decision regarding bodily integrity, freedom of movement, and disposition of property out of the ward's hands.  *See generally* Utah Code § 75-5-312 (describing general powers of guardians, including the ability to determine the ward's place of abode, the power to make medical decisions affecting the ward, and custodial care of the ward's possessions).  Absent an injunction, guardianship respondents will not only lose their constitutional and statutory right to counsel; they also will suffer the related higher likelihood of having a guardianship (or non-limited guardianship) erroneously imposed on them. Both of these harms would be permanent.

9

III.    **THE PLAINTIFFS HAVE A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS OF THEIR ADA AND CONSTITUTIONAL CLAIMS.**

A.    **Plaintiffs Properly Bring Their Claims as a Facial Challenge to Utah's Statutory Scheme.**

Plaintiffs bring their challenge to H.B. 101 (codified as Utah Code Section 75-5-303(d)) as a facial challenge, as they seek broad relief for all guardianship respondents.  *See Citizens United v. FEC*, 558 U.S. 310, 331 (2010) ("[T]he distinction between facial and as-applied challenges is not so well defined that . . . it must always control the pleadings and disposition . . . .  [I]t goes to the breadth of the remedy employed by the Court[.]").  Courts consider facial challenges like this one "simply by applying the relevant constitutional test to the challenged statute without attempting to conjure up whether or not there is a hypothetical situation in which application of the statute might be valid."  *Doe v. City of Albuquerque*, 667 F.3d 1111 (10th Cir. 2012); *see also ACLU v. Individual Members of the Ind. State Bd. of Law Examiners*, 2011 U.S. Dist. LEXIS 106337, *29-31 (S.D. Ind. Sept. 20, 2011) (finding invalid in a facial challenge a question related to applicants' medical history on state bar application); *California Found. for Indep. Living Centers v. Cty. of Sacramento*, 142 F. Supp. 3d 1035, 1060-1063 (E.D. Cal. 2015) (awarding summary judgment in favor of plaintiffs on issue of county's liability, where plaintiffs (disabled advocacy organization and individual disabled plaintiff) challenged county airport emergency evacuation plan as violating the ADA and Rehabilitation Act).

Courts regularly grant facial challenges under the ADA, Rehabilitation Act, and 14th Amendment as *City of Albuquerque* instructs—by applying the relevant test to the challenged regulation without considering whether the statute may validly be applied in some hypothetical situation.  *See e.g.*, *California Found. for Indep. Living Centers v. Cty. of Sacramento*, 142 F.

10

Supp. 3d at 1060-1063.  For example, the *Franco* court certified a class of people "who have a serious mental disorder or defect that renders them incompetent to represent themselves in detention or removal proceedings." *Franco-Gonzales v. Napolitano*, No. 10-CV-02211, 2011 WL 11705815, at *2 (C.D. Cal. Nov. 21, 2011) (*Franco II*).  It then found counsel to be a reasonable accommodation across this broad class without considering whether some class members might not qualify for counsel.  *See Franco-Gonzalez v. Holder* (*Franco II*), No. 10-CV-02211, 2013 WL 8115423, at *1 (C.D. Cal. Apr. 23, 2013) (*Franco III*).  In *Planned Parenthood of S.E. Penn. v. Casey*, the Court recognized that a spousal notice provision would affect only the small group of "married women seeking abortions who do not wish to notify [their husbands of] their intentions and who do not qualify for one of the statutory notice exemptions."  505 U.S. 833, 894-95 (1992). But it struck this provision down as facially unconstitutional even though it could be constitutionally applied to the large group of women seeking abortions who fell outside of this category.[5]  And in *Kitchen v. Herbert*, the court facially struck down Utah's constitutional provision limiting marriage to a man and a woman even though this provision could be constitutionally applied to the majority of marriages involving a man and a woman.  961 F. Supp. 2d 1181, 1216 (D. Utah 2013), *aff'd*, 755 F.3d 1193 (10th Cir. 2014).

### B.   Denying Individuals with Disabilities the Full Ability to Defend Themselves Against Guardianship Proceedings Violates Title II of the Americans With Disabilities Act.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services,

---

[5] Although most of *Casey* is a plurality decision, a majority of the Court joined this holding.

programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132; *see also Robertson v. Las Animas Cty. Sheriff's Dep't*, 500 F.3d 1185, 1193 (10th Cir. 2007). To state a claim, a plaintiff must allege (1) that he is a qualified individual with a disability; (2) that he was either "excluded from participation in or denied the benefits of some entity's services, programs, or activities," or was otherwise discriminated against by the public entity, and (3) that "such exclusion, denial of benefits, or discrimination was by reason" of his disability. *Robertson*, 500 F.3d at 1193 (citing 42 U.S.C. § 12132). Because guardianship respondents cannot meaningfully defend themselves without counsel, the ADA requires counsel in these crucial proceedings.

As a threshold matter, state court systems including Utah's are public entities subject to the ADA. *See* 42 U.S.C. § 12131(1) ("The term 'public entity' means (A) any State or local government; [and] (B) any department, agency, special purpose district, or other instrumentality of a State or States or local government[.]"); *see also Shotz v. Cates*, 256 F.3d 1077, 1080 (11th Cir. 2001) ("A trial undoubtably is a service, program, or activity within the meaning of § 12132." (citations omitted)).

        1.        <u>Any Respondent in a Guardianship Proceeding Necessarily Meets the<br>ADA's Requirements That He or She Be "Qualified" and "Disabled."</u>

The ADA defines "disability" as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). A plaintiff must also be "qualified": an "individual with a disability who, with or without reasonable modifications to rules, policies, the removal of . . . communication . . . barriers, or the provision of auxiliary aids or

services, meets the essential eligibility requirements for the receipt of services or the participation

in programs or activities provided by a public entity." 42 U.S.C. § 12131(2).

Any person who meets the requirements for a guardianship is necessarily "disabled" and

"qualified" under the ADA.  A guardianship may only be imposed upon a judicial determination

amounting to a finding of "disability" under the ADA: "that an adult's ability to [receive and

evaluate information, make or communicate decisions, or provide for necessities] is impaired to

the extent that the individual lacks the ability . . . to meet the essential requirements for financial

protection or physical health, safety, or self-care."  Utah Code § 75-1-201(22); *see also* 28 C.F.R.

§ 35.108(d)(2)(iii)(C), (E), (G), (K) ("[I]t should be easily concluded that the types of impairments

set forth in paragraphs (d)(2)(iii)(A) through (K) of this section will, at a minimum, substantially

limit the major life activities indicated.").[6]  All guardianship respondents are entitled to participate

in their own defense, rendering them "qualified" to participate in the state court programs.  *See*

*Popovich v. Cuyahoga Cty. Ct. Com. Pl., Dom. Rel. Div.*, 276 F.3d 808, 815 (6th Cir. 2002) (en

banc) (noting that disabled father had the right to "participate meaningfully" in court proceedings

which would impact his rights).

> 2.     Absent an Injunction, Guardianship Respondents' Lack of Counsel Will
>        Deprive Them of the Ability to Meaningfully Defend Against a
>        Guardianship, Subjecting Them to Both (1) Exclusion From or Denial of
>        Benefits of Public Activities and (2) Discrimination.

---

[6] Paragraphs (d)(2)(iii)(A) through (K) include the following "[p]redictable assessments": "(C)
Intellectual disability substantially limits brain function; . . . (E) Autism substantially limits brain
function; . . . (G) Cerebral palsy substantially limits brain function; . . . (K) Major depressive
disorder, bipolar disorder, post-traumatic stress disorder, traumatic brain injury, obsessive
compulsive disorder, and schizophrenia each substantially limits brain function."

"[C]ourts have recognized two types of [ADA] claims: (1) exclusion from or denial of benefits and (2) discrimination."  *J.V. v. Albuquerque Pub. Sch.*, 813 F.3d 1289, 1295 (10th Cir. 2016) (internal citations omitted).  H.B. 101 imposes both of these harms.

First, the denial of counsel excludes the guardianship respondents from benefits.  "The ADA requires more than physical access to public entities:  it requires public entities to provide 'meaningful access' to their programs and services."  *See Robertson*, 500 F.3d at 1195 (citing *Chaffin v. Kansas State Fair Bd.*, 348 F.3d 850, 857 (10th Cir. 2003)); *see also Randolph v. Rodgers*, 170 F.3d 850, 858 (8th Cir. 1999) (holding that although a deaf inmate could physically attend prison activities, he did not have "meaningful access" without a sign language interpreter). Public entities are required to make such reasonable modifications where a disabled individual requests an accommodation or where the "need is obvious."[7]  *See Robertson*, 500 F.3d at 1196.

Second, denying guardianship respondents counsel discriminates against them.  A public entity's failure to make a reasonable modification to policies or practices can constitute discrimination.  *See* 28 C.F.R. § 35.130(b)(7)(i); *see also Robertson*, 500 F.3d at 1195 ("To effectuate Title II's mandate, the regulations require public entities to 'make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid

---

[7] The Defendants are on notice that H.B. 101 strips guardianship respondents of the reasonable accommodation of counsel for two reasons.  First, the need for accommodation is "obvious" because adult guardianship respondents are—by the nature of the proceeding—necessarily alleged to be incapacitated.  *See Robertson*, 500 F.3d at 1196.  Second, Plaintiff DLC and other organizations sent letters to Governor Herbert and a Utah agency, noting that a guardianship proceeding in which the respondent is not represented by counsel could constitute a violation of Title II of the ADA and Section 504 of the Rehabilitation Act and describing the assistance of counsel as a reasonable modification necessary to provide meaningful access to the courts.  *See* Zahradnikova Decl., Exs. A, C-E.  A representative for the Utah agency has responded to at least one of these letters.  Zahradnikova Decl., Ex. F.

discrimination on the basis of disability.'").  Similarly, "[a] public entity may not, directly or through contractual or other arrangements, utilize criteria or methods of administration . . . [t]hat have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability[.]"  28 C.F.R. § 35.130(b)(3)(i).

Congress viewed access to courts as one of the ADA's key protections.  *Tennessee v. Lane*, 541 U.S. at 526-27 ("In the deliberations that led up to the enactment of the ADA . . . Congress learned that many individuals . . . were being excluded from courthouses and court proceedings by reason of their disabilities.").  Without counsel, guardianship respondents face the exact type of exclusion from court proceedings that Congress sought to prevent.  The claims in this case thus fall squarely within the scope of rights the ADA protects.

Courts have recognized the need for counsel in analogous settings.  In *Franco I*, a district court granted a preliminary injunction, finding the provision of counsel to certain mentally ill immigrants facing removal proceedings a reasonable modification necessary to prevent discrimination based on disability.[8]  767 F. Supp. 2d at 1053-55.[9]  Even though there is no general guarantee of counsel in removal proceedings, the court found that, given "the importance of the issues at stake" and the immigrants' mental illnesses, "it is difficult to conceive of any paradigm

---

[8] *Franco I* was decided under Section 504 of the Rehabilitation Act.  However, it applies equally to the Plaintiffs' ADA and Rehabilitation Act claims:  "Title II of the ADA is modeled on the Rehabilitation Act, and decisional law on the Rehabilitation Act may be relied upon interchangeably in examining claims under the ADA."  *Young v. City of Claremore*, 411 F. Supp. 2d 1295, 1303 (N.D. Okla. 2005).

[9] The *Franco I* court further held that the government must cover the cost of counsel or find counsel willing to provide the services *pro bono*.  *Id.* at 1058.  The plaintiffs will eventually seek the determination of such a right in this case, but do not do so now in this preliminary injunction.

in which [the named plaintiff] could proceed *pro se*." *Id.* at 1054. The *Franco I* court's analysis applies equally to guardianship proceedings: like removal proceedings, they involve permanent infringements on respondents' liberty, and like the *Franco-Gonzales* plaintiffs, guardianship respondents require counsel's assistance to meaningfully defend themselves.

The Sixth Circuit has similarly upheld accommodations to protect a disabled person's right to access the courts. *Popovich*, 276 F.3d 808. In *Popovich*, a person with a hearing disability claimed that the court's failure to provide adequate hearing assistance discriminated against him by denying him "the opportunity to participate equally in [a child-custody] proceeding pending before the court." *Id.* at 811, 816. The *en banc* Sixth Circuit underscored the importance of his claims, noting his "significant" interest in a "judicial proceeding [that] will determine the amount of time, if any, he can spend with his daughter." *Id.* at 815. Concerned that "[f]ailure to accommodate his hearing disability may render him unable to participate meaningfully in that determination" the court noted that if "he cannot understand what is happening during the [] hearing, it will be impossible for him to refute claims made against him, or to offer evidence on his own behalf." *Id.* Like the hearing-impaired plaintiff in *Popovich*, Utah guardianship respondents require counsel in order to meaningfully defend their case by "refut[ing] claims made against" them and "offer[ing] evidence." *Id.* Not only does a guardianship proceeding subsume the same child-custody issues that the *Popovich* court found sufficient to generate a "significant" interest; it extends to a respondent's control over basic aspects of his or her own life.

3.      <u>The Discrimination or Denial of Benefits Is on the Basis of Guardianship Respondents' Disabilities Because It Removes Their Ability to Meaningfully Present a Defense</u>.

An ADA plaintiff must show that the discrimination or denial of benefits occurred "by reason of" his disability. 42 U.S.C. § 12132; *accord* 29 U.S.C. § 794(a). This third prong of the analysis essentially constitutes a nexus requirement between the disability and the relief requested. *See Henrietta D. v. Bloomberg*, 331 F.3d 261, 277 (2d Cir. 2003).

The guardianship respondents satisfy this requirement because their disabilities cause their lack of access to the courts. *See Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 598 (1999) (holding that the denial of community-living opportunities to developmentally disabled people was "by reason of" their disability). Indeed, the statute, by its very nature as a part of the "Protection of Persons Under Disability and their Property" subsection of the Utah's Utah Code, is explicit that it affects only those with disabilities. *See* Utah Code § 75-5.

**C.    The Same Showing That Establishes an ADA Violation Also Establishes A Violation of Section 504 of the Rehabilitation Act.**

Section 504 of the Rehabilitation Act provides that, "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance[.]" 29 U.S.C. § 794(a). "Program or activity" includes the operations of any "department, agency, special purpose district, or other instrumentality of a State or of a local government." 29 U.S.C. § 794(b)(1)(A). To establish a prima facie claim under § 504, a plaintiff must demonstrate that "(1) plaintiff is handicapped under the Act; (2) he is 'otherwise qualified' to participate in the program; (3) the program receives federal financial assistance; and (4) the program discriminates against plaintiff."

17

*U.S. Olympic Comm.,* 513 F.3d 1191, 1194 (10th Cir. 2008).  Given the overlap between the ADA and Section 504 of the Rehabilitation Act, courts "apply the standards from the [ADA] in analyzing a Rehabilitation Act claim." *Wilkerson v. Shinseki*, 606 F.3d 1256, 1262 (10th Cir. 2010) (citations omitted); *see also Jarvis v. Potter*, 500 F.3d 1113, 1121 (10th Cir. 2007) ("We . . . look to the ADA for guidance in resolving Rehabilitation Act claims."); *cf. Fry*, 137 S. Ct. at 749 (Section 504 [because of its similarity to the ADA] has been interpreted to demand "certain 'reasonable' modifications to existing practices in order to 'accommodate' persons with disabilities." (citing *Alexander v. Choate*, 469 U.S. 287, 299–300, (1985))).

Utah receives federal funding for its court system.  *See Utah State Legislature Compendium of Budget Information for the 2017 General Session: Executive Offices and Criminal Justice*, Utah Legislature Website (2017), *available at* https://le.utah.gov/lfa/cobi/currentCobi/cobi.html?cobiID=94&tab=financialsTab.  Because the remaining considerations are the same for the Plaintiffs' claims under Section 504 as they are for the Plaintiffs' ADA claims, the Plaintiffs are—for the same reasons—likely to succeed on this Section 504 claim.  As explained above, the Plaintiffs are disabled individuals and are "otherwise qualified" to participate in court proceedings.  *See, supra*, Section III.B.1; *Wilkerson*, 606 F.3d at 1262-63 (analyzing whether plaintiff was disabled and a qualified individual for purposes of Rehabilitation Act analysis by reference to ADA standards).  The State Court system discriminates against the Plaintiffs and other guardianship respondents by failing to require counsel as a reasonable accommodation for their disabilities.  *See supra*, III.B.2-3; *Miller ex rel. S.M. v. Bd. of Educ. of Albuquerque Pub. Sch.*, 565 F.3d 1232, 1245 (10th Cir. 2009) (analyzing discrimination elements of ADA Tile II and Section 504 of the Rehabilitation Act together "[b]ecause these

provisions involve the same substantive standards.").  The Plaintiffs are therefore also likely to succeed on the merits of their claims under Section 504.

    **D.**    **Utah's Guardianship Law Undermines the Fourteenth Amendment's Procedural Due Process Guarantee of Access to a Full and Fair Hearing.**

Procedural due process "'require[s] that deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case.'"  *Boddie v. Connecticut*, 401 U.S. 371, 377-78 (1971) (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950)).  "The formality and procedural requisites for the hearing can vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings."  *Id.* at 378.  Courts evaluate procedural-due-process claims through the three-part inquiry the Supreme Court set out in *Mathews v. Eldridge*, 424 U.S. 319 (1976).  This inquiry balances (1) "the private interest affected," (2) "the risk of an erroneous deprivation of that interest through the procedures used, as well as the probable value of additional safeguards," and (3) "the Government's interest, including the administrative burden that additional procedural requirements would impose."  *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 53 (1993) (citing *Mathews*, 424 U.S. at 335).  Any minimal burden to the government of requiring counsel pales in comparison to the high risk of the erroneous deprivation of crucial liberty interests faced by guardianship respondents.  Procedural due process thus requires counsel.

    1.    <u>H.B. 101 Puts at Risk the Guardianship Respondent's Fundamental Autonomy and Physical Liberty</u>

The private interests at stake in a guardianship proceeding are among the highest in any legal proceeding.  *See State ex rel. Shamblin*, 445 S.E.2d at 739 ("Appointment of a guardian results in a massive curtailment of liberty . . . .  The guardian becomes the custodian of the person,

estate and business affairs of the ward; the guardian dictates the ward's residence; the ward's freedom to travel is curtailed; and the ward's legal relationship with other persons is limited." (internal quotation omitted)); *Matter of Howes*, 471 A.2d 689, 691 (Me. 1984) ("The appointment of a guardian for an incapacitated person affects the fundamental personal liberty of the prospective ward."); *Estate of Milstein v. Ayers*, 955 P.2d 78, 81 (Colo. App. 1998) (holding, for standing purposes, that "[b]ecause a guardianship proceeding involves a potential deprivation of fundamental rights and liberties, it implicates constitutional issues").   A full legal guardianship essentially strips the ward of his legal autonomy, depriving him of his ability to determine his place of abode, marry or determine custody of his children, dispose of his assets, or make life-altering medical decisions—including the choice to terminate life-sustaining treatment.  Utah Code § 75-5-312; Zahradnikova Decl., ¶ 12; *see also* Zahradnikova Decl., Exs. G, H; Virgien Decl., Ex. B. This deprivation is designed to be permanent.  Utah Code § 75-5-306; *see also* Zahradnikova Decl., Ex. G (limited guardianship order described as "permanent").

A guardianship can exhibit many of the hallmarks of physical detention, implicating "the most elemental of liberty interests" deserving the strongest procedural protections.  *See Hamdi v. Rumsfeld*, 542 U.S. 507, 529, 531 (2004) (finding an accused illegal enemy combatant's liberty interest to outweigh even "the weighty and sensitive governmental interests" related to war and treason); *Addington v. Texas*, 441 U.S. 418, 425 (1979) ("This Court repeatedly has recognized that civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection." (citations omitted)).  Wards lose control over movement, association, and medical decisions including whether to be institutionalized.  Utah Code § 75-5-312; Zahradnikova Decl., ¶ 12; *see also* Zahradnikova Decl., Ex. G; Virgien Decl., Ex. B.  The fact that a ward may

20

be confined in a home or institution rather than a prison is immaterial—all are deprivations of liberty. *See Gault*, 387 U.S. at 27 ("It is of no constitutional consequence—and of limited practical meaning—that the institution to which [a juvenile] is committed is called an Industrial School. The fact of the matter is that, however euphemistic the title, a 'receiving home' or an 'industrial school' for juveniles is an institution of confinement."). Utah's own state agency responsible for public guardianship services describes guardianship as "limit[ing] the self-determination of the person placed under it" and notes that "[t]here are few legal processes more restrictive on citizens in a free society than guardianship." *Rights of Protected Persons*, Utah Office of the Public Guardian, available at digitallibrary.utah.gov/awweb/awarchive?type=download&item=17999. The intrusions on a ward's body and physical freedom under a guardianship order implicate physical liberty. *Vitek,* 445 U.S. at 491-92 (holding commitment to a mental hospital a "massive curtailment of liberty" requiring counsel); *Grant v. Johnson*, 757 F. Supp. 1127, 1132 (D. Or. 1991) (holding that a guardianship procedure that could result in commitment to a mental hospital "contemplates restraints on the liberty of alleged incapacitated persons and, therefore, the due process protections under the Fifth and Fourteenth Amendments to the United States Constitution must be afforded to those persons"). These strong interests require the strictest procedural protections.

The Supreme Court has repeatedly held that this fundamental liberty interest requires the strictest procedural protections in similar civil cases. Soon after it recognized a right to counsel in criminal cases under the Fourteenth Amendment in *Gideon v. Wainwright*, 372 U.S. 335 (1963), the Court recognized that procedural due process requires an analogous right in juvenile delinquency proceedings. *Gault*, 387 U.S. at 36-37. The state argued that—unlike an adversarial

21

criminal trial—a delinquency proceeding represented a civil action by the state acting in the child's best interest to provide him custody. *Id.* at 16. The Court rejected that view, recognizing that any deprivation of physical liberty—no matter the positive intent or benign label—requires the strictest protections. *Id.* at 27-29. Given the potential loss of physical liberty and the comparative lack of sophistication exhibited by juveniles, the Court concluded that "[t]he juvenile needs the assistance of counsel to cope with problems of law, to make skilled inquiry into the facts, to insist upon regularity of the proceedings, and to ascertain whether he has a defense and to prepare and submit it." *Id.* at 36. Courts have extended this procedural-due-process right to counsel to a variety of procedures that put physical liberty is at stake. A plurality of justices held that procedural due process requires appointed counsel before indigent prisoners may be involuntarily transferred to a state mental hospital for treatment. *Vitek v. Jones*, 445 U.S. 480 (1980). The *Vitek* plurality rejected the state's argument that a physician's opinion provided an adequate procedural safeguard because it "neither removes the prisoner's interest from due process protection nor answers the question of what process is due under the Constitution." *Id.* at 491. Guided by this precedent, the Tenth Circuit has held that due process requires appointed counsel in civil-commitment proceedings. *Heryford*, 396 F.2d at 396 ("It matters not whether the proceedings be labeled 'civil' or 'criminal' or whether the subject matter be mental instability or juvenile delinquency."). Hence, the private liberty interests at stake here are nothing less than the essential rights to personal autonomy and physical liberty at the heart of the Bill of Rights—foundational concerns that have repeatedly triggered a right to appointed counsel in situations that closely resemble guardianships.

The gravity of the liberty interests at stake in guardianship proceedings is underscored by the nationwide consensus recognizing state law rights to counsel in such cases. Each state's

guardianship program has different rules, but all recognize the fundamental nature of the liberties at stake by providing some form of statutory right to counsel or guardian ad litem in guardianship hearings; 37 states and the District of Columbia require counsel without discretion of the court and without requiring the respondent to request counsel.  *See* ABA Commission on Law and Aging, *Representation and Investigation in Guardianship Proceedings, available at* http://www.americanbar.org/content/dam/aba/administrative/law_aging/chartrepresentationandinvestigation.authcheckdam.pdf (2016).  Even Utah provides a limited guarantee, although only to respondents who do not meet the requirements of H.B. 101 (such as those with more than $20,000 in net assets).  Not all states' guarantees are sufficient, but their existence shows that states recognize that the private liberty interests at stake in a guardianship proceeding.  *See Gideon*, 372 U.S. at 345 (referencing twenty-two states' support of a criminal right to counsel through an amicus brief).

> 2.    The Risk of Erroneous Deprivation Is Far Too High Given the Weight of the Liberty Interests at Stake

If respondents are forced to navigate the guardianship determination without counsel, they face a particularly high risk of erroneous deprivation.  The Supreme Court has admonished that "[t]he opportunity to be heard must be tailored to the capacities and circumstances of those who are to be heard."  *Goldberg v. Kelly*, 397 U.S. 254, 268-69 (1970) (finding written submissions an insufficient protection for welfare recipients, many of "who[m] lack the educational attainment necessary to write effectively").  And it has recognized that courts must be particularly vigilant in protecting the procedural-due-process protections due some classes of people—such as those without education or with intellectual disabilities.  *Powell v. Alabama*, 287 U.S. 45, 68-69 (1932); *see also id.* ("The right to be heard would be, in many cases, of little avail if it did not comprehend

the right to be heard by counsel.  Even the intelligent and educated layman has small and sometimes no skill in the science of law . . . .  If that be true of men of intelligence, how much more true is it of the ignorant and illiterate, or those of feeble intellect.”).  .”[10]).  This procedural stewardship may be especially important in “an unusually complex case where a defendant ‘can fairly be represented only by a trained advocate.’”  *Turner*, 564 U.S. at 449 (quoting *Gagnon v. Scarpelli*, 411 U.S. 778, 787 (1973)).  Guardianship respondents are unusually vulnerable to abuses through the judicial process.  Without counsel, they may be unable to fully express their desires to the court, put on the evidence that best supports their case, and— when the court finds that guardianship is appropriate—argue for limitations to that guardianship to prevent unnecessary infringements on their liberty.  The barriers preventing respondents from meaningfully defending themselves thus give rise to a high risk that they will be erroneously deprived of crucial rights.

3.    The Defendants’ Interests Pale in Comparison to the Fundamental Liberty Interests Imperiled by H.B. 101.

The Defendants can state no serious interest to counter the high risk that a guardianship proceeding without counsel will erroneously deprive a ward of a crucial liberty interest.  The Plaintiffs will ultimately seek a permanent injunction requiring Utah to pay for guardianship respondents’ counsel—and can readily support this relief given the severity of the need for counsel—but at this stage they merely seek to return to a status quo ante where Utah paid nothing for guardianship respondents’ attorneys.  The serious risks that the Plaintiffs will suffer severe deprivations greatly outweigh any minor interest the Defendants can claim.  *See supra*, Section II.  A minor pecuniary interest cannot justify imposing a barrier to meaningful access to the judicial

---

[10] The term “those of feeble intellect” is outdated.  *See supra* n. 2.

24

process under the *Mathews* balancing test.  *Little v. Streater*, 452 U.S. 1 (1981) (holding that the state's interest in avoiding the cost of a blood test by passing it on to parties could not justify the barrier this cost presented to indigent parties).

**IV.   THE PUBLIC INTEREST REQUIRES A PRELIMINARY INJUNCTION PROTECTING GUARDIANSHIP RESPONDENTS FROM DEVASTATING, PERMANENT DEPRIVATIONS OF LIBERTY WHILE THIS CASE PROCEEDS TO A FINAL DETERMINATION.**

The public has a robust interest in accurate determinations in all legal proceedings.  This interest is heightened in guardianship proceedings, where citizens particularly vulnerable to abuses at the hands of the legal system face serious deprivations of liberty.  "[I]t is always in the public interest to prevent the violation of a party's constitutional rights."  *Verlo v. Martinez*, 820 F.3d 1113, 1127 (10th Cir. 2016) (citing *Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012)) (internal quotation marks omitted).  Courts have also recognized the equally strong public interest in statutory causes of action targeting discrimination on the basis of disabilities.  *See Enyart v. Nat'l Conference of Bar Examiners, Inc.*, 630 F.3d 1153, 1167 (9th Cir. 2011) ("In enacting the ADA, Congress demonstrated its view that the public has an interest in ensuring the eradication of discrimination on the basis of disabilities.").  The public thus has a strong interest in a preliminary injunction protecting guardianship respondents' constitutional rights and shielding them from discrimination.

<u>**CONCLUSION**</u>

For the foregoing reasons, the Plaintiffs respectfully request that this Court issue a preliminary injunction barring the Defendants from implementing H.B. 101.

DATED:  December 22, 2017   LATHAM & WATKINS LLP

/s/ Kyle A. Virgien
Alfred C. Pfeiffer, Jr. (*pro hac vice*)
Kyle A. Virgien (*pro hac vice*)
Dorottya Schranz (*pro hac vice*)
John H. Steinbach (*pro hac vice*)
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, California  94111-6538
Telephone:  415.391.0600
Facsimile:  415.395.8095
al.pfeiffer@lw.com
kyle.virgien@lw.com
dorey.schranz@lw.com
john.steinbach@lw.com

Claudia Center (*pro hac vice*)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
39 Drumm Street
San Francisco, CA 94111
Telephone:  415.343.0762
Facsimile:  415.395.0950
ccenter@aclu.org

John Mejia (Bar No. 13965)
Leah Farrell (Bar No. 13696)
AMERICAN CIVIL LIBERTIES UNION OF
UTAH FOUNDATION, INC.
355 N. 300 W.
Salt Lake City, Utah 84103
Telephone:  801.521.9862
Facsimile:  801.532.2850
aclu@acluutah.org

Attorneys for Plaintiffs Disability Law Center,
Katherine C., and Anthony M.