DAVID N. WOLF (6688)
LAURA K. THOMPSON (6328)
ANDREW DYMEK (9277)
BRETT PETERSON (13330)
Assistant Utah Attorneys General
Utah Attorney General's Office
160 East 300 South, Sixth Floor
P.O. Box 140856
Salt Lake City, Utah 84114-0856
Telephone: (801) 366-0100
Facsimile: (801) 366-0101
E-mail: dnwolf@agutah.gov
E-mail: lathomps@agutah.gov
E-mail: adymek@agutah.gov
E-mail: brettmpeterson@agutah.gov

*Counsel for Defendants*

---

## IN THE UNITED STATES DISTRICT COURT

## IN AND FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| DISABILITY LAW CENTER, KATHERINE C., AND ANTHONY M.<br><br>Plaintiffs,<br><br>v.<br><br>THE STATE OF UTAH; GARY HERBERT IN HIS OFFICIAL CAPACITY AS GOVERNOR OF UTAH,<br><br>Defendants. | **DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT**<br><br>Case No. 2:17-CV-00748-RJS<br><br>Judge Robert J. Shelby |

Pursuant to Federal Rules of Civil Procedures12(b)(1), and 12(b)(6), Defendants the State

of Utah (the "State") and Governor Gary Herbert ("Gov. Herbert") submit this Motion to

Dismiss Plaintiffs' First Amended Complaint ("FAC").[1]

---

[1] *See* Dkt. 78.

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................ iv

I.  FACTS CONTROVERTING ALLEGATIONS IN AMENDED COMPLAINT FOR
PURPOSES OF RULE 12(B)(1) MOTION ............................................................ 4

    A.  In a DLC publication entitled "The Guardianship Process," which is available on the
DLC's website, the DLC informs the public that under H.B. 101,............................. 4

    B.  In the same publication, DLC states as follows:.................................................... 5

ARGUMENT ...................................................................................................... 5

I.  THIS COURT LACKS SUBJECT MATTER JURISDICTION OVER THE CLAIMS
AGAINST DEFENDANTS .................................................................................... 5

II.  PLAINTIFFS STILL HAVE NOT DEMONSTRATED THEY HAVE STANDING ...... 6

    1. Katherine and Anthony Lack Standing ..................................................... 7

        a.  There are Still No Allegations Showing that a Guardianship Proceeding and
Denial of Counsel is Imminent ........................................................ 7

        b.  Plaintiffs' Contingent Liability Theory Fails. .................................. 8

        c.  Plaintiffs Improperly Rely on Events Post-Dating the Original Complaint ...... 9

        d.  Even Considering the Post Hoc Events, Plaintiffs' Contingent Liability Theory
Fails.................................................................................. 10

        e.  Causation and Redressability are Lacking because Plaintiffs Have Failed to
Name Defendants Involved in the Enforcement of H.B. 101 ......................... 18

        f.  Katherine's and Anthony's Claimed Injuries are not Redressable for Other
Reasons ............................................................................ 21

    2. Constituents A and B Lack Standing ..................................................... 22

    3. Disability Law Center – No standing in its own right ............................... 23

    4. Disability Law Center – No associational standing .................................. 26

    5. Plaintiffs Lack Standing to Challenge H.B. 101 with Hypotheticals ............ 33

III. THIS COURT LACKS FEDERAL QUESTION JURISDICTION ................................ 33

IV. THE COURT LACKS JURISDICTION OVER CLAIMS BASED ON DENIAL OF
COUNSEL AT COMPLETED GUARDIANSHIP PROCEEDINGS ................................ 36

V.  DEFENDANTS ARE IMMUNE FROM SUIT ...................................................... 36

    1. Legislative Immunity ........................................................................ 36

2. Judicial Immunity ........................................................................................ 38

3. Sovereign Immunity...................................................................................... 38

   i.  Section 504 of the RA ............................................................................ 39

   ii.  Title II of the ADA ............................................................................... 40

VI. PLAINTIFFS HAVE FAILED TO STATE A CLAIM FOR WHICH RELIEF MAY BE
GRANTED .................................................................................................................... 43

      A.  PLAINTIFFS HAVE FAILED TO STATE AN AS APPLIED CLAIM . 43

     i.  Katherine and Anthony ......................................................................... 44

     ii.  DLC in its own right ............................................................................. 44

     iii.  Constituents A and B ........................................................................... 44

     iv.  Other Defects ....................................................................................... 46

    B.  PLAINTIFFS HAVE FAILED TO STATE A FACIAL CLAIM............. 47

CONCLUSION........................................................................................................... 50

TABLE OF AUTHORITIES

Cases

*1st Westco Corp. v. Sch. Dist.*,
  6 F.3d 108 (3d Cir. 1993)........................................................................................ 20

*Access 4 All, Inc. v. Smith's Food & Drug Centers, Inc.*,
  No. 2:16-CV-00475-JNP, 2017 WL 3484921 (D. Utah Aug. 14, 2017)................... 26

*Arbogast v. Kansas, Dep't of Labor*,
  789 F.3d 1174 (10th Cir. 2015) .............................................................................. 41

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) .................................................................................................. 5

*Ass'n for Retarded Citizens of Dall. v. Dall. Cnty. Mental Health & Mental Retardation Ctr. Bd. of Trs.*,
  19 F.3d 241 (5th Cir.1994) ............................................................................... 30, 31

*Barney v. Pulsipher*,
  143 F.3d 1299 (10th Cir. 1998) .............................................................................. 23

*Barrett v. Univ. of New Mexico Bd. of Regents*,
  562 F. App'x. 692 (10th Cir. 2014) ........................................................................ 40

*Bd. of Managers of Mason Fisk Condo. v. 72 Berry St., LLC*,
  801 F. Supp. 2d 30 (E.D.N.Y. 2011) ...................................................................... 28

*Bear v. Patton*,
  451 F.3d 639 (10th Cir. 2006) ................................................................................ 23

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007) ................................................................................................ 44

*Bogan v. Scott-Harris*,
  523 U.S. 44 (1998) .................................................................................................. 37

*Branson Sch. Dist. RE-82 v. Romer*,
  161 F.3d 619 (10th Cir. 1998) ................................................................................ 48

*Bronson v. Swensen*,
  500 F.3d 1099 (10th Cir. 2007) .............................................................................. 18

*Brown v. Herbert*,
  850 F. Supp. 2d 1240 .............................................................................................. 20

*Calzone v. Hawley*,
  866 F.3d 866 (8th Cir. 2017) .................................................................................. 20

*Camick v. Holladay*,
  2017 WL 4099472 (D. Kan. Sept. 14, 2017) .......................................................... 50

iv

*City of Los Angeles v. Lyons,*
   461 U.S. 95 (1983) ................................................................................. 23, 24

*Clapper v. Amnesty Intern. USA,*
   568 U.S. 398 (2013) ....................................................... 8, 11, 12, 14

*Cook v. Gates,*
   528 F.3d 42 (1st Cir. 2008) ................................................................ 46

*COPE v. Kansas State Bd. Of Educ.,*
   821 F.3d 1215 (10th Cir. 2016) ......................................................... 15

*D.U. Co. v. Jenkins,*
   2009 UT App 195, 216 P.3d 360 ...................................................... 30

*Davies Warehouse Co. v. Bowles,*
   321 U.S. 144 (1944) .......................................................................... 48

*Devon Energy Prod. Co., L.P. v. Mosaic Potash Carlsbad, Inc.,*
   693 F.3d 1195 (10th Cir. 2012) ......................................................... 34

*Disability Advocates, Inc. v. New York Coal. for Quality Assisted Living, Inc.,*
   675 F.3d 149 (2d Cir. 2012) .............................................................. 30

*District of Columbia Court of Appeals v. Feldman,*
   103 S. Ct. 1303 (1983) ...................................................................... 36

*Doe v. Bd. of Cty. Comm'rs of Payne Cty., Okla.,*
   613 F. App'x. 743 (10th Cir. 2015) ................................................... 49

*Doe v. Stincer,*
   175 F.3d 879 (11th Cir.1999) ........................................................... 31

*Duke Power Co. v. Carolina Envtl. Study Grp., Inc.,*
   438 U.S. 59 (1978) .............................................................................. 6

*Edelman v. Jordan,*
   415 U.S. 651 (1999) .......................................................................... 40

*First W. Capital Mgmt. Co. v. Malamed,*
   874 F.3d 1136 (10th Cir. 2017) ......................................................... 30

*Fitzgerald v. Corr. Corp. of Am.,*
   403 F.3d 1134 (10th Cir. 2005) ......................................................... 49

*Franklin Life Ins. Co. v. Johnson,*
   157 F.2d 653 (10th Cir. 1946) ........................................................... 42

*Full Life Hospice, LLC v. Sebelius,*
   709 F.3d 1012 (10th Cir. 2013) ........................................................... 5

*Garramone v. Romo,*
   94 F.3d 1446 (10th Cir. 1996) ........................................................... 51

*Gorka v. Sullivan,*
   82 F.3d 772 (7th Cir. 1996) .............................................................. 40

*Gressman v. State*,
   2013 UT 63, 323 P.3d 998 .................................................................... 20

*Grynberg v. Bar S Servs., Inc.*,
   527 F. App'x. 736 (10th Cir. 2013) ...................................................... 30

*Heryford v. Parker*,
   396 F.2d 393 (10th Cir. 1968) ............................................................. 47

*Horton v. Ward*,
   123 F. App'x 368 (10th Cir. 2005) ....................................................... 48

*Hunt v. Wash. State Apple Adver. Comm'n*,
   432 U.S. 333 (1977).......................................................................... 26, 31

*In re E.L.*,
   2006 WL 727875 (Cal. Ct. App. March 22, 2006) .............................. 15

*In re Schwenke*,
   2004 UT 17, 89 P.3d 117 ..................................................................... 19

*Irish Lesbian & Gay Org. v. Giuliani*,
   143 F.3d 638 (2d Cir. 1998)................................................................. 25

*J.V. v. Albuquerque Pub. Sch.*,
   813 F.3d 1289 (10th Cir. 2016) ........................................................... 46

*Jackson v. Seaboard Coast Line R.R.*,
   678 F.2d 992 (11th Cir.1982) .............................................................. 33

*Khalik v. United Air Lines,*
   671 F.3d 1188 (10th Cir. 2012) ........................................................... 44

*Kitchen v. Herbert,*
   755 F.3d 1193 (10th Cir. 2014) ..................................................... 18, 20

*Knox v. Bland*,
   632 F.3d 1290 (10th Cir. 2011) ........................................................... 38

*Koslow v. Commonwealth of Pennsylvania*,
   302 F.3d 161 (3d. Cir.2002)................................................................. 41

*Lassiter v. Dep't. of Social Servs. of Durham County*,
   452 U.S. 18 (1981)......................................................................... 47, 51

*Lawrence v. Kuenhold*,
   271 F. App'x. 763 (10th Cir. 2008) ...................................................... 38

*Lowery v. Utah*,
   2006 WL 3304414 (D. Utah Nov. 13, 2006) ....................................... 38

*Lujun v. Defenders of Wildlife*,
   504 U.S. 555 (1992).......................................................................... 6, 14

*Lyng v. Nw. Indian Cemetery Protective Ass'n*,
   485 U.S. 439(1988)............................................................................. 48

*Massey v. Utah Dept. of Corrections,*
  2017 WL 1476138 (D. Utah April 24, 2017).......................................................... 40

*Mathews v. Eldridge,*
  424 U.S. 319 (1976)............................................................................................... 47

*Matter of Guardianship of Roe,*
  421 N.E.2d 40 (Mass. 1981).................................................................................. 47

*Medtronic, Inc. v. Mirowski Family Ventures, LLC,*
  134 S. Ct. 843 (2014)....................................................................................... 34, 35

*Mitchell v. City of Sapulpa,*
  857 F.2d 713 (10th Cir. 1988)............................................................................... 48

*Mo. Prot. & Advocacy Servs., Inc. v. Carnahan,*
  499 F.3d 803 (8th Cir.2007) ............................................................................ 30, 31

*Mocek v. City of Albuquerque,*
  813 F.3d 912 (10th Cir. 2015) ................................................................................. 5

*Moore v. Walker,*
  24 F. App'x 924 (10th Cir. 2001) ...................................................................... 50, 51

*Morgan v. McCotter,*
  365 F.3d 882 (10th Cir. 2004) ............................................................................... 17

*Murdock v. Ute Indian Tribe of Uintah & Ouray Reservation,*
  975 F.2d 683 (10th Cir. 1992) ............................................................................... 27

*Muscogee (Creek) Nation v. Pruitt,*
  669 F.3d 1159 (10th Cir. 2012) ............................................................................. 40

*New Directions Treatment Servs. v. City of Reading,*
  490 F.3d 293 (3d Cir. 2007).................................................................................. 49

*New York Civil Liberties Union v. New York City Transit Auth.,*
  684 F.3d 286 (2d Cir. 2012).................................................................................. 25

*Nova Health Systems v. Gandy,*
  416 F.3d 1149 (10th Cir. 2005) ............................................................................. 20

*Oregon Advocacy Ctr. v. Mink,*
  322 F.3d 1101 (9th Cir.2003) .......................................................................... 31, 32

*Pac. Shores Properties LLC v. City of Newport Beach,*
  2008 WL 11336337 (C.D. Cal. Oct. 28, 2008)....................................................... 50

*Parsons Steel, Inc. v. First Alabama Bank,*
  474 U.S. 518 (1986)......................................................................................... 36, 37

*Pinson v. Equifax Credit Info. Servs., Inc.,*
  316 F. App'x 744 (10th Cir. 2009) ......................................................................... 46

*Popovich v. Cuyahoga Cty. Court of Common Pleas,*
  150 F. App'x. 424 (6th Cir. 2005) .......................................................................... 26

*Protocols, LLC v. Leavitt*,
549 F.3d 1294 (10th Cir. 2008) .................................................................... 10, 18

*Rector v. City & County of Denver*,
348 F.3d 935 (10th Cir. 2003) ...................................................................... 17, 23

*Roth v. King*,
449 F.3d 1272 (D.C.Cir.2006) ............................................................................ 38

*Rud v. Dahl*,
578 F.2d 674 (7th Cir. 1978) ............................................................................... 47

*Savage v. Fallan*,
663 Fed. App'x. 588 (10th Cir. 2016) ................................................................. 37

*Searle Bros. v. Searle*,
588 P.2d 689 (Utah 1978) .................................................................................. 20

*SK Finance, S.A. v. La Plata County*,
126 F.3d 1272 (10th Cir.1997) ............................................................................. 4

*Smith v. Bayer*,
564 U.S. 299 (2011) ........................................................................................... 21

*Snell v. Tunnell*,
920 F.2d 673 (10th Cir.1990) .............................................................................. 48

*Southern Utah Wilderness Alliance v. Palma*,
707 F.3d 1143 (10th Cir. 2013) ...................................................................... 7, 10

*Spokeo, Inc. v. Robins*,
136 S. Ct. 1540 (2016) ..................................................................................... 6, 7

*St. Paul Fire & Marine Ins. Co. v. Runyon*,
53 F.3d 1167 ..................................................................................................... 35

*Steadfast Ins. Co. v. Agr. Ins. Co.*,
507 F.3d 1250 (10th Cir. 2007) .......................................................................... 40

*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009) ........................................................................................... 26

*supra*,
SUWA, 707 F.3d ................................................................................................ 22

*Sweeten v. Sneddon*,
463 F.2d 713 (10th Cir. 1972) ............................................................................ 36

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*,
322 F.3d 1064 (9th Cir. 2003) ...................................................................... 27, 28

*Tanasse v. City of St. George*,
172 F.3d 63 (10th Cir. 1999) .............................................................................. 44

*Tennessee v. Lane*,
541 U.S. 509 (2004) ..................................................................................... 42, 43

*Three Affiliated Tribes of Fort Berthold Reservation v. Wold Eng'g, P.C.*,
  467 U.S. 138 (1984) ................................................................................................ 48
*Town of Chester v. Laroe Estates, Inc.*,
  137 S. Ct. 1645 (2017) ......................................................................................... 6, 22
*Turner v. McKee*,
  681 F.3d 1215 (10th Cir. 2012) ............................................................................. 17
*Turner v. Rogers*,
  564 U.S. 431 (2011) ............................................................................................... 51
*U.S. v. Ramos*,
  695 F.3d 1035 (10th Cir. 2012) ............................................................................. 33
*U.S. v. Supreme Court of New Mexico*,
  839 F.3d 888 (10th Cir. 2016) ............................................................................... 18
*United Food and Commercial Workers Union Local 751 v. Brown Group, Inc.*,
  517 U.S. 544 (1996) ............................................................................................... 26
*United States v. Georgia*,
  546 U.S. 151(2006) ........................................................................................... 43, 49
*United States v. Mitchell*,
  445 U.S. 535 (1980) ............................................................................................... 42
*United States v. Morgan*,
  748 F.3d 1024 (10th Cir. 2014) ............................................................................. 44
*United States v. Rodriguez–Aguirre*,
  264 F.3d 1195 (10th Cir. 2001) ............................................................................... 5
*Updike v. City of Gresham*,
  62 F.Supp.3d 1205 (D. Or. 2014) .......................................................................... 38
*Valdez v. National Security Agency*,
  228 F.Supp.3d 1271 (D. Utah 2017) ..................................................................... 5, 6
*West Jordan City v. Goodman*,
  2006 UT 27, 135 P.3d 874 ............................................................................... 19, 24
*Whitmore v. Arkansas*,
  495 U.S. 149 (1990) ........................................................................................... 7, 12
*Wood v. Milyard*,
  414 Fed. App'x. 103 (10th Cir. 2011) ................................................................... 40

Statutes

28 U.S.C. § 1738 ........................................................................................................ 36
42 U.S. Code § 10807 ................................................................................................. 33
42 U.S.C. § 10802(4) .................................................................................................. 29
42 U.S.C. § 10805(1)(B)-(C) ..................................................................................... 28

42 U.S.C. § 10805(a)(6) (B-C) ........................................................... 32

42 U.S.C. § 12132 (2000 ed.) ............................................................. 48

42 U.S.C. § 12202 ............................................................................. 42

42 U.S.C. § 12210(a) ........................................................................ 50

42 U.S.C. § 15002(8) ........................................................................ 29

Article III of the U.S. Constitution .................................................... 6

U.S. Const. Art. III, § 2, cl. 1 ............................................................ 34

Utah Code Ann. § 75-5-303(2) .......................................................... 35

Utah Code Ann. § 75-5-303(5)(d) ..................................................... 15

Utah Code Ann. § 75-5-303(5)(d)(v) ...................................... 35, 46, 49

Utah Code Ann. § 75-5-311(2) & (3)(a) ............................................ 35

Utah Code Ann. § 75-5-311(3) .......................................................... 14

Utah Code § 75-5-304(1) .................................................................. 50

Utah Const. art. V, § 1 ...................................................................... 19

Other Authorities

13A Federal Practice and Procedure 3d § 3531.9.5 (2011) ................ 28

**INTRODUCTION**

Effective May 10, 2016, House Bill 101 ("H.B. 101") modified Utah's guardianship statute to permit probate court judges, in limited circumstances, not to appoint counsel for potential wards in guardianship proceedings.  With a statutory mandate to "protect and advocate" for persons with disabilities, and several lawyers and numerous support staff at its disposal, Plaintiff Disability Law Center ("DLC") has had the opportunity to monitor and scrutinize the enforcement of H.B. 101 throughout its 20-month history.  Yet, even with an opportunity to amend its complaint, and with H.B. 101 sunsetting in just six months, DLC has identified only two persons ("Constituent A" and "Constituent B") who allegedly did not receive counsel pursuant to H.B. 101.  And DLC has not pleaded facts plausibly showing that the guardianships received by Constituent A or B, or anyone else, were improper or overly restrictive in the least.

Undeterred by their inability to identify any harm or damage caused by H.B. 101, Plaintiffs are seeking a statewide injunction precluding H.B. 101 from being enforced in its few remaining months.  Standing in Plaintiffs' way is an absence of a "case or controversy," including Plaintiffs' continued lack of standing; the absence of federal question jurisdiction; Defendants' immunity from suit; and Plaintiffs' failure to state a claim.

As for the first of these obstacles, H.B. 101 simply does not leave room for a legitimate Article III "case or controversy" over whether it violates federal law.  H.B. 101 expressly requires counsel be appointed for prospective wards in most guardianship cases.  And it never forbids a court from appointing counsel in any case.  H.B. 101 merely permits a court not to appoint counsel if the court determines that counsel is not necessary to protect the interests of the prospective ward (and several other conditions are satisfied).  This means the only potential

"controversy" is whether federal law requires counsel be appointed even when counsel is not necessary to protect the prospective ward's interests.

There is no controversy.  Rather, it is a tautology that federal law does not require counsel when counsel is not required to protect a person's interests.  A person's interests include, but are not limited to, his or her interests under federal law.

The absence of any controversy over whether H.B. 101 violates federal law helps explain why, after two tries, Plaintiffs still have not established they have standing.  In dismissing the original complaint on standing grounds, the Court rejected Plaintiffs' contingent liability theory because they had failed to plead what Court called a "plus factor."  But, in their amendments to the complaint, Plaintiffs have instead pleaded what the U.S. Supreme Court has called "self-inflicted injuries"—Plaintiff Katherine C. ("Katherine") allegedly ran away from home, and Plaintiff Anthony M. ("Anthony") allegedly set aside $40 in case he needs a lawyer.  Besides not being fairly traceable to Katherine's and Anthony's participation in a future guardianship proceeding, which remains only a remote and speculative possibility, Plaintiffs' "self-inflicted injuries" occurred after their original complaint was filed and therefore do not establish, as they must, that the Plaintiffs had suffered an "injury in fact" at the time of the original complaint.

Plaintiffs' other amendments to their complaint are equally ineffectual.  Originally, Plaintiffs named the Utah Judicial Council ("JC") and Administrative Office of the Courts ("AOC") as defendants.  But in response to the JC's and AOC's assertions that they perform purely administrative functions and have no control over the judiciary's decision to appoint counsel in a guardianship case, Plaintiffs dropped them as defendants and, in their place, named another person who has no control over such judicial decisions, Utah Governor Gary Herbert

("Gov. Herbert").  Because Plaintiffs' alleged "injuries" are neither caused by nor fairly

traceable to Gov. Herbert, Plaintiffs lack standing to bring claims against him.

The failure of Plaintiffs to show that any named individual has standing means that

Plaintiff Disability Law Center ("DLC") lacks associational standing.  There are also other

reasons to deny DLC associational standing.  One of the best reasons is that Plaintiffs' claims

under the Americans with Disabilities Act and the Due Process Clause demand fact-intensive

inquiries into the facts and circumstances of each case, and require the participation and

involvement of DLC's individual constituents.

Another reason is that the strategy that DLC is pursuing in this case may not serve the

interests of all or even a substantial part of its claimed constituency.  To plead and prevail on its

associational standing theory requires that DLC make significant concessions on behalf of its

claimed constituency, to include conceding that its constituents are either seriously mentally ill

or developmentally disabled.  If DLC prevails in this case, these concessions would be binding in

a future guardianship proceeding under such doctrines as judicial estoppel.  Such binding

concessions would not be in the best interests of potential wards wanting to challenge the

allegations of disability in their guardianship proceeding.

Even if Plaintiffs avoid dismissal on standing grounds, there are several other reasons to

grant Defendants' motion to dismiss.  Under the relevant test from controlling precedent, this

Court lacks federal question jurisdiction because the claimed federal questions do not necessarily

arise in a guardianship proceeding.  They do not necessarily arise because H.B. 101 requires

judges to appoint counsel in many cases.  In fact, under H.B. 101, the default rule and

3

presumption is that counsel will be appointed for potential wards.  And in many cases the

counsel will be provided free of charge under the Guardianship Signature Program.

Dismissal is also required because Defendants, i.e., the State of Utah and Gov. Herbert,

have legislative, judicial, and/or sovereign immunity from Plaintiffs' claims.

Finally, Plaintiffs have failed to plead either a valid "as applied" or facial challenge. On

its face, H.B. 101 does not discriminate against persons with disabilities with respect to the

appointment of or payment for counsel.  Further, under U.S. Supreme Court precedent, there is a

presumption that due process does not require the appointment of counsel in cases like

guardianship proceedings.  Yet, under H.B. 101, there is a presumption in favor of appointment

of counsel.

I.   **FACTS CONTROVERTING ALLEGATIONS IN AMENDED COMPLAINT FOR
     PURPOSES OF RULE 12(B)(1) MOTION**

In the event the Court elects to consider extrinsic evidence for purposes of the State's rule

12(b)(1) motion,[2] the State sets forth the following facts:

A.   In a DLC publication entitled "The Guardianship Process,"[3] which is available on

the DLC's website, the DLC informs the public that under H.B. 101,

> **Waiver of counsel will not likely be freely given** because a
> guardianship takes away an individual's important rights. Since the
> judge will decide at the beginning of the case whether to waive your
> family member's right to counsel, it is important that you submit
> adequate medical/psychological information when filing your
> petition.  **The judge will likely NOT waive your family member's
> right to counsel if: 1) they understand the proceedings and they
> want an attorney, or; 2) they object to, or don't like all the areas**

---

[2] A court may consider extrinsic evidence in resolving a 12(b)(1) motion to dismiss, without converting it
into a motion for summary judgment. *SK Finance, S.A. v. La Plata County*, 126 F.3d 1272, 1275 (10th
Cir.1997).
[3] *See* Valencia Declaration, Dkt. 37 at ¶ 6.

*where you want to make decisions for them.* (*See* http://disabilitylawcenter.org/wp-content/uploads2/2016/05/The-Guardianship-Process.pdf) (emphasis added)

B.     In the same publication, DLC states as follows:

We can provide basic information about the rights of people with disabilities and guardianship law. We're happy to help you connect with local resources. However, **we cannot represent a petitioner or a proposed ward in guardianship proceedings, nor can we offer specific legal advice about your guardianship situation**. (Emphasis added).

## ARGUMENT

## I.     THIS COURT LACKS SUBJECT MATTER JURISDICTION OVER THE CLAIMS AGAINST DEFENDANTS

A 12(b)(1) motion to dismiss allows defendants to challenge a court's subject matter jurisdiction both facially and factually.  *United States v. Rodriguez–Aguirre*, 264 F.3d 1195, 1203 (10th Cir. 2001).  A facial challenge targets the adequacy of the allegations in the complaint.  *Id.*; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Because federal courts have limited jurisdiction, they presume they lack jurisdiction unless plaintiffs plead sufficient facts to establish it.  *Mocek v. City of Albuquerque*, 813 F.3d 912, 932 (10th Cir. 2015) (citation omitted); *Full Life Hospice, LLC v. Sebelius*, 709 F.3d 1012, 1016 (10th Cir. 2013).

When presented with a facial challenge, courts (1) identify the allegations in the complaint entitled to an assumption of truth and (2) evaluate whether these allegations plausibly support an entitlement to relief.  *Iqbal,* 556 U.S. at 680; *Valdez v. National Security Agency*, 228 F.Supp.3d 1271, 1279, & n.24, 27 (D. Utah 2017) (noting *Iqbal* pleading standards apply to 12(b)(1) motions).  To be entitled to an assumption of truth, allegations must be "well-pleaded," which means, at a minimum, they cannot be legal conclusions, bare assertions, or "formulaic

recitations" of the elements of a claim.  *Valdez,* 228 F.Supp.3d at 1279.  In resolving a factual

challenge to a court's subject matter jurisdiction, the court "does not presume the truthfulness of

the complaint's factual allegations, but has wide discretion to allow affidavits, other documents,

and a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1)." *Id.*

at 1279 & n.24.

Plaintiffs' first amended complaint does not withstand either a facial or factual challenge.

## II.    PLAINTIFFS STILL HAVE NOT DEMONSTRATED THEY HAVE STANDING

Even with the amendments to their pleadings, Plaintiffs have not demonstrated they have

standing.  Standing is required for there to be a justiciable case or controversy under Article III

of the U.S. Constitution. *Lujun v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).   The essence

of the standing inquiry is whether plaintiffs have "alleged such a personal stake in the outcome

of the controversy as to assure that concrete adverseness which sharpens the presentation of

issues upon which the court so largely depends for illumination of difficult constitutional

questions." *Duke Power Co. v. Carolina Envtl. Study Grp., Inc*., 438 U.S. 59, 72 (1978).

Because standing is "not dispensed in gross," a plaintiff must demonstrate standing "for each

claim he seeks to press and for each form of relief that is sought." *Town of Chester v. Laroe

Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) (citations omitted).

A plaintiff has standing only when (1) she has suffered an injury in fact that is (2) fairly

traceable to (caused by) the alleged conduct of the defendant, and (3) likely to be redressed by a

favorable judicial decision. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).  Plaintiffs have

the burden of establishing the elements of standing. *Id.*  To satisfy this burden at the pleadings

stage, a party's complaint must include well-pleaded allegations of fact demonstrating each

element of standing.  *Id.*   "A federal court is powerless to create its own jurisdiction by embellishing otherwise deficient allegations of standing."  *Whitmore v. Arkansas*, 495 U.S. 149, 155–56 (1990).

When a complaint is amended, a court should examine the allegations in the amended complaint to determine if plaintiffs have adequately pleaded standing.  *Southern Utah Wilderness Alliance v. Palma*, 707 F.3d 1143, 1152-53 (10th Cir. 2013) ("*SUWA*").  But the allegations must demonstrate the plaintiffs had standing at the time the original complaint was filed.  *Id.* (stating that although "we examine the allegations in [the association's] Amended Complaint, our inquiry focuses on whether [the association] had standing when the original complaint was filed in April 2007.").  Allegations of events that occurred after the filing of the original complaint should be disregarded.  *See id.*

In violation of these principles, Plaintiffs' amended complaint relies on allegations of events that occurred after the original filing date of July 6, 2017.  (*See, e.g.,* FAC, ¶¶ 23-24, 27, 37-39, 5).  With or without the benefit of their untimely allegations, Plaintiffs lack standing.

### 1.  Katherine and Anthony Lack Standing

Despite amending their complaint, Plaintiffs Katherine C. ("Katherine") and Anthony M. ("Anthony") have still not alleged facts plausibly showing they have standing.

### a.  There are Still No Allegations Showing that a Guardianship Proceeding and Denial of Counsel is Imminent

In the State's first motion to dismiss, the State demonstrated that the allegations in the original complaint failed to show that Katherine or Anthony faced an imminent, concrete, and particularized invasion of a legally protectable interest as a result of H.B. 101, as is required to

establish standing. *Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 409 (2013). Plaintiffs have not corrected this defect in their amended complaint.

To the contrary, the allegations in the amended complaint still show, at best, only a remote, speculative, and hypothetical possibility that Katherine and Anthony will participate in a guardianship proceeding before H.B. 101 sunsets or ever, and even a more speculative possibility that they would not be appointed counsel during the proceeding. There are still no allegations showing that, at the time of the original complaint, Katherine's or Anthony's parents had taken any concrete steps to file a guardianship petition or that any state actor had told Katherine or Anthony that they would be denied counsel if they ever participate in a guardianship proceeding. Because the possibility that Katherine or Anthony will be denied counsel at a guardianship proceeding is no less remote and speculative under the amended complaint than it was under the original complaint, Defendants simply incorporate herein by reference the pertinent arguments from their original motion to dismiss.

> b.  *Plaintiffs' Contingent Liability Theory Fails.*

In Plaintiffs' opposition to the State's earlier motion to dismiss, Plaintiffs argued that it did not matter whether they had shown that Katherine or Anthony faced an imminent injury at a guardianship proceeding because Plaintiffs were relying on a contingent liability theory. (Dkt. 54, p. 20). But the Court rejected Plaintiffs' contingent liability theory and granted the State's motion to dismiss because Plaintiffs' failed to plead one of the essential elements of the theory. The Court called this element the "plus factor."[4] In amending the portions of their complaint

---

[4] The Court did not rule that the "plus factor" was the only element of the contingent liability theory, or that Katherine and Anthony had sufficiently pleaded the contingent liability theory except for the "plus factor" element, although Plaintiffs evidently believe otherwise. Plaintiffs are mistaken.

pertaining to Katherine and Anthony, Plaintiffs have focused on attempting to plead the "plus factor." But Plaintiffs still have not shown that Katherine and Anthony have standing.

  c. *Plaintiffs Improperly Rely on Events Post-Dating the Original Complaint*

Plaintiffs have attempted to plead the "plus factor" with allegations of events that occurred after the filing of the original complaint ("OC"). In the OC, Plaintiffs alleged that Katherine was *currently* working as a law clerk for a non-profit and voluntarily living with her parents and relying on them for financial support. (OC, ¶¶ 22, 24). In the first amended complaint ("FAC"), Plaintiffs allege Katherine *recently* quit her job, stopped using her credit cards and cell phone, and left the state "in response to her acute fear that her parents would obtain a guardianship over her." (FAC, ¶ 37). Yet, Katherine's fears have subsided to the point that she "has since returned to Utah and is again living with her parents, as she lacks the financial means to live on her own," (*id*., ¶ 38), although her relationship with her parents has "recently" become "more strained" due to her "abrupt move away from" the state. (*Id*., ¶ 38). As for Anthony, Plaintiffs have alleged that he "has set aside $40" due to his speculative fears that at some indeterminate future date "his parents will initiate guardianship proceedings against him and that the Defendants will deny him counsel" or require him "to pay for his counsel or secure *pro bono* counsel." (*Id*., ¶ 53).

Under *SUWA,* it was incumbent on Plaintiffs to allege facts showing that these events—i.e., Katherine's quitting her job, leaving and returning to Utah, etc., and Anthony's setting aside $40—occurred on or before the date of filing of the original complaint. Plaintiffs have failed to do so. In fact, Plaintiffs' allegations indicate that these events (the "*post hoc* events") occurred after the original complaint was filed. Accordingly, the Court should disregard the *post hoc*

events for purposes of determining whether Katherine and Anthony have standing.  *SUWA*, 707 F.3d 1152, 53.

After disregarding the *post hoc* events, there is no material difference between the original and amended complaints concerning whether Katherine and Anthony (and therefore DLC) have standing.  Thus, for the same reasons the Court ruled that Plaintiffs failed to establish standing in their original complaint, the Court should rule they failed to do so in their first amended complaint.

>    d.   *Even Considering the Post Hoc Events, Plaintiffs' Contingent Liability Theory Fails*

Katherine and Anthony lack standing even if the *post hoc* events are considered.  In their earlier briefing, Plaintiffs relied on cases where courts had held that standing is not necessarily defeated when liability is *temporally* contingent.  *E.g., Protocols, LLC v. Leavitt*, 549 F.3d 1294, 1301 (10th Cir. 2008).  But these cases did not hold that a party has standing despite the existence of multiple contingencies or a contingency in the liability itself.  And the Tenth Circuit has not held that asserting a contingent liability theory relieves a plaintiff of the burden of pleading facts plausibly showing the traceability, causation, and redressability elements of standing.

To the contrary, although the Tenth Circuit permitted a contingent liability theory in *Protocols*, it held later that a case is not constitutionally ripe if it "rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all."  *SUWA*, 707 F.3d at 1157-58. (noting that "doctrines of standing and ripeness substantially overlap in many cases" and that ripeness is essentially "standing on a timeline").  And the U.S. Supreme Court has held plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their

fears of *hypothetical future harm* that is not certainly impending." *Clapper*, 568 U.S. at 402, 416 (emphasis added).

Where, as here, Plaintiffs are attempting to plead the "plus factor" by alleging that Katherine and Anthony have taken actions in response to their "fears" related to a hypothetical future guardianship proceeding, *Clapper* is particularly instructive.  In *Clapper*, the U.S. Supreme Court overturned the Second Circuit's ruling that plaintiffs had demonstrated standing because they "established that they suffered *present* injuries in fact—economic and professional harms—stemming from a reasonable fear of *future* harmful government conduct." 568 U.S. at 415-16.  In so doing, the Supreme Court held that plaintiffs could *not* establish standing by "making an expenditure based on a nonparanoid fear" or "asserting that they suffer present costs and burdens that are based on a fear of surveillance, so long as that fear is not 'fanciful, paranoid, or otherwise unreasonable.'" *Clapper*, 568 U.S. at 416.  In other words, any "contention that [plaintiffs] have standing because they incurred certain costs as a reasonable reaction to a risk of harm is unavailing." *Id*.[5]

Rather, to avoid improperly "watering down the fundamental requirements of Article III," the alleged costs and burdens (plus factors) must not only constitute bona fide injuries in fact, they must, as always, be traceable to the challenged action and be redressed by the requested relief.  *Id*. at 409.   In *Clapper*, plaintiffs' downfall was that the "ongoing injuries that respondents [were] suffering [were] not fairly traceable to" the challenged statute.  *Id*. at 416.  The injuries were not fairly traceable because they rested on a "speculative chain of

---

[5] Katherine's allegations, e.g., the she quit her job, left Utah, etc., would not even satisfy the rejected Second Circuit test because they are not reasonable reactions to a hypothetical guardianship proceeding. And Anthony's allegation that he "set aside" and did not spend $40 is not an injury-in-fact because it is not an invasion of a legally protected interest.

11

possibilities," i.e., the possibilities the government would (1) target foreign individuals that the plaintiffs communicated with; (2) invoke its authority under the statutory provision at issue; (3) obtain authorization for the interception from a judge; and (4) actually intercept communications involving the plaintiffs.  *Id.* at 410.

Although there was a speculative chain of possibilities, the *Clapper* court emphasized that the presence of an "independent decisionmaker" (a judge) in the chain, by itself, broke the chain of causation.  *Id.* at 412-14.  (stating that even if respondents could show that the earlier events in the chain of causation would occur, "respondents can only speculate as to whether that court will authorize such surveillance.").  Reaffirming past precedent, the Supreme Court noted that historically it had "been reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment."  *Id.* at 414; *Whitmore v. Arkansas*, 495 U.S. 149, 159–60 (1990) ("It is just not possible for a litigant to prove in advance that the judicial system will lead to any particular result in his case.").

In this case, there are at least two independent decisionmakers in the chain of causation, i.e., Katherine's and Anthony's parents and the probate court judge presiding over their hypothetical guardianship proceeding, and probably additional independent decision makers, including Anthony's wife and other "interested parties" participating in the hypothetical guardianship proceeding.  Plaintiffs' standing theory relies on speculation and guesswork as to how these independent decisionmakers will exercise their judgment.  Under *Clapper*, such speculation and guesswork breaks the chain of causation and redressability, as a matter of law.

It would require unfounded speculation to conclude that either Katherine's or Anthony's parents would necessarily exercise their judgment in favor of petitioning for guardianship before

H.B. 101 sunsets in July 2018.  The FAC supports just the opposite conclusion.  As shown by the FAC, in the decade or more since Katherine and Anthony became adults, their parents never petitioned for guardianship (or took any discernible concrete steps to do so), even during times when Katherine and Anthony exhibited behaviors and limitations potentially more concerning than what they were exhibiting at the time the OC or FAC were filed.

Katherine alleges she is a graduate of college and law school, and has formerly worked for a non-profit.  (FAC, ¶ 29).  Although Katherine experienced paranoid schizophrenic episodes in October 2015 and September 2016, her parents did not seek a guardianship at that time or later.  Rather, during the episodes, Katherine was involuntarily confined by two treatment facilities.  (FAC, ¶¶ 33-35).  Katherine's parents also did not seek a guardianship when she allegedly abruptly quit her job, stopped using her credit card and cell phone, and left Utah.  (FAC, ¶ 37).  Having previously declined to seek a guardianship in the face of these behaviors and actions, there is no reason to believe that Katherine's parents will seek a guardianship now that she has "returned to Utah and is again living with her parents."  (FAC, ¶ 38).

Although Katherine alleges that she "worries" her parents will attempt to obtain a guardianship over her "if" they think her symptoms are worsening again, (FAC, ¶39), it is speculative to assume her symptoms will worsen again and even more speculative to assume that her parents would necessarily respond by petitioning for a guardianship.  As history shows, twice before when Katherine's symptoms worsened, the result was not a petition for guardianship but involuntary confinement by persons other than her parents.  As Katherine herself admits, she "faces the prospect of long-term involuntary confinement should she experience another paranoid schizophrenic episode."  (FAC, ¶ 35).   The availability of involuntary confinement and

other "alternatives to guardianship," (FAC, ¶ 77), makes it even more speculative to assume that Katherine's or Anthony's parents will ever petition for guardianship. *Cf. Clapper*, 568 U.S. at 412-13 ("[E]ven if respondents could demonstrate that the targeting of their foreign contacts is imminent, respondents can only speculate as to whether the Government will seek to use § 1881a-authorized surveillance (*rather than other methods*) to do so. The Government has numerous other methods of conducting surveillance, none of which is challenged here.") (emphasis added).   There is a web, not merely a chain, of speculative possibilities in this case.

Similarly, the potential for a guardianship proceeding involving Anthony and his parents is remote and speculative.  Anthony alleges that he is 34 years old, "currently lives with his wife and son" (neither of whom is alleged to be disabled), has "*developed skills and abilities* over time," and now is *employed* as an assistant custodian.  (FAC, ¶¶ 33-34, 37, 39) (emphasis added).  Thus, in the 16 years since Anthony reached adulthood, his parents have not sought or obtained a guardianship over him, or taken any concrete steps to do so.  Moreover, during this time his abilities have *improved,* and he now lives with and has the support of a wife, who has priority over Anthony's parents for appointment as his guardian.  *See* Utah Code Ann. § 75-5-311(3).  In the five months between the filing of the FAC and OC, nothing in this regard has changed, except that H.B. 101 is even closer to sunsetting.   There is no reason to conclude that Anthony's parents will petition for a guardianship, even "some day." *See Lujan*, 504 U.S. at 564 (holding that "some day" intentions fail to establish standing). [6]

---

[6] Even assuming Katherine's and Anthony's "concerns" arising from their 'parents' statements constitute an injury, they are not "fairly traceable" to Defendants for purposes of determining whether Plaintiffs have standing.  *See Lujan,* 504 U.S. at 560 (stating that, for purposes of establishing standing, the injury must not be the result of independent action of third party not before the court).

Even if one indulges in speculation and assumes that Katherine's and Anthony's parents will some-day petition for guardianship, it is speculative to assume that the probate court judge will not appoint them counsel.  The plain language of the H.B. 101 does not mandate that Katherine and Anthony be denied counsel.  To the contrary, the default requirement and presumption is that counsel will be appointed for all potential wards.  In fact, H.B. 101 *requires* the probate court judge to appoint counsel unless five conditions are satisfied, one of which is a judicial determination, based on all the relevant facts of circumstances at the time, that appointment of counsel is not necessary to protect the interests of the proposed ward.  Even if the judge determines that all five conditions are satisfied, H.B. 101 does not preclude the judge from appointing counsel.  Utah Code Ann. § 75-5-303(5)(d) (stating merely that counsel "is not required" if the five conditions are met); *In re E.L.*, 2006 WL 727875, *4 (Cal. Ct. App. March 22, 2006) ("The use of the phrase 'is not required' indicates that the juvenile court retains some discretion . . . .") (unpublished).

Because H.B. 101 presumes the probate court judge will appoint counsel, and leaves it to the judge to decide whether the appointment of counsel is necessary, Katherine's and Anthony's alleged injuries are not fairly traceable to H.B. 101.  *Id.*; *COPE v. Kansas State Bd. Of Educ.*, 821 F.3d 1215, 1222-23 (10th Cir. 2016) (holding that plaintiffs lacks standing to challenge science standards adopted by board of education pursuant to statute because school districts retained authority to reject or alter standards in ways that would alleviate plaintiffs' concerns).

Likewise, it is speculative to assume that Katherine or Anthony would have to pay for appointed counsel.  Plaintiffs allege, and therefore admit, that Utah judges endorse and use a "Guardianship Signature Program," which makes available "lawyers who have volunteered to

represent respondents in guardianship proceedings, . . . on a sliding scale if the client's income

qualifies . . . ." (FAC, ¶¶ 74-75). In fact, the FAC references a Utah Court website that makes

clear that the cost of appointed counsel is "free" for respondents with incomes up to 125 % of

federal poverty income guidelines. (*Id.*, ¶ 74 (citing

www.utcourts.gov/howto/family/gc/signature/index.html). Plaintiffs have failed to plead facts

plausibly showing that Katherine and Anthony would not qualify for free legal representation.

To the contrary, the fact they both allege they "would not be able to pay" for a lawyer in a

guardianship proceeding, (Dkt. 96, ¶ 22; Dkt. 97, ¶ 12), means they would qualify for a free

lawyer under the Guardianship Signature Program. And absent from the FAC are any facts

plausibly showing that a guardianship respondent has ever actually paid for counsel appointed

under the guardianship statute.

Adding to the speculation is the uncertainty regarding the type of guardianship (full or

limited) that the parents would seek if they ever petition for guardianship; whether and how any

other interested parties would participate in the proceeding (e.g., Would Anthony's wife cross-

petition or object? Would another interested party request or arrange for counsel for Katherine

or Anthony?); Katherine's and Anthony's condition and conduct during the guardianship

proceeding (e.g., Would they decline or be unable to appear at the initial hearing and therefore

automatically be appointed counsel? If they appeared at the hearing, would they request counsel

or object to the guardianship?); and what other procedures would be employed by the probate

court. (e.g., Would a visitor or physician be appointed?) The answers to these unknown and

unknowable facts and circumstances would be material to the probate court's decision to appoint

counsel. Yet, Plaintiffs have not pleaded, and cannot responsibly attempt to plead, any of these

facts or circumstances because they cannot be predicted without resorting to speculation about the future.

Equally fatal to Plaintiffs' claims is their failure and inability to plead facts plausibly showing that Katherine and Anthony would have a defense to whatever type of guardianship their parents would seek at the hypothetical future guardianship proceeding.  Where, as here, Plaintiffs' theory of standing is based on a possible future procedural violation, i.e., not appointing counsel, it is important to recognize that the "Constitution does not protect procedure for procedure's sake."  *Turner v. McKee*, 681 F.3d 1215, 1219 n.5 (10th Cir. 2012) (quoting *Morgan v. McCotter*, 365 F.3d 882, 889 (10th Cir. 2004)).  In determining whether a party has standing resulting from an alleged denial of due process, "one must ask whether, assuming the truth and validity of all of a plaintiff's factual allegations and legal theories, the due process protections would have alleviated any harm."  *Id.*

To demonstrate standing, then, it is necessary that Plaintiffs plead facts plausibly showing, at a minimum, that Katherine and Anthony would have a defense to the imposition of guardianship.  *Cf. Rector v. City & County of Denver*, 348 F.3d 935, 945 (10th Cir. 2003) (holding that plaintiff "does not have standing to bring the suit and to represent the class, because her injury, the payment of the fine, is fairly traceable not to the allegedly defective notice but to her lack of any legal defense to the parking ticket.").  Plaintiffs cannot satisfy their pleading burden because the availability of a defense depends upon the facts and circumstances at the time the guardianship petition is filed, including the type of guardianship sought, the present condition and functioning of potential ward, and other facts and circumstances.

17

This case is nothing like the cases Plaintiffs cited previously in support of their contingent liability theory. *Protocols, LLC v. Leavitt*, 549 F.3d 1294, 1301 (10th Cir. 2008), stands for the inapposite proposition that a plaintiff may have standing if the plaintiff and the government entity charged with enforcing the statute *agree* that plaintiff has engaged in conduct that is contrary to the government entity's interpretation of the statute. *Id.* (noting that plaintiff "*admits* that it has arranged settlements that are contrary to what [defendant government agency] has declared to be required" and "Defendants *do not dispute* that [government agency's] present view of the law is contrary to [plaintiff's] understanding and contrary to the manner in which [plaintiff] has constructed settlements." (emphasis added)). And, in *U.S. v. Supreme Court of New Mexico*, 839 F.3d 888 (10th Cir. 2016), the court relied upon the proposition that standing may exist where the "challenged provision on its face proscribes the conduct in which a plaintiff wishes to engage." *Id.* at 901. In contrast, H.B. 101 does not on its face preclude a probate court from appointing counsel for Katherine or Anthony, and there is no stipulation that a court would necessarily deny them counsel. Further, neither *Protocols* nor *New Mexico* required guesswork or speculation regarding how two independent decisionmakers would exercise their judgment.

   e. *Causation and Redressability are Lacking because Plaintiffs Have Failed to Name Defendants Involved in the Enforcement of H.B. 101*

Katherine and Anthony also lack standing due to their failure to join as defendants any party involved in the enforcement of H.B. 101. The causation and redressability elements of standing are not satisfied if the named defendant lacks authority to enforce the challenged statute. *Bronson v. Swensen*, 500 F.3d 1099, 1110 (10th Cir. 2007); *Kitchen v. Herbert*, 755 F.3d 1193, 1201 (10th Cir. 2014). Neither of the named defendants—the State of Utah and Gov. Gary Herbert—enforce H.B. 101 or decide whether or not to appoint counsel for a respondent in a

guardianship proceeding. Guardianship proceedings under H.B. 101 are initiated and prosecuted by private parties (parents), and the only state actor involved in the proceedings is the probate court judge.

Plaintiffs also fail to allege facts plausibly showing that the State of Utah enforces the provisions of H.B. 101 concerning the appointment of counsel. The only allegation that touches on this issue is that the State of Utah is responsible for operating its programs, *et al*., including its guardianship procedures, in conformity with the ADA, the RA, and U.S. Constitution. (FAC, ¶ 54). This legal conclusion is not entitled to a presumption of truth, and is inaccurate and imprecise.

The State does not operate as a monolith. The State is divided into three branches of government—legislative, executive, and judicial, each with its own powers and functions. *See Utah Const. art. V, § 1*. Under the separation of powers principle, the State as a whole does not control the branches in the performance of their assigned powers and functions.

As shown by the express terms of H.B. 101, a probate court judge, a member of the judicial branch, decides whether or not to appoint counsel. Under the separation of powers principle and canons of judicial ethics, this decision is made independently and is not controlled by the other branches of government or the State as a whole. *See In re Schwenke*, 2004 UT 17, ¶ 36, 89 P.3d 117; *West Jordan City v. Goodman*, 2006 UT 27, ¶ 21, 135 P.3d 874. Thus, the requested prospective relief against the State as a whole will not redress Plaintiffs' alleged injuries.

Likewise, Gov. Herbert is not authorized to enforce H.B. 101. Neither Gov. Herbert nor any official under his control in the executive branch participates in guardianship proceedings

19

under H.B. 101.  The only state actor involved in the proceedings, i.e., the probate court judge, is a member of the judicial branch and therefore outside Gov. Herbert's supervisory control.  The Governor's exercise of supervisory control over a probate court judge would violate the separation of powers principle.

Plaintiffs' allegation that Gov. Herbert is responsible for "see[ing] that the laws are faithfully executed," (FAC ¶ 56), is legally insufficient.  *Brown v. Herbert*, 850 F. Supp. 2d 1240, 1250 n .8 (D. Utah 2012) (holding that causation element of standing not satisfied by Gov. Herbert's responsibility to "see that the laws are faithfully executed"); *Calzone v. Hawley*, 866 F.3d 866, 870 (8th Cir. 2017); *1st Westco Corp. v. Sch. Dist.*, 6 F.3d 108, 113 (3d Cir. 1993).

Plaintiffs' remaining allegations concerning Gov. Herbert also fail to establish causation or redressability.  Although Plaintiffs allege that Gov. Herbert is responsible for delivering proposed budget recommendations, including recommendations on the state court's administrator's estimate, to the Utah Legislature, (FAC ¶ 57), these allegations do not plausibly establish that Gov. Herbert has a "particular duty to enforce [H.B. 101] and a demonstrated willingness to exercise that duty," *Kitchen*, 755 F.3d at 1201 (citation omitted), as is necessary to satisfy the causation and redressability elements.

Likewise, Plaintiffs' injuries will not be redressed by the requested prospective relief because they have failed to join Katherine's and Anthony's parents to this lawsuit.  The failure to join the parents means that any injunction or declaration arising from this case will not bind the parents in a subsequent guardianship proceeding under principles of res judicata or collateral estoppel.  *See Gressman v. State*, 2013 UT 63, ¶ 37, 323 P.3d 998, 1009; *Searle Bros. v. Searle*, 588 P.2d 689, 690-91 (Utah 1978); *cf. Nova Health Systems v. Gandy*, 416 F.3d 1149, 1158-59

(10th Cir. 2005) (holding plaintiffs lacked standing because the "record cannot support a conclusion that a judgment enjoining *only these defendants* from filing suit to recover damages under [statute] would redress [plaintiff's] injury.").  Similarly, even if Plaintiffs are successful in this litigation against the named defendants, they could not later obtain an injunction from this Court preventing the parents from relitigating the question of whether Katherine and Anthony must be appointed counsel.  *See Smith v. Bayer*, 564 U.S. 299, 306-308, 312-313 (2011) (holding that relitigation exception to the Anti-Injunction Act did not apply because person presenting issue in state court was not a party to prior federal court case in which the issue was decided).

> ### f.   Katherine's and Anthony's Claimed Injuries are not Redressable for Other Reasons

Further, Katherine and Anthony lack standing because none of the alleged effects or injuries constituting their "plus factor" will be redressed by the prospective relief requested by Plaintiffs.  The requested prospective relief will not return Katherine to the position she was in before the occurrence of the events alleged in the FAC.  The prospective relief will not give her job back, compensate her for any costs she incurred in departing or returning to Utah or the time she spent calling family law and probate attorneys, and will not repair the strain in the relationship with her parents caused by "her abrupt move away from Utah (and home)."  (FAC¶¶ 37-39).  Although Katherine alleges that she avoids spending time or discussing certain matters with her parents because she "worries" that her *parents* "will attempt to get a guardianship over her," (FAC ¶ 39), this situation will not be redressed by the requested relief.  Plaintiffs are not seeking an injunction preventing her *parents* from attempting to obtain guardianship over her.

Likewise, Anthony's decision to set aside $40 because he fears his parents will seek a guardianship and "Defendants will deny him counsel or will impose upon him the burden" of

"pay[ing] for his own counsel or secur[ing] *pro bono* counsel," will not be redressed by each form of relief sought.   Because Anthony must have standing "for each form of relief that is sought," *Town of Chester,* 137 S. Ct. at 1650, Anthony must demonstrate that his decision to set aside $40 would be redressed both by the requested (1) declaration/injunction requiring Defendants to appoint him counsel and (2) declaration/injunction requiring Defendants to pay for his appointed counsel.[7]   But requiring Defendants to appoint counsel for Anthony will not redress his decision to set aside $40.   To the contrary, Anthony alleges that he set aside the $40 because he fears he may have to pay for counsel (even though Anthony alleges he is unable to pay for counsel, (Dkt. 91, ¶ 12), and the probate court can appoint "free" counsel through the Guardianship Signature Program).   For this additional reason, Anthony lacks standing to seek a declaration/injunction requiring the appointment of counsel.

### 2.   Constituents A and B Lack Standing

Plaintiffs allege that Constituents A and B were not appointed counsel and were assigned full guardians pursuant to H.B. 101. (FAC, ¶¶ 23-25).   Although Constituents A and B are not named as plaintiffs, Defendants anticipate that DLC will argue that it has associational standing because these constituents have standing.   DLC's anticipated argument fails, for several reasons.

First, Plaintiffs allege that Constituent A was denied counsel on November 15, 2017 (i.e., over four months after the filing of the original complaint).   (FAC, ¶ 23).   This allegation does not demonstrate that Constituent A and DLC had standing at the time of the original complaint, as is necessary for DLC to avoid dismissal.   *See, supra, SUWA,* 707 F.3d at 1152-53.

---

[7] That these are distinct and severable forms of relief is demonstrated by Plaintiffs' original motion for a preliminary injunction, in which Plaintiffs sought an injunction requiring that Defendants appoint, but not pay for, counsel for potential wards.

Further, Plaintiffs have failed to plead any facts plausibly showing that either Constituent A or B had a defense to receiving a guardianship.  Thus, the traceability element of standing is lacking, as a matter of law.  *See, supra, Rector*, 348 F.3d at 945.

Likewise, Plaintiffs have failed to plead facts plausibly showing that the requested declaratory and injunctive relief would redress any alleged injury-in-fact suffered by Constituent A or B.  To do so, Plaintiffs would have had to plead facts plausibly showing the Constituents A and B will imminently face, and be denied counsel at, *another* guardianship proceeding.  *City of Los Angeles v. Lyons*, 461 U.S. 95, 110 (1983) ("The equitable remedy is unavailable absent a showing of irreparable injury, a requirement that cannot be met where there is no showing of any *real or immediate threat that the plaintiff will be wronged again*.") (emphasis added); *Barney v. Pulsipher*, 143 F.3d 1299, 1306 n.3 (10th Cir. 1998) (stating a plaintiff lack standing to "maintain a declaratory or injunctive action unless he or she can demonstrate a good chance of being likewise injured in the future.") (citation omitted).  Plaintiffs have not done so.

Conversely, the redressability element is lacking because Plaintiffs are not requesting that the Court overturn or modify Constituent A and B's guardianships.  And the *Rooker-Feldman* doctrine precludes Plaintiffs from obtaining such relief.  *Bear v. Patton*, 451 F.3d 639, 641 (10th Cir. 2006).

Finally, as is the case with Katherine and Anthony, the causation and redressability elements of standing are lacking due to the failure of Plaintiffs to join as defendants the parents of Constituents A and B, or any persons involved in the enforcement of H.B. 101.

### 3.  Disability Law Center – No standing in its own right

DLC likewise lacks standing for several reasons. First, the absence of in standing

resulting from Plaintiffs' failure to include any defendants involved in the enforcement of H.B. 101 applies to DLC as well.

Further, the "injuries" DLC allegedly suffered in the past do not give DLC standing to claim prospective relief. A plaintiff lacks standing to maintain an action for prospective relief based on a past injury-causing event unless it plead facts plausibly showing a real or immediate threat that the event and injury will recur. *Lyons*, 461 U.S. at 110. The following allegations, by themselves, fail to demonstrate that there is an immediate threat that the alleged injury-causing events will be repeated in the future: that DLC "has devoted [past tense] a substantial portion of its operating budget to formal advocacy efforts," (FAC, ¶ 26); DLC "has diverted [past tense] a significant amounted of its limited resources toward educational initiatives," (*id.*); DLC hosted [past tense] a conference costing almost $25K on July 10, 2017. (*Id.*, ¶ 27).[8] Further, the allegations regarding the conference fail to establish that DLC had standing at the time of filing of the original complaint. The conference allegedly occurred on July 10, 2017, i.e., several days after the original complaint was filed.

Plaintiffs do allege that DLC "will continue" to suffer a diversion of its limited resources. (FAC, ¶ 109). This conclusory statement about the future falls short of the *Twombly* and *Iqbal* standard, or the teachings of *Lyons* and *Clapper*. DLC "cannot manufacture standing merely by inflicting harm on [itself] based on their fears of hypothetical future harm that is not certainly

---

[8] Defendants continue to maintain that the vague and conclusory allegations in paragraph 26 of the FAC are legally insufficient under *Twombly* and *Iqbal* and do not satisfy DLC's burden to demonstrate it has suffered an injury in fact, especially in light of contradictory evidence brought forward by Defendants (*see* Fact section, *supra*) and contradictory law precluding reliance on litigation and lobbying expenses as injuries in fact, as previously argued in Defendants' briefing on their earlier motion to dismiss. But, as the Court decided otherwise, Defendants do not repeat these arguments here. Yet, to make clear that Defendants are not waiving these arguments, Defendants' earlier briefing is incorporated herein by reference.

impending." *Clapper, at* 416

DLC's alleged future expenditures are based on hypothetical future harms that are not certainly impending.  As noted earlier, DLC has failed to plead facts plausibly showing that Katherine or Anthony will imminently be denied counsel or will be required to pay for counsel in the future.  Likewise, DLC has failed to make this showing for any alleged unnamed constituents.

Past history does not assist the Plaintiffs.  H.B. 101 went in effect on May 10, 2016, and will sunset on July 1, 2018.  Although Plaintiffs have pleaded facts plausibly showing that *one* person (Constituent A) was not appointed counsel in the 15 months between the effective date of H.B. 101 and the date of the original complaint, as noted previously, Plaintiffs failed to allege facts showing that Constituent A had a defense to a guardianship or had any reason to oppose the guardianship.  The same pleading defects apply to Constituent B.  Further, Plaintiffs have failed to plead facts showing that any guardianship respondent has ever actually been required to pay for appointed counsel or will imminently be required to pay for counsel despite the availability of the Guardianship Signature Program.

Whether DLC has standing in its own right is academic, in any event.  At best, DLC would "have standing in its own right to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the [organization] itself may enjoy." *New York Civil Liberties Union v. New York City Transit Auth.*, 684 F.3d 286, 295 (2d Cir. 2012).  But DLC does not have standing in its own right to assert causes of action under the ADA, RA, and Due Process Clause premised on the rights of individual respondents in guardianship proceedings.  *Cf. Irish Lesbian & Gay Org. v. Giuliani*, 143 F.3d 638, 649 (2d Cir. 1998) (stating that although district court was

25

"obviously correct" that organization did not have standing to assert its members' individual rights, organization had standing to assert claim under § 1983 for a denial of its own First Amendment rights). And DLC lacks even statutory standing to sue under ADA because DLC has not alleged that it has been denied "denied access to or participation in any of the public services covered by Title II of ADA." *Popovich v. Cuyahoga Cty. Court of Common Pleas*, 150 F. App'x. 424, 427 (6th Cir. 2005) (unpublished).

### 4. Disability Law Center – No associational standing

To adequately plead associational standing, a plaintiff must allege facts showing that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977). The first *Hunt* element requires "an organization suing as a representative [to] include at least one member with standing to present, in his or her own right, the claim (or the type of claim) pleaded by the association." *United Food and Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 555 (1996).

The first *Hunt* element is dispositive. As shown earlier, none of individuals named in the FAC (Katherine, Anthony, or Constituents A and B) have standing to seek the claims for prospective relief pleaded by DLC. Thus, DLC lacks associational standing. *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009); *Access 4 All, Inc. v. Smith's Food & Drug Centers, Inc.*, No. 2:16-CV-00475-JNP, 2017 WL 3484921, at *4 (D. Utah Aug. 14, 2017) (unpublished). But even if the Court determines that any of the named individuals have standing to seek the prospective relief, there are other reasons to rule that DLC lacks associational standing.

This may be the first time DLC has relied on associational standing.  DLC does not allege that it relied on associational standing in any of its previous cases referenced in paragraph 14 of the amended complaint.  In *Just for Kids* and *Six Feet Below*, DLC attorneys represented individuals; and in *DLC v. Utah*, DLC brought a "class-action suit."  (FAC, ¶ 14).

This is not the proper case for DLC to experiment with an untried theory.  Its unprecedented reliance on associational standing raises serious due process concerns.  DLC alleges that it has over 300,000 constituents, and has brought this action to "advocate for the rights and interests of prospective wards in guardianship proceedings"—all of them—as shown by the broad prospective relief requested (FAC, ¶¶ 17-18).  A "*prospective* ward," by definition, has not yet been appointed a guardian or been judicially declared to be incapacitated or legally incompetent, and thus should not be treated as such.  But DLC has not alleged that any of the presumptively legally-competent *prospective* wards that DLC purports to represent have authorized or received notice of this lawsuit or consented to DLC's representation of their interests.  DLC's reliance on associational standing thus disregards the same autonomy and due process rights that it purports to champion.

This disregard for autonomy and due process rights, if unchecked, could result in further damage to the legal interests of prospective wards.   If DLC is correct that a ruling from this Court would be binding in a state court guardianship proceeding if DLC prevails on the merits, it must be equally binding in state court if DLC loses on the merits.  *See Murdock v. Ute Indian Tribe of Uintah & Ouray Reservation*, 975 F.2d 683, 688 (10th Cir. 1992) (stating that where an association "adequately represent[s] the interests of all members," the association's actions bind its members); *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 322 F.3d 1064,

1082 (9th Cir. 2003).  If DLC loses on the merits here, under principles of collateral and judicial

estoppel, prospective wards would not be free to re-litigate the issues that DLC is raising here.

*Id.*; Charles Alan Wright, et al., 13A Federal Practice and Procedure 3d § 3531.9.5 (2011) ("A

defendant who has been sued on [the theory of associational representation] can reasonably

argue that it should be protected against subsequent litigation" by association members.).  Thus,

respect for due process demands, at a minimum, that prospective wards be given the opportunity

to decide whether to allow DLC to represent their interests now or instead represent their own

interests if they are ever subject to a guardianship proceeding.   This opportunity is provided in a

class action, through the notice and opt-out protections afforded to class members.  No similar

due process protections are provided by associational standing.  *Bd. of Managers of Mason Fisk*

*Condo. v. 72 Berry St., LLC*, 801 F. Supp. 2d 30, 36 n.2 (E.D.N.Y. 2011) ("Without the clear

opt-out mechanism of a class action, the *res judicata* consequences of the association members

are also of some concern.").

DLC argued previously that the Protection and Advocacy for Individuals with Mental

Illnesses ("PAIMI") and Protection and Advocacy for Individuals with Developmental

Disabilities ("PADD") statutes justify its assertion of associational standing on behalf of *all*

prospective wards.  In the specific context of this case, DLC's reliance on PAIMI and PADD is

misplaced.   PAIMI and PADD are quite restrictive.  PAIMI authorizes protection and advocacy

systems to pursue legal remedies only to "ensure the protection of individuals with mental illness

who are receiving care or treatment in the State" or within 90 days of their discharge from a

treatment facility.  42 U.S.C. § 10805(1)(B)-(C).  An "individual with mental illness" must have

a "*significant* mental illness or emotional impairment" as determined by a "qualified medical

professional." 42 U.S.C. § 10802(4) (emphasis added).  PADD authorizes the pursuit of legal remedies to ensure the protection of individuals with "developmental disabilities," which are defined as "severe, chronic" disabilities that, inter alia, are "manifested before the individual attains age 22," are "likely to continue indefinitely," and result in "substantial functional limitations" in at least three of seven areas of "major life activity." 42 U.S.C. § 15002(8).

DLC has not pleaded facts showing that any named individual is its "constituent" under PAIMI or PADD.  DLC has failed to plead facts plausibly showing Constituents A or B are either significantly mentally ill and receiving medical treatment in Utah (as required by PAIMI), or developmentally disabled (as required by PADD).   Further, Katherine is not alleged to be "receiving care or treatment in the State."  And Anthony is alleged to suffer functional limitations in only two areas of major life activity, i.e., capacity for independent living and economic self-sufficiency. (FAC, ¶¶ 36-37).

DLC has likewise failed to plead facts plausibly showing that all *prospective* guardianship respondents meet the restrictive definitions of PAIMI and PADD.  Prospective wards, including those addicted to illegal or prescription drugs or alcohol, or suffering from a traumatic brain injury or another incapacitating injury or disease that occurred after age 22, may be neither significantly mentally ill (or diagnosed or treated as such) or developmentally disabled, yet may be incapacitated within the meaning of the guardianship statute.  And respondents in meritless guardianship actions may not be remotely mentally ill, developmentally disabled, or incapacitated.  Thus, DLC may not assert the rights of *all* prospective guardianship respondents or obtain sweeping injunctive relief on their behalf, as a matter of law.

For the subset of prospective wards to whom PAIMI or PADD might apply, DLC's

allegations of associational standing constitute judicial admissions that they have a significant mental illness or developmental disability. *Grynberg v. Bar S Servs., Inc.*, 527 F. App'x. 736, 739 (10th Cir. 2013) (unpublished). Thus, if DLC succeeds with its associational standing theory in this Court, all prospective wards subject to the Court's injunctive relief will be estopped from asserting they are *not* significantly mentally ill or "developmentally disabled" in a guardianship proceeding in state court. *D.U. Co. v. Jenkins*, 2009 UT App 195, ¶ 16, 216 P.3d 360, 366; *First W. Capital Mgmt. Co. v. Malamed*, 874 F.3d 1136, 1145-46 (10th Cir. 2017). This would present a serious obstacle to prospective wards defending against a guardianship action, where the ultimate issue is whether the alleged ward is incapacitated. DLC would have won the battle in federal court only to have the prospective wards lose the war in state court. For this additional reason, DLC's reliance on associational standing places the rights of individual prospective wards at risk.

Even in situations where a binding admission of disability is not so profoundly damaging to the legal interests of the individuals whom a disability rights organization purports to represent, courts are split over whether the organization may assert associational standing. *Compare Mo. Prot. & Advocacy Servs., Inc. v. Carnahan*, 499 F.3d 803, 810 (8th Cir.2007) (concluding Missouri's protection and advocacy ("P & A") system lacked associational standing); *Ass'n for Retarded Citizens of Dall. v. Dall. Cnty. Mental Health & Mental Retardation Ctr. Bd. of Trs.*, 19 F.3d 241, 244 (5th Cir.1994) (concluding that Texas's P & A system bore "no relationship to [a] traditional membership group[ ], because most of its 'clients' . . . are unable to participate in and guide the organization's efforts"); *and Disability Advocates, Inc. v. New York Coal. for Quality Assisted Living, Inc.*, 675 F.3d 149, 158 (2d Cir. 2012)

30

(holding that contractor to New York's P & A system lacked associational standing) *with Oregon Advocacy Ctr. v. Mink*, 322 F.3d 1101, 1110 (9th Cir.2003) and *Doe v. Stincer*, 175 F.3d 879, 886 (11th Cir.1999).

As the courts in these cases agree, disability rights organizations are not "associations" and persons covered by PAIMI/PADD are not "members" in the traditional sense because the latter do not voluntarily join the organization.  Rather, they are involuntarily deemed to be the constituents of the disability rights organization if they meet the definitions of "mentally ill" or "developmentally disabled."   The "constituents" of DLC did not become, nor do they remain, its constituents as a matter of individual choice, but rather by fiat.  A person with a disability cannot quit DLC, or opt-out of a lawsuit brought by it, if he or she disagrees with its legal strategy.

Although the courts in these cases have reached different results, they generally start their analysis by comparing the case before them with the situation in *Hunt*, which permitted an associational standing theory even though the "apple growers and dealers [were] not 'members' of the Commission in the traditional trade association sense." The *Hunt* court did so because the grower/dealers "possess all of the indicia of membership in an organization," i.e., "[t]hey alone elect the members of the Commission; they alone may serve on the Commission; they alone finance its activities, including the costs of this lawsuit, through assessments levied upon them." 432 U.S. at 344-45.

Plaintiffs have failed to plead facts plausibly showing that the constituents of DLC possess any of these indicia of membership in an organization.  This failure would be fatal under the reasoning of the courts rejecting the use of associational standing by other P & A organizations.  *E.g., Carnahan*, 499 F.3d 810; *Dallas County*, 19 F.3d at 244.

Courts that have ruled differently have found that the P & A organization's constituents possess other indicia of membership, including the "means to influence the priorities and activities the [P & A organization] undertakes" these courts also considered whether the organization's own interests would be "adversely impacted by the outcome of [the] litigation." *Mink*, 322 F.3d, at 1112.

The Court need not resolve this split of authority, because this case is distinguishable from the cases finding a P & A organization had associational standing.  The distinguishing features here are a lack of representation by individuals with disabilities in the affairs of DLC, and the presence of conflicts of interest.  In *Mink*, there was "undisputed testimony that people with disabilities constitute a majority of [P & A organization's] board of directors and that individuals who had received or were receiving mental health services, or family members of such individuals, compose more than 60 percent of the advisory council." *Id.* at 1112.  In contrast, DLC's 15-member board of trustees is dominated by lawyers and includes only two persons described as having disabilities.  (*See* Exhibit A, available at "http:\\disabilitylawcenter.org/board-trustees").  And, unlike *Mink*, DLC does not allege that at least 60 percent of its advisory council is "comprised of individuals who have received or are receiving mental health services or who are family members of such individuals," as is required by law.  322 F.3d at 1111-12 (quoting 42 U.S.C. § 10805(a)(6) (B-C)); *see* FAC, ¶ 14.

In further contrast to *Mink*, the presence of any parents of individuals with disabilities on DLC's board of trustees or advisory council is not an unqualified source of reassurance that the interests of prospective wards are adequately represented, not when the premise of DLC's lawsuit is that the interests of parents and their adult children may not be entirely aligned in a

32

guardianship proceeding under H.B. 101.[9]

### 5.   Plaintiffs Lack Standing to Challenge H.B. 101 with Hypotheticals

Plaintiffs have argued and are expected to continue to argue that a full guardianship potentially allows a guardian to make various decisions for a ward, including decisions regarding the ward's residence and medical treatment.  These arguments are purely hypothetical because the individual plaintiffs, Katherine and Anthony, have not alleged that they have been appointed a full guardian or even that their parents have threatened to obtain a full guardianship (as opposed to a limited guardianship) and would actually exercise any of the alleged hypothetical rights of a full guardian.  Plaintiffs' hypothetical arguments are unavailing because Plaintiffs lack standing to challenge H.B. 101 with hypotheticals that do not resemble their own situation.  *U.S. v. Ramos,* 695 F.3d 1035, 1047-48 (10th Cir. 2012) ("In other words, by offering a fanciful hypothetical—that did not resemble his own situation—Mr. Mendes had not established that the purported constitutional defect in the statute adversely impacted his own rights, or caused his sentencing injury. Consequently, he lacked standing.").  Plaintiffs have "standing to challenge the constitutionality of a statute only insofar as it has an adverse impact on [their] own rights." *Id.* at 1047 (citation omitted).

## III.   THIS COURT LACKS FEDERAL QUESTION JURISDICTION

Katherine and Anthony have never participated in a guardianship proceeding or been denied counsel under H.B. 101.  However, relying on the Declaratory Judgment Act, Katherine

---

[9] Plaintiffs have also not pleaded facts plausibly showing that it was not appropriate to exhaust administrative remedies or that this lawsuit was necessary to prevent "imminent serious harm" to an individual, as required by PAIMI. 42 U.S. Code § 10807; *see also Jackson v. Seaboard Coast Line R.R.,* 678 F.2d 992, 999 n. 7, 1000–01 (11th Cir.1982) (failure to allege in pleadings exhaustion of administrative remedies implicates Rule 9(c)).

and Anthony seek declarations that the failure to appoint and pay for counsel for them at a hypothetical future guardianship proceeding would violate procedural due process, the Rehabilitation Act ("RA") and the Americans with Disabilities Act ("ADA").  The Court should dismiss Katherine's and Anthony's claims due to a lack of federal question jurisdiction.

Federal courts have subject matter jurisdiction over cases or controversies arising under federal law.  U.S. Const. Art. III, § 2, cl. 1.   This is sometimes called federal question jurisdiction.  In deciding whether they have federal question jurisdiction, courts generally follow the "well-pleaded complaint rule" and base their decision on the plaintiff's statement of his or her cause of action.  *Devon Energy Prod. Co., L.P. v. Mosaic Potash Carlsbad, Inc*., 693 F.3d 1195, 1202 (10th Cir. 2012).   But this rule does not apply to declaratory judgment actions.  *Id*. at 1202-03.  With declaratory judgment actions, the Tenth Circuit and other federal courts instead look to character of the *threatened or hypothetical action* to determine whether it would necessarily present a federal question.  *Id*.; *Medtronic, Inc. v. Mirowski Family Ventures, LLC,* 134 S. Ct. 843, 848 (2014) (citations omitted).

Under the *Devon Energy* test, it is clear the Court lacks federal question jurisdiction over Katherine's and Anthony's claims.  Guardianships are solely within the province of the states. There are no federal guardianship laws or guardianship proceedings.  Thus, the character of the hypothetical future action is a guardianship proceeding arising under state law.  The alleged "federal questions" do not necessarily arise during a guardianship proceeding because in many cases the potential ward will be represented by counsel.  Under H.B. 101, a potential ward has the right to appear with counsel of his or her own choice.  Utah Code Ann. § 75-5-303(2).  And, if the potential ward does not appear with counsel, there is a presumption that appointment of

counsel is required. *Id.* This presumption may be rebutted only if five conditions are met, one of which requires the court be "satisfied that counsel is not necessary in order to protect the interests of the person." Utah Code Ann. § 75-5-303(5)(d)(v). Further, the Guardianship Signature Program provides counsel at no or minimal cost. Thus, in many cases, the court will appoint *pro bono* counsel and avoid the alleged "federal questions."

Because H.B. 101 permits potential wards to be represented by their chosen or appointed counsel, a guardianship proceeding does not necessarily present the alleged federal questions. Thus, the Court should conclude it does not have federal question jurisdiction over claims of Katherine, Anthony, and any other alleged constituent of DLC who have not participated in a guardianship proceeding.

Further, the Court should exercise its discretion not to assert jurisdiction under the Declaratory Judgment Act. *St. Paul Fire & Marine Ins. Co. v. Runyon*, 53 F.3d 1167, 1168 (10th Cir. 1995). Katherine's and Anthony's claims are so unripe that they are essentially seeking an advisory opinion on a hypothetical set of facts. And Katherine and Anthony do not require a remedy as drastic as a federal injunction to protect themselves. If they have concerns that their parents may overreach in a guardianship proceeding, Katherine and Anthony may immediately designate another person (e.g., Anthony's spouse, another relative) to serve as guardian in the event they become incapacitated. Utah Code Ann. § 75-5-311(2) & (3)(a). They may also take advantage of advance directives, durable powers of attorneys, and trusts, to make their wishes known now.

An injunction is also unnecessary because Katherine and Anthony will have an adequate remedy at law if they ever face a guardianship proceeding. H.B. 101 already requires counsel be

appointed whenever necessary to protect prospective wards' rights, and a decision not to appoint counsel is subject to appeal to Utah appellate courts and the U.S. Supreme Court. *Cf. Sweeten v. Sneddon*, 463 F.2d 713, 715 (10th Cir. 1972) (holding that injunction precluding ongoing prosecution from going forward unless counsel was secured for indigent defendant was "improvidently granted" because state law required appointment of counsel in serious cases or where "essential in assuring a fair trial," and thus issue of appointment could be "resolved as readily in the criminal case as in a suit for an injunction" and was subject to appellate review). Plaintiffs have not explained why DLC cannot raise the same arguments they are raising here in state court, during a live controversy.

## IV.   THE COURT LACKS JURISDICTION OVER CLAIMS BASED ON DENIAL OF COUNSEL AT COMPLETED GUARDIANSHIP PROCEEDINGS

Under the *Rooker-Feldman* doctrine, this Court also lacks subject matter jurisdiction to review the probate court's alleged decisions not to appoint counsel for Constituent A and Constituent B. *District of Columbia Court of Appeals v. Feldman*, 103 S. Ct. 1303, 1311 (1983); *Parsons Steel, Inc. v. First Alabama Bank*, 474 U.S. 518, 523 (1986) (stating that under 28 U.S.C. § 1738, federal courts must "give the same preclusive effect to a state-court judgment as another court of that State would give."). If Plaintiffs attempt to circumvent the *Rooker-Feldman* bar by arguing, as they did before, that they are not "ask[ing] this Court to overturn any state-court judgment," (Dkt. 52, at 9), this will prove that the requested prospective relief does not redress any alleged injuries suffered by Constituents A and B, and thus they lack standing and DLC lacks associational standing to assert their claims.

## V.   DEFENDANTS ARE IMMUNE FROM SUIT

### 1.   Legislative Immunity

Plaintiffs assert claims premised on Gov. Herbert's alleged failure to pay for counsel for guardianship respondents, (*e.g.,* FAC ¶¶ 137-138; 151-152), and request declaratory and injunctive relief requiring him, along with the State, to "pay for counsel for all guardianship respondents in the State of Utah." (*Id.,* Prayer for Relief, B, D-E).  In support of these claims and requests, Plaintiffs allege that Gov. Herbert is responsible, under Utah law, for delivering to the Utah Legislature proposed budget recommendations, including an itemized estimate of proposed changes to appropriations for the Judicial Department as certified by the state court administrator (FAC. ¶ 57).  Plaintiffs further allege that Gov. Herbert has the discretion to make "separate recommendations" on the court administrator's estimate.  (*Id.*).

These claims and requests for prospective relief against Gov. Herbert are barred by the doctrine of legislative immunity.  "Absolute legislative immunity extends to action taken in the sphere of legitimate legislative activity." *Bogan v. Scott-Harris*, 523 U.S. 44, 54 (1998) (internal quote omitted).  "[O]fficials outside the legislative branch are entitled to legislative immunity when they perform legislative functions" and "integral steps in the legislative process."  *Id*. at 55. (observing legislative immunity protects a Governor's actions in signing or vetoing a bill because such actions are part of the legislative process.).  Gov. Herbert's alleged responsibility for delivering budget recommendations to the Utah legislature is an integral part of the legislative process for which he enjoys absolute legislative immunity.  *Savage v. Fallan*, 663 Fed. App'x. 588, 591 (10th Cir. 2016) (unpublished) (holding that governor was entitled to legislative immunity "as to her alleged failure to prompt the legislature to provide additional funding" to remedy alleged overcrowding and understaffing in state prisons).  He therefore cannot be enjoined to pay for counsel for guardianship respondents.

### 2. Judicial Immunity

Plaintiffs also seek an injunction against the State and Gov. Herbert requiring them to appoint counsel for guardianship respondents in all cases.  Yet, Plaintiffs' claims are premised on speculative fears that a judge might not appoint counsel for Katherine and Anthony at a future guardianship proceeding.  And, as the plain language of H.B. 101 shows, the requested injunction would enjoin and control the actions of probate court judges, who are the only State actors involved in H.B. 101 proceedings.  Thus, Plaintiffs' requested injunction should be dismissed under the doctrine of judicial immunity.  *Lawrence v. Kuenhold*, 271 F. App'x. 763, 766 n.6 (10th Cir. 2008) (unpublished) (stating that the "doctrine of judicial immunity now extends to suits against judges where a plaintiff seeks not only monetary relief, but injunctive relief as well."); *Knox v. Bland*, 632 F.3d 1290, 1292 (10th Cir. 2011); *Roth v. King*, 449 F.3d 1272, 1286 (D.C.Cir.2006).  Plaintiffs cannot circumvent the doctrine of judicial immunity by naming nonjudicial parties as defendants.  *See Lowery v. Utah*, 2006 WL 3304414, * 2 (D. Utah Nov. 13, 2006) (unpublished) ("Plaintiff cannot hold the State of Utah . . . liable for actions undertaken by Judge Quinn in his judicial capacity because, as previously stated, any claims based upon these actions are barred by the doctrine of judicial immunity."); *Updike v. City of Gresham*, 62 F.Supp.3d 1205, 1212-13 (D. Or. 2014) (holding that State of Oregon was entitled to judicial immunity because plaintiff's allegations and claims under ADA and RA related to the conduct of a judge).

### 3. Sovereign Immunity

The State of Utah is immune from suits in federal court, including suits seeking

injunctive and declaratory relief. [10] *Steadfast Ins. Co. v. Agr. Ins. Co.*, 507 F.3d 1250, 1252 (10th Cir. 2007); *Massey v. Utah Dept. of Corrections*, 2017 WL 1476138, *1 (D. Utah April 24, 2017)* (unpublished).  Unless Plaintiffs demonstrate that an exception to sovereign immunity applies, this Court lacks subject matter jurisdiction over the case against the State  *Wood v. Milyard*, 414 Fed. App'x. 103, 105 (10th Cir. 2011) (unpublished) (citing *Edelman v. Jordan*, 415 U.S. 651, 678 (1999)); *Gorka v. Sullivan*, 82 F.3d 772, 775 (7th Cir. 1996); *Muscogee (Creek) Nation v. Pruitt,* 669 F.3d 1159, 1166 (10th Cir. 2012).

In their opposition to Defendants' previous motion to dismiss, Plaintiffs did not assert that any exception to sovereign immunity applied to their cause of action against the State based on the procedural Due Process Clause of the Fourteenth Amendment.  Yet, in the FAC's Fourth Claim for Relief, Plaintiffs continue to assert this cause of action.  For the same reasons stated in State's earlier motion to dismiss, this cause of action should be dismissed.

Plaintiffs previously argued that their claims under Section 504 of the Rehabilitation Act ("RA") and Title II of the Americans with Disabilities Act ("ADA") are protected by the legislative abrogation exception to sovereign immunity.  Plaintiffs are mistaken.

      *i.   Section 504 of the RA*

The State of Utah retains its sovereign immunity because the waiver of immunity provided by section 504 of the RA does not apply to the State.  Although Section 504 conditions the receipt of federal funds on a waiver of immunity, the waiver is limited.  "[C]ourts considering the scope of a state entity's waiver under the Rehabilitation Act acknowledge that

---

[10] Gov. Herbert likewise has sovereign immunity from Plaintiffs' claims because Plaintiffs have failed to plead facts plausibly showing that he has a particular "duty to enforce [H.B. 101] and a demonstrated willingness to do so."  *Barrett v. Univ. of New Mexico Bd. of Regents*, 562 F. App'x. 692, 694 (10th Cir. 2014) (unpublished).

[it] was 'not intended to sweep in the *whole state* or local government' whenever one subdivision discriminates." *Arbogast v. Kansas, Dep't of Labor*, 789 F.3d 1174, 1184 (10th Cir. 2015). Instead, the "waiver of immunity conditioned on receipt of Rehabilitation Act funds applies on an agency-by-agency, or a department-by-department basis." *Koslow v. Commonwealth of Pennsylvania*, 302 F.3d 161, 171, 176 (3d. Cir.2002).

Plaintiffs allege, on information and belief, that the "State of Utah receives federal funding, including federal funding for its court system," (FAC, ¶ 116), and that the "Utah State Court system" is itself a "public entity" subject to section 504 of the RA. (FAC, ¶ 60). The State's acceptance of "federal funds results in a waiver of Eleventh Amendment immunity for the 'program or agency' receiving the funds." *Id*. at 170-71. However, the State's acceptance of funds does not waive the *State's* Eleventh Amendment immunity because the "state, as a whole, cannot be a 'program or activity'" under the RA. *Id*. at 171.

Thus, the State's alleged receipt of federal funds for the state court system, at best, waives sovereign immunity only for the state court system, but not the State as a whole. *Id.* Plaintiffs' RA claims against the State should therefore be dismissed.

### ii.   *Title II of the ADA*

The State of Utah likewise retains its sovereign immunity against Katherine's and Anthony's ADA claims. To determine whether Congress abrogated the State's sovereign immunity against Plaintiffs' ADA claims, the Court must determine whether "Congress unequivocally expressed its intent to abrogate that immunity" and, if so, whether Congress had the power to do so. *Tennessee v. Lane*, 541 U.S. 509, 517 (2004).

The State retains its sovereign immunity because Congress did not unequivocally express its intent to abrogate immunity against claims premised on unripened ADA violations, such as those raised by Plaintiffs.  Plaintiffs have alleged that ADA would be violated if a guardianship respondent is not appointed counsel or would have to pay for appointed counsel.  However, Plaintiffs have not alleged that Katherine or Anthony have ever participated in a guardianship proceeding, or have ever been denied counsel or had to pay for appointed counsel at such a proceeding.  Although Plaintiffs may argue that a violation of Katherine's and Anthony's ADA rights is imminent, there can be no dispute that Katherine and Anthony have not, as yet, suffered any violation of their ADA rights.  That is why Katherine and Anthony are seeking declaratory judgments.  *Franklin Life Ins. Co. v. Johnson*, 157 F.2d 653 (10th Cir. 1946) ("The purpose of the declaratory judgment action is to settle actual controversies *before they have ripened into violations* of law or a breach of duty.") (emphasis added).

But Congress did not *unequivocally* intend to abrogate sovereign immunity against unripened or potential or even imminent violations of Title II of ADA.  As shown by ADA's abrogation provision, Congress intended to abrogate immunity only for violations of Title II.  *See* 42 U.S.C. § 12202 ("A State shall not be immune under the eleventh amendment to the Constitution of the United States from an action . . . for *a violation* of this chapter.") (emphasis added); *accord United States v. Mitchell*, 445 U.S. 535, 538 (1980) (stating that waivers of sovereign immunity "cannot be implied but must be unequivocally expressed.") (citation omitted).  The State is not alleged to have engaged in conduct constituting a violation of Katherine's and Anthony's ADA rights.

Consistent with this plain language interpretation of ADA's abrogation provision, the

41

persons with disabilities in *Lane* and *United States v. Georgia*, 546 U.S. 151(2006), alleged that they had experienced actual violations of ADA.  *Lane*, 541 U.S. at 513-14 (noting the paraplegic alleged that courthouse lacked an elevator, forcing him to crawl up "two flights of stairs to get to the courtroom."); *Georgia*, 546 U.S. at 155 (noting the prisoner alleged, "he was confined for 23–to–24 hours per day in a 12–by–3–foot cell in which he could not turn his wheelchair around.").

Interpreting ADA's abrogation provision as applying only to "actual violations" of ADA is consistent with the language used by the Supreme Court in describing the scope of abrogation. *Georgia*, 546 U.S. 151, 159 (2006) (holding "insofar as Title II creates a private cause of action for damages against the States for conduct that *actually* violates the Fourteenth Amendment, Title II validly abrogates state sovereign immunity.").  That there must be an actual, completed violation of ADA is again emphasized in the *Georgia* court's three-step analysis for determining whether Title II validly abrogates sovereign immunity.  That three-step analysis requires courts to determine on "a claim-by-claim basis, (1) which aspects of the State's alleged conduct *violated* Title II; (2) to what extent such misconduct also *violated* the Fourteenth Amendment; and (3) insofar as such misconduct *violated* Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid."  *Id.* (emphasis added).

Thus, the State retains its sovereign immunity against Katherine's and Anthony's purported ADA claims.  As for claims of Constituents A and B that DLC is attempting to assert despite their lack of standing, they also fail to satisfy *Georgia*'s test for abrogation of sovereign immunity.  Plaintiffs have failed to plead facts plausibly showing that Constituents A and B, or

42

anyone else, were subject to conduct that violated both Title II and the Fourteenth Amendment, as shown in the 12(b)(6) portion of this motion.

## VI.   PLAINTIFFS HAVE FAILED TO STATE A CLAIM FOR WHICH RELIEF MAY BE GRANTED

To withstand a rule 12(b)(6) motion to dismiss, a complaint must include sufficient factual allegations to state a claim that is plausible, not merely conceivable. *Khalik v. United Air Lines,* 671 F.3d 1188, 1190 (10th Cir. 2012) (*citing Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). As is the case with a 12(b)(1) motion, in determining whether the complaint validly states a claim, courts disregard mere labels and conclusions, and "formulaic recitation[s] of the elements of a cause of action." *Id*. at 1190-91.

Plaintiffs raise both "as applied" and facial challenges to H.B. 101 under the ADA (First and Fifth Claims for Relief), the Rehabilitation Act (Second Claim for Relief) and procedural Due Process Clause (Third, Fourth, and Fifth Claims for Relief). [11] If Plaintiffs have failed to state an "as applied" claim, their facial challenge necessarily fails. *See United States v. Morgan*, 748 F.3d 1024, 1031 (10th Cir. 2014); *Tanasse v. City of St. George*, 172 F.3d 63, *7 (10th Cir. 1999)* (unpublished).

### A.  PLAINTIFFS HAVE FAILED TO STATE AN AS APPLIED CLAIM

Plaintiffs have failed to state a claim that H.B. 101 violates the ADA, Rehabilitation Act ("RA"), or procedural due process, as applied to any plaintiff (Katherine, Anthony, or DLC) or even any non-party (Constituent A or B).

---

[11] In their pending motion for a preliminary injunction, Plaintiffs acknowledge that they are raising a facial challenge to H.B. 101. The allegations in the FAC also indicate that Plaintiffs are raising "as applied" challenges.

### i. Katherine and Anthony

Plaintiffs' ADA, RA, and Due Process Clause claims are all premised on a prospective ward not being appointed counsel or having to pay for their appointed counsel at a guardianship proceeding.  Yet, Plaintiffs have not alleged facts plausibly showing that Katherine and Anthony have participated in a guardianship proceeding.  As shown in the section on standing, Plaintiffs have also not pleaded facts plausibly showing that Plaintiffs will ever participate in a guardianship proceeding or that, if they ever do, they would be denied appointed counsel or have to pay for appointed counsel.  Thus, Plaintiffs have failed to state an "as applied" claim for Katherine and Anthony.

### ii. DLC in its own right

DLC has also failed to state an as applied claim because it does not and cannot allege that it has been or will be denied counsel or has paid or will pay for counsel at a guardianship proceeding.

### iii. Constituents A and B

Plaintiffs allege that Constituents A and B were not appointed counsel and received full guardianships at guardianship proceedings, but little else regarding the facts and circumstances surrounding the guardianship proceeding.  (FAC, ¶¶ 23-34).  As a result, Plaintiffs have not stated an "as applied" claim for Constituents A and B.

Plaintiffs have failed to plead facts plausibly showing a violation of ADA or the Rehabilitation Act ("RA").  Plaintiffs maintain that ADA and RA require the appointment of a lawyer as an accommodation for a guardianship respondent's disability.  But a public entity's duty to accommodate is not triggered unless a person with a disability requests an

accommodation or the need for an accommodation is obvious. *J.V. v. Albuquerque Pub. Sch.*, 813 F.3d 1289, 1299 (10th Cir. 2016). Plaintiffs have not alleged facts plausibly showing that either Constituent A or B requested a lawyer or any other accommodation or that the need for one was obvious. And there is "no support for the proposition" that ADA requires a court to appoint counsel "on its own volition." *Pinson v. Equifax Credit Info. Servs., Inc.*, 316 F. App'x 744, 749 (10th Cir. 2009) (unpublished).

Even if Plaintiffs had pleaded facts showing that the need for a lawyer was obvious, that would not mean that H.B. 101 violated ADA or RA as applied to Constituents A and B. It would mean, at most, that the probate court misapplied H.B. 101. *Cook v. Gates*, 528 F.3d 42, 56 n.8 (1st Cir. 2008) (differentiating situations where a statute is misapplied by the tribunal from "as applied" challenges where a statute violates the constitution when it is administered according to its terms). If H.B. 101 is enforced in accordance with its terms, counsel will be appointed whenever the need for counsel is obvious. *See* Utah Code § 75-5-303(5)(d)(v) (requiring appointment of counsel whenever "necessary to protect the interests of" the prospective ward). Thus, a court's failure to appoint counsel when the need for one is obvious is a violation of state law and does not justify either an "as applied" or facial attack on H.B. 101 under federal law.

Likewise, Plaintiffs have not pleaded facts plausibly showing that Constituent's A or B's due process rights were violated because they were not appointed counsel. The test for due process set forth in *Mathews v. Eldridge*, 424 U.S. 319, 334-35 (1976), is highly fact intensive. Yet Plaintiffs have not plead any facts concerning such essential information as the condition or functional limitations of Constituents A or B, or the amount or quality of the information provided to the Court in the petition for guardianship or from other sources. And there is a

presumption against a right to appointed counsel in guardianship cases because they do not result in imprisonment or confinement in a state institution.  *See Lassiter v. Dep't. of Social Servs. of Durham County*, 452 U.S. 18, 25-27 (1981) (holding that "an indigent litigant has a right to appointed counsel only when, if he loses, he may be deprived of his physical liberty" equivalent to "actual imprisonment" or involuntary "commitment to an institution."); *Heryford v. Parker*, 396 F.2d 393, 396 (10th Cir. 1968) (stating that it is the "likelihood of involuntary incarceration" in a state institution that requires that a mentally deficient person be afforded legal counsel in an involuntary commitment proceeding);  *Rud v. Dahl*, 578 F.2d 674, 679 (7th Cir. 1978) ("[T]he nature of the intrusion on liberty interests resulting from an adjudication of incompetency is far less severe than the intrusion resulting from other types of proceedings in which the presence of counsel has been mandated."); *Matter of Guardianship of Roe*, 421 N.E.2d 40, 46 (Mass. 1981) ("recogniz[ing] the vast differences between the appointment of a guardian for a mentally ill ward and the involuntary civil commitment of a mentally ill person.").

### iv.   Other Defects

Likewise, all of Plaintiffs' claims against the State and Gov. Herbert fail because Plaintiffs have failed to plead facts plausibly showing that the State and/or Gov. Herbert caused or would cause any of the alleged violations of federal law.  Specifically, Plaintiffs have not alleged facts plausibly showing that the State, constrained as it is by the separation of powers principle, or Gov. Herbert caused or would cause Plaintiffs not to be appointed counsel or to pay for appointed counsel.  That omission is fatal to Plaintiffs' claims.  *See Snell v. Tunnell*, 920 F.2d 673, 700 (10th Cir.1990); *Horton v. Ward*, 123 F. App'x 368, 371 (10th Cir. 2005) (unpublished).

### B.  PLAINTIFFS HAVE FAILED TO STATE A FACIAL CLAIM

State statutes are presumed valid and should not be invalidated if it is "fairly possible" to

interpret the statute in a manner that renders it valid. *Branson Sch. Dist. RE-82 v. Romer*, 161

F.3d 619, 636 (10th Cir. 1998); *see Mitchell v. City of Sapulpa*, 857 F.2d 713, 719 (10th Cir.

1988) (stating that state statutes are entitled to a presumption of constitutionality) (citing *Davies*

*Warehouse Co. v. Bowles*, 321 U.S. 144, 153 (1944)); *see also Three Affiliated Tribes of Fort*

*Berthold Reservation v. Wold Eng'g, P.C.*, 467 U.S. 138, 152 (1984) (noting that a "state court

may construe state law narrowly to avoid a perceived conflict with federal statutory or

constitutional requirements."); *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439,

445(1988) ("A fundamental and long-standing principle of judicial restraint requires that courts

avoid reaching constitutional questions in advance of the necessity of deciding them.").

Applying these principles, there is no facial conflict between H.B. 101 and

ADA/Rehabilitation Act with respect to the appointment of counsel.[12]  Title II of the ADA

provides that "no qualified individual with a disability shall, by reason of such disability, be

excluded from participation in or be denied the benefits of the services, programs, or activities of

a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132 (2000

ed.); *United States v. Georgia*, 546 U.S. 151, 153 (2006).

H.B. 101 does not facially violate Title II of ADA.  *See Rehab. Support Servs., Inc. v.*

*City of Albany, New York*, *3 (N.D.N.Y. July 28, 2017) (unpublished) ("Facial challenges to

statutes under ADA are generally evaluated under the rubric of intentional discrimination," and

---

[12] Plaintiffs have argued that their claims under the ADA and Rehabilitation Act require the same showing.  (Pls' 1st PI Motion at 17-18).  Defendants therefore will henceforth refer to both sets of claims as ADA claims.

not under theories of disparate impact or a failure to accommodate).  Specifically, H.B. 101 does not, on its face, deny a guardianship respondent counsel or require they pay for counsel *solely* or even partially by reason of a disability.  *Fitzgerald v. Corr. Corp. of Am.*, 403 F.3d 1134, 1144 (10th Cir. 2005) ("Under either [Title II of the] ADA or the Rehabilitation Act, Fitzgerald is obligated to show that he was "otherwise qualified" for the benefits he sought and that he was denied those "*solely* by reason of disability.") (emphasis added); *Doe v. Bd. of Cty. Comm'rs of Payne Cty., Okla.*, 613 F. App'x. 743, 747 (10th Cir. 2015) (unpublished) (stating "at present *Fitzgerald* is the controlling law in this circuit.").  Rather, H.B. 101 permits, but does not require, the probate court not to appoint counsel only if five conditions are met.  None of the conditions discriminate against the prospective ward by reason of disability.  Indeed, one of the conditions is especially solicitous of the interests of the potential ward.  Utah Code Ann. § 75-5-303(5)(d)(v) (requiring appointment of counsel unless court is, inter alia, "satisfied that counsel is not necessary in order to protect the interests of the person.").

Of note, H.B. 101 does not discriminate in favor of other participants in a guardianship proceeding with respect to the appointment of counsel.  To the contrary, under H.B. 101, only potential wards are eligible for appointed counsel.  It does not require or permit the appointment of counsel for parents or other interested parties who participate in a guardianship proceeding.  For this additional reason, H.B. 101 does not facially violate ADA.  *Cf. New Directions Treatment Servs. v. City of Reading*, 490 F.3d 293, 305 (3d Cir. 2007) (stating "that a law that singles out methadone clinics for different zoning procedures is facially discriminatory under the ADA and the Rehabilitation Act."); *Pac. Shores Properties LLC v. City of Newport Beach*, 2008 WL 11336337, *3 (C.D. Cal. Oct. 28, 2008) (unpublished) ("[T]he Ordinance does not facially

discriminate against [residential care facilities] under . . . the ADA" because the "Ordinance facially treats residential care facilities more favorably than all other group residential uses [because] only residential care facilities . . . are eligible for a use permit.").

Further, H.B. 101 does not facially violate Title II of ADA because guardianship respondents are not necessarily "qualified individuals with disabilities." To the contrary, the purpose of a guardianship proceeding is to determine whether the proposed ward has an incapacitating disability. Utah Code § 75-5-304(1). Deeming Title II of ADA to apply to a guardianship proceeding is to prejudge the ultimate issue.[13] And potential wards who are "currently engaging in the illegal use of drugs" are not "individuals with disabilities" under ADA. 42 U.S.C. § 12210(a).

Likewise, H.B. 101 does not, on its face, violate the federal Due Process Clause. H.B. 101 does not forbid the appointment of counsel in any case and affirmatively requires the appointment of counsel in most cases. In fact, it is, at the very least, "fairly possible" to interpret subsection 75-5-303(5)(d)(v) to encompass the requirements of due process. That is, counsel would be considered "necessary in order to protect the interests of the person" under H.B. 101 whenever due process required the appointment of counsel. And, under *Lassiter*, there is a presumption against the appointment of counsel in civil guardianship cases. *See Garramone v. Romo*, 94 F.3d 1446, 1449 (10th Cir. 1996) ("In proceedings where litigants are not directly threatened by a loss of physical liberty, a presumption arises against their right to appointed

---

[13] Of note, if Katherine or Anthony brought this action *pro se* or if their counsel withdrew, they would not have an absolute right to appointed counsel, despite their allegations of disability. The ADA statute provides courts only "discretionary authority to appoint an attorney for an ADA complainant." *Moore v. Walker*, 24 F. App'x 924, 927 (10th Cir. 2001); *Camick v. Holladay*, 2017 WL 4099472, at *1 (D. Kan. Sept. 14, 2017) (unpublished).

counsel,"); *Turner v. Rogers*, 564 U.S. 431, 443 (2011) (noting that the "Court previously found a right to counsel 'only' in cases involving incarceration, not that a right to counsel exists in all such cases."); *Moore* 24 F. App'x at 929 (unpublished).  Likewise, *Lassiter* requires that only indigent parties not be required to pay for appointed counsel.  452 U.S. 18, 25-27.  Under the Guardianship Signature Program, indigent parties do not have to pay for counsel.

## CONCLUSION

For the reasons stated above, Defendants respectfully request that this Court dismiss Plaintiffs' claims and the FAC in its entirety, without granting Plaintiffs' leave to amend.

DATED:  January 12, 2018.

OFFICE OF THE UTAH ATTORNEY GENERAL

/s/ Andrew Dymek
DAVID N. WOLF
LAURA K. THOMPSON
ANDREW DYMEK
BRETT PETERSON
Assistant Utah Attorneys General
*Counsel for Defendants*