DAVID N. WOLF (6688)
LAURA K. THOMPSON (6328)
ANDREW DYMEK (9277)
BRETT PETERSON (13330)
Assistant Utah Attorneys General
Utah Attorney General's Office
160 East 300 South, Sixth Floor
P.O. Box 140856
Salt Lake City, Utah 84114-0856
Telephone: (801) 366-0100
Facsimile: (801) 366-0101
E-mail: dnwolf@agutah.gov
E-mail: lathomps@agutah.gov
E-mail: adymek@agutah.gov
E-mail: brettmpeterson@agutah.gov

*Counsel for Defendants*

## IN THE UNITED STATES DISTRICT COURT

## IN AND FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| DISABILITY LAW CENTER, KATHERINE C., AND ANTHONY M.<br><br>      Plaintiffs,<br><br>v.<br><br>THE STATE OF UTAH; GARY HERBERT IN HIS OFFICIAL CAPACITY AS GOVERNOR OF UTAH,<br><br>      Defendants. | **DEFENDANT STATE OF UTAH'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br><br>Case No. 2:17-CV-00748-RJS<br><br>Judge Robert J. Shelby |

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

I.   LEGAL STANDARD FOR PRELIMINARY INJUNCTIONS ......................................... 2

II.  PLAINTIFFS HAVE FAILED TO DEMONSTRATE A LIKELIHOOD OF
     IRREPARABLE HARM ............................................................................................ 7

III. PLAINTIFFS HAVE FAILED TO DEMONSTRATE A SUBSTANTIAL LIKELIHOOD
     OF SUCCESS ON THE MERITS ............................................................................. 14

      A.  Plaintiffs Have Failed to Address Standing and Subject Matter Jurisdiction .......... 14

      B.  Plaintiffs Challenge a "Straw Man," Not the Terms of the Actual Statute.............. 15

      C.  Plaintiffs Rely on Events that Have Nothing to Do with the Terms of H.B. 101.... 17

      D.  Plaintiffs Do Not Take Into Account Essential Law ............................................. 17

      E.  Plaintiffs' Facial Challenges Under the ADA and Rehabilitation Act Fail. ........... 18

      F.  Plaintiffs' Facial Challenge Under Due Process Also Fails. .................................. 21

IV. THE BALANCE OF EQUITIES AND PUBLIC INTEREST IS NOT IN PLAINTIFFS'
     FAVOR. ................................................................................................................ 24

V.   EVIDENTIARY HEARING REQUESTED..................................................................... 25

CONCLUSION............................................................................................................... 26

# TABLE OF AUTHORITIES

## Cases

*Beltronics USA, Inc. v. Midwest Inventory Distribution*, LLC,
   562 F.3d 1067 (10th Cir. 2009) ................................................................. 4

*Branson Sch. Dist. RE-82 v. Romer*,
   161 F.3d 619 (10th Cir. 1998) ................................................................ 17

*Camick v. Holladay*,
   2017 WL 4099472 (D. Kan. Sept. 14, 2017).......................................... 19

*Caribbean Marine Servs. Co. v. Baldrige*,
   844 F.2d 668 (9th Cir. 1988) ................................................................... 8

*Davies Warehouse Co. v. Bowles*,
   321 U.S. 144 (1944)............................................................................... 17

*Doe v. City of Albuquerque*,
   667 F.3d 1111 (10th Cir. 2012) .............................................. 15, 16, 21

*Endico v Fonte*,
   485 F.Supp.2d, 411 (S.D.N.Y. 2007)..................................................... 14

*Ezell v. City of Chicago*,
   651 F.3d 684, 2011 U.S. App. LEXIS 14108, at *32–33 & n. 10 (7th Cir.2011) ................... 12

*First W. Capital Mgmt. Co. v. Malamed*,
   874 F.3d 1136 (10th Cir. 2017) .......................................................... 3, 12

*Fish v. Kobach,*
   840 F.3d 710 (10th Cir. 2016) ............................................................ 4, 13

*Garramone v. Romo*,
   94 F.3d 1446 (10th Cir. 1996) .............................................................. 22

*Hamlyn v. Rock Island Cty. Metro. Mass Transit Dist.*,
   960 F. Supp. 160 (C.D. Ill. 1997) ......................................................... 12

*Heideman v. South Salt Lake City*,
   348 F3d 1182 (10th Cir. 2003) ....................................................... 3, 7, 9

*Hernandez-Carrera v. Carlson*,
   547 F.3d 1237 (10th Cir. 2008) ............................................................ 21

*Home-Stake Prod. Co. v. Talon Petroleum, C.A.*,
   907 F.2d 1012 (10th Cir. 1990) ............................................................ 14

*Jetpay Merch. Servs., LLC v. Merrick Bank Corp.*,
   No. 2:12-CV-197-RJS, 2013 WL 12182104 (D. Utah July 29, 2013) ....................... 5

*Lassiter v. Dep't. of Social Servs. of Durham County*,
   452 U.S. 18 (1981)................................................................................ 22

*Lawrence v. Reed*,
  406 F.3d 1224 (10th Cir. 2005) ............................................................ 22, 23
*Little v. Jones*,
  607 F.3d 1245 (10th Cir. 2010) ....................................................................... 5
*Mbaku v. Bank of Am., Nat. Ass'n*,
  628 F. App'x 968 (10th Cir. 2015) ............................................................... 22
*McBride v. West*,
  940 F. Supp. 893 (E.D.N.C. 1996) ............................................................... 11
*McDonnell v. City & Cty. of Denver*,
  No. 17-1071, 2018 WL 283406 (10th Cir. Jan. 4, 2018) ................................ 3
*Mitchell v. City of Sapulpa*,
  857 F.2d 713 (10th Cir. 1988) ....................................................................... 17
*Moore v. Walker*,
  24 F. App'x 924 (10th Cir. 2001) .................................................................. 19
*Nat'l Farmers Union Ins. Companies v. Crow Tribe of Indians*,
  471 U.S. 845, (1985) ........................................................................................ 8
*New Mexico Dep't of Game & Fish v. United States Dep't of the Interior*,
  854 F.3d 1236 (10th Cir. 2017) .......................................................... 7, 8, 14, 25
*O Centro Espirita Beneficente Uniao Do Vegetal v. Ashcroft*,
  389 F.3d 973 (10th Cir. 2004) ......................................................................... 3
*O'Brien v. Town of Caledonia*,
  748 F.2d 403 (7th Cir. 1984) ............................................................... 8, 9, 10
*Pinson v. Equifax Credit Info. Servs., Inc.*,
  316 F. App'x 744 (10th Cir. 2009) ............................................................... 19
*Prairie Band of Potawatomi Indians v. Pierce*,
  253 F.3d 1234 (10th Cir.2001) ........................................................................ 8
*Rizzo v. Goode*,
  423 U.S. 362 (1976) .......................................................................................... 7
*RoDa Drilling Co. v. Siegal*,
  552 F.3d 1203 (10th Cir. 2009) ....................................................................... 3
*Sampson v. Murray*,
  415 U.S. 61 (1974) ............................................................................................ 8
*SCFC ILC, Inc. v. Visa USA, Inc.*,
  936 F.2d 1096 (10th Cir. 1991) ....................................................................... 6
*Schrier v. University of Colo.*,
  427 F.3d 1253 (10th Cir. 2005) ............................................................... 3, 5, 6
*Schulder v. Hooker*,
  No. 08-CV-3052(ENV), 2008 WL 4862461 (E.D.N.Y. Nov. 10, 2008) ...... 11

iv

*Seegmiller v. Accredited Home Lenders, Inc.,*
    No. 2:11-CV-00771 CW, 2011 WL 4964508 (D. Utah Oct. 19, 2011)................................... 12

*Stamatakos v. Wells Fargo Bank, Nat'l Ass'n,*
    No. CV 17-62S, 2017 WL 2635291 (D.R.I. Apr. 20, 2017)....................................... 11

*Turner v. Rogers,*
    564 U.S. 431 (2011) ......................................................................... 22

*Univ. of Tex. v. Camenisch,*
    451 U.S. 390 (1981) .......................................................................... 2

*Warner v. Gross,*
    776 F.3d 721 (10th Cir. 2015) ................................................................ 3

*Wolff v. McDonnell,*
    418 U.S. 539 (1974) ......................................................................... 22

Statutes

Utah Code. § 75-5-303(2) ..................................................................... 16

Utah Code Ann. § 75-5-307 .................................................................... 11

Utah Code § 30-1-9............................................................................ 24

Utah Code § 62A-5-312 ........................................................................ 24

Utah Code § 62A-6-102(3) ..................................................................... 24

Utah Code § 62A-6-111 ........................................................................ 24

Utah Code § 62A-15-631 ....................................................................... 24

Utah Code § 75-2a-103(23) .................................................................... 23

Utah Code § 75-2a-104(4) ..................................................................... 23

Utah Code § 75-2a-104(5) ..................................................................... 23

Utah Code § 75-2a-108(1)(ii)(B) .............................................................. 23

Utah Code § 75-2a-111(1) ..................................................................... 23

Utah Code § 75-5-303.......................................................................... 6

Utah Code § 75-5-303(4) ...................................................................... 16

Utah Code § 75-5-303(5)(d)(iv)............................................................... 17

Utah Code § 75-5-303(5)(d)(v)........................................................ 1, 16, 18

Utah Code § 75-5-311(2) & (3)(a)............................................................. 11

Utah Code §§ 30-1-1 .......................................................................... 24

Rules

Fed. R. Civ. P. 65 ............................................................................ 1

Fed. R. Evid. 702 ............................................................................ 25

Pursuant to Fed. R. Civ. P. 65 and DUCivR 7-1(b), Defendants the State of Utah (the "State") and Governor Gary Herbert ("Gov. Herbert") submit this Memorandum in Opposition to Plaintiffs' Motion for a Preliminary Injunction.[1]

## INTRODUCTION

Plaintiffs seek a preliminary injunction requiring that all respondents (potential wards) be appointed counsel in Utah guardianship proceedings. But Utah's guardianship statute, as amended by House Bill ("H.B. 101"), already requires that potential wards be appointed counsel whenever "necessary in order to protect [their] interests."[2] Thus, the only thing the requested injunction would require that H.B. 101 does not already require is the appointment of counsel when it is *not* necessary to protect the interests of potential wards. Requiring unnecessary counsel is a dubious goal in and of itself. Yet Plaintiffs promise to later seek another injunction requiring Utah to pay for the unnecessary counsel. The only people that stand to benefit from the mandatory appointment and payment of unnecessary lawyers are lawyers.[3]

Plaintiffs' requested preliminary injunction should be denied. Plaintiffs have not met their burden of demonstrating that they are entitled to such a drastic and extraordinary remedy. The four-factor test for preliminary injunctions weighs strongly in Defendants' favor.

Plaintiffs have made no showing under the first factor, irreparable harm. In fact, the actions of Plaintiff Disability Law Center ("DLC") belie its unproven allegations of irreparable harm. DLC claims it has an affirmative statutory duty to take legal action to prevent harm to persons with disabilities. But the evidence shows that DLC was present at two probate court

---

[1] *See* Dkt. 89.
[2] Utah Code § 75-5-303(5)(d)(v).
[3] Plaintiff Disability Law Center's governing board of trustees is dominated by lawyers, not by persons with disabilities. (*See* http:\\disabilitylawcenter.org/board-trustees).

proceedings and yet did nothing to intervene, object, or raise an appeal when its alleged constituents were appointed a guardian without counsel.[4]  DLC's inaction despite its duty to act shows that DLC believes that harm does not result whenever counsel is not appointed for a potential ward.

As for the second preliminary injunction factor, Plaintiffs have failed to demonstrate any likelihood of success on the merits of their facial challenges to H.B. 101.  To the contrary, Plaintiffs' claims should be dismissed for several reasons.  As shown in Defendants' pending motion to dismiss, Plaintiffs continue to lack standing, the Court lacks federal question jurisdiction, Defendants have immunity from suit, and Plaintiffs have failed to state a claim.[5]

The remaining factors, i.e., the equities and public interest, also weigh against the issuance of an injunction.  Plaintiffs have not shown their federal rights have been or imminently will be violated as a result of H.B. 101.[6]  And the public in Utah has a strong interest in the enforcement of a statute enacted by its democratically-elected legislature, whose motives and good faith are unchallenged in this litigation.[7]

## I.    LEGAL STANDARD FOR PRELIMINARY INJUNCTIONS

Typically, the "purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).  Even when a preliminary injunction would merely preserve the parties'

---

[4] *See* Sell Decl., Dkt. 94, ¶¶ 6-10; Zahradnikova Decl., Dkt. 8-2, ¶¶ 13-14.

[5] *See* Dkt. 109.

[6] As noted in Defendants' motion to dismiss, House Bill 101 is scheduled to sunset on July 1, 2018.  Several days after filing the motion to dismiss, Defendants' counsel learned of a proposed bill (House Bill 167) that would, if enacted, remove the sunset date.  (*See* https://le.utah.gov/~2018/bills/static/HB0167.html).  It is unclear at this time whether H.B. 167 will become law.

[7] In briefing related to their first motion for a preliminary injunction, Plaintiffs expressly stated that they were not claiming animus on the part of the Utah legislature.  [Dkt. 69, p. 3 of 7].  Plaintiffs have not changed their position in this regard.

relative positions, it is still considered to be an "extraordinary and drastic remedy." *Warner v. Gross*, 776 F.3d 721, 728 (10th Cir. 2015).

"As such, a Court must deny motions for preliminary injunctions unless the movant establishes: "(1) a likelihood of success on the merits; (2) a likelihood that the movant will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the movant's favor; and (4) that the injunction is in the public interest." *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009). Because a status-quo-preserving preliminary injunction is an extraordinary and drastic remedy, the "right to relief must be clear and unequivocal." *First W. Capital Mgmt. Co. v. Malamed*, 874 F.3d 1136, 1141 (10th Cir. 2017); *Heideman v. South Salt Lake City*, 348 F3d 1182, 1188 (10th Cir. 2003) (citations omitted).

Plaintiffs must shoulder even a greater burden in this case because they are not seeking merely a status-quo-preserving injunction, but rather a particularly disfavored type of preliminary injunction. In the Tenth Circuit, three types of injunctions are particularly disfavored, and are considered an even more drastic and extraordinary remedy:  (1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits. *Schrier v. University of Colo.*, 427 F.3d 1253, 1259 (10th Cir. 2005). These disfavored injunctions "must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course." *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 975 (10th Cir. 2004). And a party seeking a disfavored injunction must make a heightened showing of the preliminary injunction factors, including "a *strong* showing both with regard to the likelihood of success on the merits and with regard to the balance of the harms." *McDonnell v. City & Cty. of Denver*,

3

No. 17-1071, 2018 WL 283406, at *3 (10th Cir. Jan. 4, 2018) (emphasis added); *Fish v. Kobach*, 840 F.3d 710, 723 (10th Cir. 2016). Plaintiffs are seeking an injunction that exemplifies two of the three types of disfavored injunctions. That is, Plaintiffs are seeking a status-quo-disrupting, mandatory preliminary injunction.

"An injunction disrupts the status quo when it changes the last peaceable uncontested status existing between the parties before the dispute developed." *Beltronics USA, Inc. v. Midwest Inventory Distribution*, LLC, 562 F.3d 1067, 1071 (10th Cir. 2009) (internal quotation omitted). H.B. 101 went into effect on May 10, 2016. The last peaceable uncontested status between Katherine and Anthony, on the one hand, and Defendants, on the other, was just before the original complaint was filed on July 6, 2017 (i.e., after H.B. 101 had been in effect over a year). In their declarations, Katherine and Anthony do not claim any dispute between them and Defendants arose before then. Thus, the requested injunction disrupts the status quo between Katherine, Anthony, and Defendants.

The "last peaceful uncontested status" between Disability Law Center ("DLC") and Defendants likewise occurred after H.B. 101 went into effect. On March 21, 2016, DLC sent letters and a petition to Gov. Herbert, asking that he veto H.B. 101. (Zahradnikova Decl. I, Dkt. 8-2, ¶¶ 18-19; Zahradnikova Decl. II, Dkt. 93, ¶¶ 15-16).[8] Yet, in "late July or early August 2016," after H.B. 101 went into effect, DLC monitored 15 guardianship proceedings, including one proceeding in which the potential ward allegedly was not appointed counsel. (Zahradnikova Decl. I, Dkt 8-2, ¶¶ 12-14). DLC's response could not have been more peaceable. It did nothing to contest, object to, or appeal the court's decision not to appoint counsel, despite its

---

[8] DLC's request that Gov. Herbert veto H.B. 101 does not mean there was a dispute between DLC and Gov. Herbert. Indeed, in the original complaint, DLC did not even name Gov. Herbert as a defendant.

avowed statutory duty and authority to pursue legal remedies to ensure the protection of persons with disabilities.  (Am. Compl., ¶¶ 12-14, 20; Zahradnikova Decl. II, Dkt. 93, ¶¶ 3-5).  And any alleged injuries resulting from this decision not to appoint counsel will not be redressed by the prospective relief sought in this lawsuit.  In July or August 2016, DLC knowingly acquiesced in a decision not to appoint counsel under H.B. 101, and this knowing acquiescence was the last peaceful uncontested status between DLC and Defendants.  Thus, the requested injunction also disrupts the status quo between DLC and Defendants.

The requested preliminary injunction is also a disfavored mandatory injunction.  A mandatory injunction requires defendants to act, rather than simply prohibiting them from acting, and may require the "court to provide ongoing supervision to assure the nonmovant is abiding by the injunction."  *Schrier v. Univ. Of Co.*, 427 F.3d 1253, 1261 (10th Cir. 2005) (holding injunction was mandatory despite "merely seeking restoration of the status quo" because it affirmatively required defendant University to act in a particular way, i.e., restore plaintiff as "Chair of the Department of Medicine."); *Little v. Jones*, 607 F.3d 1245, 1251 (10th Cir. 2010) (stating "a mandatory preliminary injunction" is "one which requires the nonmoving party to take affirmative action.")

Although Defendants claim that they are seeking an injunction precluding defendants from implementing H.B. 101, (Dkt. 89), the reality is that H.B. 101 has been implemented and in effect since May 10, 2016, and thus Plaintiffs are not seeking merely a prohibitory injunction.  Plaintiffs' true intentions are disclosed in the "Prayer for Relief" of their amended complaint, where Plaintiffs request a clearly *mandatory* injunction affirmatively requiring Defendants to appoint counsel for all guardianship respondents.  *Jetpay Merch. Servs., LLC v. Merrick Bank Corp.*, No. 2:12-CV-197-RJS, 2013 WL 12182104, at *1 (D. Utah July 29, 2013) (stating a

5

mandatory injunction is one that would "direct the business affairs of another entity" and require affirmative action on its part) (unpublished).

The potential need for ongoing supervision of the requested injunction weighs in favor of treating it as mandatory. *SCFC ILC, Inc. v. Visa USA, Inc.*, 936 F.2d 1096, 1099 (10th Cir. 1991) (noting that mandatory injunctions "affirmatively require the nonmovant to act in a particular way, and as a result they place the issuing court in a position where it may have to provide ongoing supervision to assure that the nonmovant is abiding by the injunction"); *Schier*, 427 F.3d 1261 (holding that an injunction requiring University to reinstate plaintiff as department chair could require court to provide supervision). H.B. 101 went into effect 20 months ago, is part of a larger statute, Utah Code § 75-5-303, and is enforced in courts throughout Utah. Neither defendant is responsible for enforcing section 75-5-303 or H.B. 101, or deciding whether to appoint counsel in a guardianship proceeding under H.B. 101. Guardianship proceedings under H.B. 101 are initiated and prosecuted by private parties (parents), and the only state actor involved in the proceedings is the probate court judge, who us not named as a defendant.

With no parents or members of Utah's judicial branch participating as parties in this case, and with the separation of powers principle precluding the State and Gov. Herbert from controlling the actions of Utah's judiciary, the requested injunction would not redress Plaintiffs' alleged injuries, as detailed in Defendants' motion to dismiss ("MTD"). (Dkt. 109, pp. 28-32 of 60). Plaintiffs have not explained what the State or Gov. Herbert could do to ensure compliance with the requested injunction. Even if Plaintiffs provided such an explanation, the Court would, at the very least, need to provide ongoing supervision of the requested injunction.

Principles of federalism also weigh against the requested injunction. Where, as here, a

6

party seeks an injunction against a state and its governor, "federal courts must be constantly mindful of the special delicacy of the adjustment to be preserved between federal equitable power and State administration of its own law." *Rizzo v. Goode*, 423 U.S. 362, 378 (1976) (internal quotation marks).  And, "[w]here a plaintiff seeks to enjoin the activity of a government agency, even within a unitary court system, his case must contend with the well-established rule that the Government has traditionally been granted the widest latitude in the dispatch of its own internal affairs."  *Id.* at 379.

Whether or not Plaintiffs are required to make the heightened showing required of disfavored injunctions, Plaintiffs have failed to demonstrate that they are entitled to a preliminary injunction.

## II.   PLAINTIFFS HAVE FAILED TO DEMONSTRATE A LIKELIHOOD OF IRREPARABLE HARM.

To obtain preliminary injunctive relief, Plaintiffs must show they are likely to suffer irreparable harm in the absence of such relief.  *New Mexico Dep't of Game & Fish v. United States Dep't of the Interior*, 854 F.3d 1236, 1249 (10th Cir. 2017) (citation omitted).  "[A] showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction, [and therefore] the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered."  *Id.* To show irreparable harm, Plaintiffs must clear a "high bar."  *Id.* at 1251.  Plaintiffs must show, *inter alia*, that harm or injury is "both certain and great," not "merely serious or substantial," and certainly not theoretical or speculative.  *Id.* at 1250, 1251.  Plaintiffs must also show that the "injury complained of is of such imminence that there is a clear and present need for equitable relief."  *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003).  Past harms do not

justify a preliminary injunction. *O'Brien v. Town of Caledonia*, 748 F.2d 403, 406 (7th Cir. 1984)

Even if Plaintiffs show they will imminently suffer "certain and great" harm, they still must also show the harm will be *irreparable*. *New Mexico*, 854 F.3d at 1251. Harm is considered irreparable when it cannot be adequately remedied by money damages or by a court following a final determination on the merits. *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1250 (10th Cir.2001); *Sampson v. Murray*, 415 U.S. 61, 90 (1974) ("The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm."); *Nat'l Farmers Union Ins. Companies v. Crow Tribe of Indians*, 471 U.S. 845, 857 n. 22, (1985) (stating that "[i]t is a fundamental principle of long standing that a request for an injunction will not be granted as long as an adequate remedy at law is available.").

The test for irreparable harm is even more demanding than the test for standing. *See Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 675 (9th Cir. 1988) ("Because the threat of civil liability is too attenuated and conjectural to constitute a basis for their standing, it follows that this injury is too speculative to constitute an irreparable harm justifying injunctive relief."). In their MTD, Defendants argue that Plaintiffs lack standing and have not demonstrated an injury-in-fact. (Dkt. 109, pp. 16-33 of 60). These arguments, which are incorporated herein by reference, apply with even greater force in showing that Plaintiffs will not suffer irreparable injury absent a preliminary injunction.

Plaintiffs have not demonstrated they will imminently suffer harm that is certain, great, and irreparable. Plaintiffs argue they "need show no harm beyond the statutory and constitutional violations *they* have suffered." (PI Motion, Dkt. 89, pp. 15-16 of 35) (emphasis

added).  This bald assertion is contradicted by the evidence on the record.  Although Plaintiffs theorize that Katherine and Anthony could suffer statutory and constitutional violations if they are denied counsel at a future guardianship proceeding, Katherine's and Anthony's own declarations prove that they have never participated in or been denied counsel at a guardianship proceeding.  (Katherine Decl. dated 12/22/17, Dkt. 90; Anthony Decl. dated 12/22/17, Dkt. 91).  Thus, they have not suffered any "statutory and constitutional violations."  And DLC does not claim that it has any "statutory and constitutional" rights that would be violated if counsel is not appointed for Katherine or Anthony.

Equally important, even if Plaintiffs had already suffered "statutory or constitutional" violations, such past violations would not justify a preliminary injunction.  *Heideman*, 348 F.3d at 1189 (stating the "injury complained of is of such imminence that there is a clear and present need for equitable relief.").  *O'Brien, supra*, 748 F.2d at 406.  Plaintiffs have failed to demonstrate that they will imminently be denied counsel at a guardianship proceeding and suffer a statutory or constitutional violation.

Plaintiffs' supporting declarations, like the allegations in their amended complaint, do not demonstrate that Plaintiffs Katherine or Anthony will imminently be denied counsel at a guardianship proceeding and suffer irreparable harm as a result.  To the contrary, Katherine and Anthony raise only speculative concerns that their parents may possibly try to establish a guardianship over them at some indefinite point in the future.  In Katherine's most recent declaration, she states, in pertinent part, "I am concerned my parents *may* try to create a guardianship over me, or at least hold the possibility of a guardianship over my head to control my activities."  (Katherine Decl. dated 12/22/17, Dkt 90, ¶ 17) (emphasis added).  Later in her declaration she adds that recently "my parents have brought up the *possibility* of a guardianship"

9

and "I worry that *if* my parents think my symptoms are getting worse or want to get more control

over my life they will bring a guardianship proceeding against me." (*Id.,* ¶ 20) (emphasis

added).   It is speculative to assume Katherine's symptoms will worsen or that her parents will

want to get more control over her life at some point in the future, and even more speculative to

assume that her parents would necessarily respond by petitioning for a guardianship.

Similarly, Anthony states in his latest declaration that "[m]y mother has indicated that she

*may* wish to establish a guardianship over me." (Anthony Decl. dated 12/22/17, Dkt. 91, ¶ 10)

(emphasis added).  Anthony stated the exact same thing over 5 months earlier, in the declaration

he submitted in support Plaintiffs' first motion for a preliminary injunction.  (Anthony Decl.

dated 7/6/17, Dkt. 8-5, ¶ 10).  And, like Katherine, Anthony has not shown that his parents have

taken any concrete steps to imminently file a guardianship petition.

Plaintiffs also cryptically assert there is additional "abundant evidence of [irreparable]

harm." (PI Motion, Dkt. 89, p. 17 of 35).  But the only evidence marshalled by Plaintiffs in

support of this assertion is (1) an order from a single *completed* guardianship proceeding, *id.,*

citing Virgien Decl. Ex. B, Dkt. 98-2), and (2) a sentence from the declaration from DLC's

executive director stating that a "guardian *may* be vested with the power to control his or her

ward's place of residence, medical care or treatment, employment, associates, marital status, and

parental rights." (*Id.,* citing Zahradnikova Decl., ¶ 12).  With such sparse evidence, the best

Plaintiffs can say is, "Under the guardianship framework as amended by H.B. 101, *certain*

*citizens* of Utah *risk* erroneously losing a full panoply of fundamental liberty interests—

including the right to control whether they will be institutionalized or receive life-sustaining

medical treatment." (*Id.*)  This is not a description of irreparable harm.  That "certain citizens"

are facing the "risk" of harm does not mean *Plaintiffs imminently* will suffer a certain, great, and irreparable harm, as is necessary to obtain a preliminary injunction.

Because Plaintiffs have failed to demonstrate they will imminently be denied counsel at a guardianship proceeding or suffer any harm as a result, the Court could deny their motion without evaluating whether the harm would be irreparable.  In the event the Court does evaluate the nature of the harm, the Court should rule it is reparable.  The fact that that the alleged harm would occur in a court setting negates a showing of irreparable harm.  The alleged harm is reparable in probate court because the ward, DLC, or another interested party may petition the probate court to modify the guardianship order or replace the guardian.  Utah Code Ann. § 75-5-307.  The alleged harm is also reparable by an appellate court.  *Stamatakos v. Wells Fargo Bank, Nat'l Ass'n*, No. CV 17-62S, 2017 WL 2635291, at *1 (D.R.I. Apr. 20, 2017) (noting movant for "has not demonstrated that he will suffer irreparable harm if the state eviction trial commences, nor has he demonstrated that other remedies are not available, such as his right to appeal an adverse state-court decision[.]");*Schulder v. Hooker*, No. 08-CV-3052(ENV), 2008 WL 4862461, at *1 (E.D.N.Y. Nov. 10, 2008) ("[T]here is no showing of irreparable harm because, even if the Department were to deny [movant's] renewal application and do so wrongfully, . . . she [would] have a right to appeal in state court" or obtain money damages); *McBride v. West*, 940 F. Supp. 893, 896 (E.D.N.C. 1996).

Further, Katherine and Anthony may, by acting now, avoid hypothetical future harm, however speculative, associated with their parents seeking guardianships.  If they have concerns that their parents may overreach in a guardianship proceeding, Katherine and Anthony may designate another person to serve as guardian in the event they become incapacitated.  Utah Code § 75-5-311(2) & (3)(a).  They may also employ advance directives, durable powers of attorneys,

11

and trusts.  Such tools would allow them to make their wishes known now, when they have sufficient capacity to do so.

Of note, Plaintiffs do not dispute that they must show that any alleged injuries resulting from a violation of ADA or the Rehabilitation Act are *irreparable*.  *First W. Capital Mgmt. Co. v. Malamed*, 874 F.3d 1136, 1140 (10th Cir. 2017) ("Courts may presume irreparable harm only when a party is seeking an injunction under a statute that *mandates* injunctive relief as a remedy for a violation of the statute.").  Neither statute mandates injunctive relief.

As for Plaintiffs' procedural due process claim, Plaintiffs admit that a procedural due process violation, at least one involving "a deprivation of property[,] typically does not *automatically* trigger a finding of irreparable harm."  (PI Motion, Dkt. 89, p. 16 of 35, n.3) (citing *Seegmiller v. Accredited Home Lenders, Inc.,* No. 2:11-CV-00771 CW, 2011 WL 4964508, at *3 (D. Utah Oct. 19, 2011) and *Hamlyn v. Rock Island Cty. Metro. Mass Transit Dist.*, 960 F. Supp. 160, 163 (C.D. Ill. 1997)).  But, Plaintiffs assert that these holdings do not apply to due process claims involving a deprivation of a liberty interest.

Plaintiffs are mistaken.  Neither *Seegmiller* nor *Hamlyn* stated that their holdings, or the holdings of the cases on which they relied, applied only to deprivations of property and not to alleged deprivations of liberty.  In fact, *Seegmiller*'s exact quote was,

> Although "some kinds of constitutional violations" presumptively cause irreparable harm, a procedural due process violation, alone, typically "does not automatically trigger a finding of irreparable harm." *Ezell v. City of Chicago*, 651 F.3d 684, 2011 U.S. App. LEXIS 14108, at *32–33 & n. 10 (7th Cir.2011) (quotations and citations omitted).  It therefore is necessary for a court to examine "whether a protected **property or liberty** interest exists, and if such an interest exists, then determine what procedures are necessary to protect that interest."

(Emphasis added).

12

At most, a constitutional violation weighs heavily but not conclusively in the irreparable harm analysis. *Fish v. Kobach*, 840 F.3d 710, 752 (10th Cir. 2016) (stating the "while we must nonetheless engage in our traditional equitable inquiry as to the presence of irreparable harm[,] the violation of a constitutional right must weigh heavily in that analysis.").

Further, as mentioned earlier, the fact that the alleged due process violation would allegedly occur, if at all, in the context of a court proceeding means that any resulting injury would be reparable by that court or by an appellate court.

Finally, DLC's own conduct belies the notion that potential wards necessarily suffer harm when they are not appointed counsel pursuant to H.B. 101. By its own admission, DLC has a statutory duty to protect persons with disabilities, and it is aware of three individuals— Constituents A and B, and a third unnamed constituent—who were not appointed counsel at a guardianship proceeding.[9] If DLC believed that these three constituents had suffered harm because they were not appointed counsel, DLC would have a duty to promptly take affirmative actions to protect them. Yet, despite this duty, DLC has done absolutely nothing to assist these three constituents. And the prospective injunctive relief DLC seeks in this litigation will not assist them either. DLC's inaction and acquiescence constitute its consent to and ratification of the guardianship proceedings of these three constituents and demonstrates that DLC believes that these three constituents suffered no harm.

Plaintiffs have not shown that, in the absence of the requested preliminary injunction, they will imminently suffer real and great harm that is irreparable. Plaintiffs' motion for a preliminary injunction therefore fails.

---

[9] DLC was even present in court in at least two of these three guardianship proceedings. *See supra*, fn. 4.

13

### III.   PLAINTIFFS HAVE FAILED TO DEMONSTRATE A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS

Plaintiffs have not made a "strong showing" of a likelihood of success on the merits, as is required for the type of disfavored injunction they are seeking.  *New Mexico Dep't of Game & Fish v. U.S. Dep't of Interior*, 854 F.3d 1236, 1246 n.15 (10th Cir. 2017).  Plaintiffs have not even demonstrated a substantial likelihood of success on the merits.

Of note, the merits of Plaintiffs' claims have been challenged in Defendants' pending MTD (Dkt. 109), which motion is incorporated herein by reference.  The arguments in the MTD show that Plaintiffs cannot demonstrate a substantial likelihood of success on the merits.

### A.   Plaintiffs Have Failed to Address Standing and Subject Matter Jurisdiction

Plaintiffs' motion suffers from a fatal flaw.  Notably absent from Plaintiffs' motion is any argument or analysis demonstrating that they have standing, or the Court has subject matter jurisdiction.  This omission should result in the summary denial of Plaintiffs' motion.  It is Plaintiffs' burden to demonstrate they have standing to request, and the Court has subject matter jurisdiction to enter, the requested injunction.  *See Home-Stake Prod. Co. v. Talon Petroleum, C.A.*, 907 F.2d 1012, 1018 (10th Cir. 1990) ("The burden on the [movant] at the preliminary injunction stage of this litigation was to establish a reasonable probability of ultimate success on the issue of jurisdiction when the action is tried on the merits.");  *Endico v Fonte*, 485 F.Supp.2d 411, 413 (S.D.N.Y. 2007) (stating that "as plaintiff has the burden of pleading and providing the existence of subject matter jurisdiction, he must demonstrate an appropriate prospect of success on that issue in order to obtain a preliminary injunction.").  And, based on the State's motion to dismiss Plaintiffs' original complaint, Plaintiffs knew that Defendants were disputing the Court's subject matter jurisdiction and that this dispute was not going away.  Especially in light of this

14

history, Plaintiffs should have anticipated and addressed the issue of subject matter jurisdiction (to include standing) in their motion, so that Defendants would have the opportunity to respond in this opposition.

Plaintiffs have not demonstrated a substantial or even a minimal likelihood of success on the dispositive issue of the Court's subject matter jurisdiction. That is reason enough for the Court to deny Plaintiffs' motion.

### B. Plaintiffs Challenge a "Straw Man," Not the Terms of the Actual Statute

Even if Plaintiffs had demonstrated a sufficient likelihood of success on the issue of subject matter jurisdiction, Plaintiffs have not demonstrated any likelihood of success on the merits of its causes of actions, which raise facial challenges to H.B. 101 under the Americans with Disabilities Act ("ADA"), Rehabilitation Act, and procedural due process (PI Motion, Dkt. 89, p. 19 of 35). Plaintiffs' arguments in support of their facial challenge are flawed. Although Plaintiffs assert that "courts consider facial challenges like this one simply by applying the relevant constitutional test to the challenged statute," Plaintiffs have not identified or applied the "relevant test" for *facial* challenges under the ADA, Rehabilitation Act, or due process.

But there is an even greater flaw. A facial challenge requires that the relevant terms of the challenged statute be examined and "measured" against the relevant facial test. *Doe v. City of Albuquerque*, 667 F.3d 1111, 1127 (10th Cir. 2012). Yet, Plaintiffs mention the relevant terms of H.B. 101 just one time, in the "Statement of Facts" section of their motion. (PI Motion, Dkt. 89, p. 14 of 35). And Plaintiffs never measure the relevant terms of H.B. 101 against the relevant facial test. To the contrary, Plaintiffs' arguments in support of their facial challenge incorrectly assume that H.B. 101 bars all guardianship respondents from having counsel. (*See* PI Motion, Dkt. 89, p. 23 of 25 & n.7 (stating "the denial of counsel excludes the guardianship

15

respondents from benefits" and "H.B. 101 strips guardianship respondents of the reasonable accommodation of counsel . . . .")).  These are "straw man" arguments.

They are "straw man" arguments because H.B. 101 does not preclude a guardianship respondent from having counsel *in any case*.  Under Utah's guardianship statute, a respondent (potential ward) has always had the right to be represented by counsel of his or her own choice. Utah Code. § 75-5-303(2).  This was not changed by H.B. 101.  Further, when the potential ward does not retain counsel, the default rule and presumption is that the court will appoint counsel for the potential ward.  *Id.*  This default rule and presumption may be rebutted only in exceptional circumstances.  Specifically, H.B. 101 permits (but does not require) the court not to appoint counsel only if five conditions are met, one of which requires the probate court be "satisfied that counsel is not necessary in order to protect the interests of the person."  Utah Code § 75-5-303(5)(d)(v).

These are the terms that must be measured against the relevant facial test.  Yet, nowhere in Plaintiffs' motion do they measure the terms of H.B. 101 against the relevant facial test.  As a result, Plaintiffs never attempt to answer the question that must be answered to have any chance of success on the merits of their facial challenge, i.e., How does H.B. 101 facially violate ADA, Rehabilitation Act, or procedural due process, when H.B. 101 permits (but does not require) counsel not to be appointed for a potential ward only when a judge makes a determination that counsel is not necessary to protect the interests of the potential ward, and when the judge may employ other procedural devices (e.g., a visitor, a physician, *see* Utah Code § 75-5-303(4)) and accommodations (e.g., interpreters) to protect the potential ward's interests?  For this reason, the Court should rule that Plaintiffs have failed to demonstrate a substantial likelihood of success on the merits of their facial claims.

### C.  Plaintiffs Rely on Events that Have Nothing to Do with the Terms of H.B. 101

Another flaw in Plaintiffs' arguments is their reliance on alleged procedural anomalies that H.B. 101 either does not require or expressly forbids.  For example, Plaintiffs point to a single instance where a court allegedly held a forty-one second hearing and did not ask the guardianship respondent any questions, and the respondent did not make a statement.  (PI Motion, Dkt. 89, p. 15 of 35; Sell Decl., Dkt. 94, ¶ 9).  These isolated events do not support a facial challenge.  H.B. 101 does not, on its face, place any limits on the length of the hearing or the judge's and respondent's interactions and communications.  In fact, H.B. 101 affirmatively requires that the judge give the respondent the "opportunity to communicate, to the extent possible, the person's acceptance of the appointment of petitioner."  Utah Code § 75-5-303(5)(d)(iv).  And Plaintiffs fail to show any nexus between these events and H.B. 101's provisions concerning the appointment of counsel.

### D.  Plaintiffs Do Not Take Into Account Essential Law

Plaintiffs have the burden of demonstrating H.B. 101 is facially invalid under all applicable presumptions and rules of interpretation.   State statutes are presumed valid and should not be invalidated if it is "fairly possible" to interpret the statute in a manner that renders it valid. *Branson Sch. Dist. RE-82 v. Romer*, 161 F.3d 619, 636 (10th Cir. 1998); *see Mitchell v. City of Sapulpa*, 857 F.2d 713, 719 (10th Cir. 1988) (stating that state statutes are entitled to a presumption of constitutionality) (citing *Davies Warehouse Co. v. Bowles*, 321 U.S. 144, 153 (1944)).  In the arguments supporting their facial attack on H.B. 101, Plaintiffs neither acknowledge nor attempt to apply these essential principles.

Applying these principles undermines Plaintiffs' facial attack.  It is, at the very least, "fairly possible" to interpret H.B. 101 in a manner that renders it valid and consistent with ADA,

17

the Rehabilitation Act, and procedural due process (collectively, "federal law").  H.B. 101

requires the probate court to appoint counsel whenever "necessary in order to protect the

interests of the person."  Utah Code § 75-5-303(5)(d)(v).  It is fairly possible to interpret the

"interests of the person" to include the rights and interests of the person under federal law.

Under that feasible interpretation, subsection 75-5-303(5)(d)(v) requires the appointment of

counsel whenever federal law requires the appointment of counsel.  Conversely, subsection 75-5-

303(5)(d)(v) does not preclude the appointment of counsel when federal law requires it.  Because

H.B. 101 does not conflict with federal law, Plaintiffs facial challenge fails.

### E.  Plaintiffs' Facial Challenges Under the ADA and Rehabilitation Act Fail.

Plaintiffs admit that ADA applies only to "qualified individuals with disabilities." [10]  (PI

Motion, Dkt. 89, p. 20 of 35).  As such, Plaintiffs' facial challenge to H.B. 101 under ADA fails

because Plaintiffs have not demonstrated that all guardianship respondents are "qualified

individuals with disabilities."  Plaintiffs cannot make this showing.  The decision to appoint

counsel at a guardianship proceeding is made at the outset of the case.  At that time, the

guardianship respondent is only alleged to be disabled.  In some cases, the allegations may be

without merit or lack sufficient evidentiary support.  In other cases, the guardianship respondent

may dispute the allegations and take the position he or she is not disabled.  Thus, the court must

decide whether to appoint counsel at a point when the ultimate issue—i.e., whether the

respondent has an incapacitating disability—is unproven and may be disputed.  For this reason,

---

[10] Plaintiffs argue that their claims under the Rehabilitation Act ("RA") require the same showing as their claims under the ADA.  (PI Motion, Dkt. 89, p. 24 of 35, n.8).  Thus, the State's arguments in opposition to Plaintiffs' ADA claims apply with equal force to their RA claims.

Plaintiffs have not demonstrated and cannot demonstrate that ADA/Rehabilitation Act apply to the appointment of counsel in a guardianship proceeding.

Plaintiffs argue that any "person who meets the requirements for a guardianship is necessarily 'disabled' and 'qualified' under the ADA." (PI Motion, Dkt. 89, pp. 22 of 35). Even if accurate, this argument does not mean (and Plaintiffs have not shown) that every guardianship respondent is "disabled" or "qualified" or meets the requirements for a guardianship. "Persons who meet the requirements for a guardianship" are a subset of all guardianship respondents. This is a crucial point because Plaintiffs are seeking an injunction requiring counsel for every guardianship respondent. The purpose of a guardianship proceeding is to determine whether a person has an incapacitating disability and requires a guardianship. Guardianship respondents are entitled to a presumption that they do not have an incapacitating disability until proven otherwise. And, Plaintiffs have not brought forward evidence demonstrating that every guardianship petition is meritorious or results in a guardianship.

There is no conflict between H.B. 101 and ADA/Rehabilitation Act regarding the appointment of counsel. As the Tenth Circuit and other courts have noted, the ADA provides courts only "discretionary authority to appoint an attorney for an ADA complainant." *Moore v. Walker*, 24 F. App'x 924, 927 (10th Cir. 2001); *Camick v. Holladay*, 2017 WL 4099472, at *1 (D. Kan. Sept. 14, 2017) (unpublished); *see also Pinson v. Equifax Credit Info. Servs., Inc.*, 316 F. App'x 744, 749 (10th Cir. 2009) (unpublished) (finding "no support for the proposition" that ADA requires a court to appoint counsel "on its own volition."). Thus, ADA itself does not mandate the appointment of counsel for a litigant with an alleged disability.

Of note, Plaintiffs' ADA/Rehabilitation Act claims, if successful, would harm the legal interests of potential wards. Under H.B. 101, potential wards already have the right to retain

19

counsel of their own choosing in every case and the right to appointed counsel whenever necessary to protect their interests.  Thus, the net effect of Plaintiffs' requested injunction would be to require counsel in cases where counsel is not necessary to protect the interests of potential wards.  That is a dubious result.   Even worse, to obtain this dubious result for a fraction of potential wards, Plaintiffs have alleged and therefore admitted that all potential wards are "qualified individuals with disabilities" under ADA and the Rehabilitation Act.  (Am. Compl., ¶¶ 99, 122).  At one point in their motion, Plaintiffs also baldly assert that any respondent in guardianship proceeding necessarily is "qualified" and "disabled."  (PI Motion, Dkt. 89, pp. 21-22 of 35).  If Plaintiffs succeed in obtaining an injunction premised on these allegations and assertions, under principles of judicial and collateral estoppel, all potential wards entering a guardianship proceeding would be considered qualified individuals with disabilities.  That would damage the interests of guardianship respondents for whom H.B. 101 already provides counsel and who dispute the allegations of disability.

Defendants' motion to dismiss includes several other arguments showing why H.B. 101 is valid under ADA/Rehabilitation Act, including an argument showing that H.B. 101 passes the relevant test for facial validity.  These arguments are incorporated herein by reference. Likewise, because Plaintiffs have reused many of the same arguments from their first motion for a preliminary injunction, Defendants incorporate by reference the State's opposition to that motion. (Dkt. 39).

Finally, all of Plaintiffs' cases under ADA are distinguishable because none involve a guardianship proceeding or statute anything like H.B. 101, and Plaintiffs have not offered any persuasive arguments extrapolating or generalizing from the holdings of these cases to the situation at bar.

### F.  Plaintiffs' Facial Challenge Under Due Process Also Fails.

As shown in Defendants' MTD (Dkt. 109) Plaintiffs' facial challenge to H.B. 101 under the Due Process Clause is untenable.  For the "relevant constitutional test" for their facial challenge, Plaintiffs resort to the *Eldridge* test, which courts use in resolving fact-intensive, "as applied" challenges.  Plaintiffs have not demonstrated that this is the relevant test for facial challenges under the procedural Due Process Clause.

It is not the correct test.  In 2008, in a case presenting a facial challenge to a statute based on an alleged due process right to counsel, the Tenth Circuit held it "it is clear a litigant cannot prevail in a facial challenge to a regulation or statute unless he at least can show that it is invalid in the vast majority of its applications.  *Hernandez-Carrera v. Carlson*, 547 F.3d 1237, 1256 (10th Cir. 2008).  Applying this standard, the Tenth Circuit rejected the facial challenge because plaintiffs had "not shown that the government has failed to provide [counsel] in 'the vast majority' of cases."  *Id.*  Plaintiffs have not alleged or proven that guardianship respondents are unrepresented in the "vast majority" of cases where due process requires they have counsel.  In fact, H.B. 101 always permits guardianship respondents to retain counsel, and requires counsel be appointed whenever necessary to protect their interests.

*Hernandez-Carrera* remains good law.  The Tenth Circuit cited, but did not overturn *Hernandez-Carrera*, in *Doe v. City of Albuquerque*, 667 F.3d 1111, 1124 (10th Cir. 2012), cited by Plaintiffs.  *Doe* should be applied with caution here because it dealt with a facial challenge under the First Amendment, not due process, and the *Doe* court acknowledged "there is no one test that applies to all facial challenges."  *Id.* at 1124.  Three years after *Doe*, when again faced with a facial due process challenge, the Tenth Circuit cited *Hernandez-Carrera* for the proposition that a "litigant cannot prevail in a facial challenge to a regulation or statute unless he

21

at least can show that it is invalid in the vast majority of its applications." *Mbaku v. Bank of Am., Nat. Ass'n*, 628 F. App'x 968, 972 (10th Cir. 2015) (unpublished).

In any event, the *Eldridge* test leads only to presumptions in favor or against the appointment of counsel (for indigent parties only) depending on whether they will be deprived of their physical liberty, i.e., incarcerated or confined in a state institution, if they lose. *Turner v. Rogers*, 564 U.S. 431, 443 (2011) (noting that the "Court previously found a right to counsel 'only' in cases involving incarceration, not that a right to counsel exists in all such cases."); *Lassiter v. Dep't. of Social Servs. of Durham County*, 452 U.S. 18, 25-27 (1981) (holding that "an indigent litigant has a right to appointed counsel only when, if he loses, he may be deprived of his physical liberty" equivalent to "actual imprisonment" or involuntary "commitment to an institution."); *Garramone v. Romo*, 94 F.3d 1446, 1449 (10th Cir. 1996) ("In proceedings where litigants are not ***directly*** threatened by a loss of physical liberty, a ***presumption*** arises against their right to appointed counsel," and in proceedings where litigants are directly threatened with a loss of physical liberty "they have a ***presumed*** right to counsel") (emphasis added).  Whether the presumption is upheld or rebutted depends on the facts of each individual case.   Although a guardianship respondent is not directly threatened with incarceration or confinement in a state institution, even if he or she was, H.B. 101 would be constitutionally adequate because it provides a presumption in favor of appointing counsel.

Finally, Plaintiffs overstate the liberty interests at stake in a guardianship proceeding. Many of Plaintiffs' concerns hinge on *potential* deprivations that may result, at some indefinite time in the future, if the guardian exercises his or her alleged authority.  But due process is concerned with the process that is provided before a person is *finally* deprived of liberty or property interest.  *Wolff v. McDonnell*, 418 U.S. 539, 557-58 (1974); *see Lawrence v. Reed*, 406

22

F.3d 1224, 1233 (10th Cir. 2005).  The Plaintiffs have not shown that a guardianship proceeding finally deprives wards of the following liberty interests:

1.     Medical decisions.  Even without applying for a guardianship, a parent may have the right to make medical decisions for an adult child that lacks "health care decision making capacity," as determined by the medical provider.   Utah Code § 75-2a-108(1)(ii)(B) (providing that parent may act as surrogate if agent, guardian, spouse, or child of the adult are not available).  If the adult child does not have a spouse or child, obtaining a guardianship does not result in any difference in the parent's right to make medical decisions on the adult child's behalf.  *See id.*

Utah law also protects wards after a guardian is appointed.  Health care providers have an ongoing "obligation to consider whether the adult continues to lack health care decision making capacity."  Utah Code § 75-2a-104(4) Utah Code § 75-2a-103(23) (defining "surrogate" to include a guardian); Utah Code § 75-2a-111(1) (stating that a guardian has the second-highest priority, after a health care agent, "to make health care decisions on behalf of an adult who has been found to lack health care decision making capacity under Section 75-2a-104") (emphasis added).  "If at any time a health care provider finds, based on an examination and assessment, that the adult has regained health care decision making capacity, the health care provider shall record the results of the assessment in the adult's medical record, and the adult can direct the adult's own health care."  Utah Code § 75-2a-104(5) (emphasis added).  And the health care provider can seek to enjoin medical decisions with which the provider disagrees.  Utah Code § 75-2a-120 (providing that a "district court may enjoin or direct a health care decision" based on a petition filed by the patient, health care provider, etc.).

2.   <u>Involuntary commitment/institutionalization</u>.  Utah law requires a separate proceeding and procedural safeguards, including counsel, before a person is involuntarily committed.  Utah Code § 62A-5-312 (setting forth procedural rights of persons with intellectual disabilities subject to involuntary commitments); Utah Code § 62A-15-631 (setting forth procedural rights of persons with mental illnesses subject to involuntary commitments).

3.   <u>Procreation</u>.  Utah law requires a separate proceeding and procedural safeguards, including counsel, before a person is involuntarily sterilized.  Utah Code § 62A-6-102(3) ("It is unlawful for a physician to sterilize a person who is 18 years of age or older and who is not capable of giving informed consent unless a petition has been filed in accordance with Section 62A-6-107 and an order authorizing sterilization has been entered by a court of competent jurisdiction); Utah Code § 62A-6-111 (setting forth procedural rights of person for which sterilization is sought).

4.   <u>Marriage</u>.  On their face, Utah's marriage statutes do not appear to require that a guardian consent to the marriage of an adult ward.  Utah Code §§ 30-1-1, -2 (listing types of marriages that are void); Utah Code § 30-1-9 (stating conditions under which consent of parent or guardian is required).

## IV.   THE BALANCE OF EQUITIES AND PUBLIC INTEREST IS NOT IN PLAINTIFFS' FAVOR.

The balance of equities favor Defendants.  Plaintiffs have not presented any evidence that their rights, or anyone else's rights, have been violated as a result of H.B. 101, or that this law has injured anyone.  Conversely, H.B. 101, on its face, allows parties to proceed expeditiously without counsel in cases where a court has determined that counsel is not needed to protect the potential ward's interest.

24

The public has a substantial interest in enforcing a statute, passed by their democratically elected legislature, that neither violates the U.S. Constitution or any federal statutes, and which has not shown to have resulted in any harm, reparable or irreparable, in the twenty months since it came into effect. *New Mexico,* 854 F.3d at 1254-55 (stating that "[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.") (citation omitted).  Further, a blanket injunction does not serve the public interest when the question of whether a violation of federal law has occurred depends on the facts of each case.

## V.    EVIDENTIARY HEARING REQUESTED

Defendants request an evidentiary hearing before the Court grants a preliminary injunction.  The Tenth Circuit recently reaffirmed the general rule that a preliminary injunction should not issue on the basis of affidavits alone. New Mexico, 854 F.3d at 1253. Yet, on the basis of declarations alone, Defendants are asking the Court to issue a state-wide injunction negating legislation enacted by Utah's democratically-elected legislature and enforced by Utah's judiciary, whose faithfulness to the rule of law and solicitude for the rights of individuals with disabilities is unchallenged.  And Defendants' declarations are plagued with hearsay, inconsistencies, cryptic assertions, and, in the case of Adina Zahradnikova, "expert opinions" not meeting the requirements of Fed. R. Evid. 702 or *Daubert*.  At the very least, Plaintiffs' declarants should be subject to cross-examination.

**CONCLUSION**

For the reasons stated above, this Court should deny Plaintiffs' Motion for a Preliminary

Injunction or, in the alternative, schedule an evidentiary hearing.

DATED:  January 22, 2018.

OFFICE OF THE UTAH ATTORNEY GENERAL

/s/ Andrew Dymek
DAVID N. WOLF
LAURA K. THOMPSON
ANDREW DYMEK
BRETT PETERSON
Assistant Utah Attorney General
*Counsel for Defendants*

26